**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA**
HARRISONBURG DIVISION

| | |
|---|---|
| JOANNE HARRIS and JESSICA DUFF, and CHRISTY BERGHOFF and VICTORIA KIDD, on behalf of themselves and all others similarly situated, <br><br>        *Plaintiffs*, <br><br>      v. <br><br> ROBERT F. MCDONNELL, in his official capacity as Governor of Virginia; JANET M. RAINEY, in her official capacity as State Registrar of Vital Records; THOMAS E. ROBERTS, in his official capacity as Staunton Circuit Court Clerk, <br><br>        *Defendants*. | No. 5:13-cv-00077 |

## DECLARATION OF JOANNE HARRIS

I, Joanne Harris, hereby declare as follows:

1.      The testimony set forth in this Declaration is based on first-hand knowledge, about which I could and would testify competently in open Court if called upon to do so.

2.      I am a life-long Virginian, and have been in a loving relationship with Jessica Duff ("Jessi") for the past eleven years.

3.      I am the Director of Diversity and Advocacy at Mary Baldwin College in Staunton, Virginia, and am 38 years old.  Together, Jessi and I live in Staunton with our four-year-old son J. H.-D.

1

## I.  FAMILY LIFE WITH MY PARTNER, JESSICA DUFF, AND OUR SON, J. H.-D.

4.      Jessi and I met in 2002 through mutual friends.  It was not long after we met that I realized Jessi looked at me as if I were the only woman in the room, and the only woman that mattered.  I felt exactly the same way about her.  I knew that I wanted to spend the rest of my life with Jessi when Jessi's grandmother wrapped me in a big hug the moment she met me, welcoming me into the family.  Jessi and I share many values, including a commitment to our Christian faith.  I will always remember the day in 2006 that we were baptized together in the backyard river of a fellow church member.

5.      Jessi and I also both grew up on Virginia farmland.  Jessi's grandfather owned a cow farm, and my father is a pig farmer.  I lived on the family farm until I left for college.

6.      Jessi and I have commingled our finances and pledged to support each other financially.  We maintain joint checking and savings accounts, and have designated each other as beneficiaries on our retirement accounts.  We both contribute to a 529 Plan (college savings account) for J. H.-D.

7.      Our lives revolve around J. H.-D.  I am J. H.-D.'s biological mother, and he calls me "Mommy," and calls Jessi "Momma DeeDee," or "DeeDee" (his chosen name for Jessi).  We all are members of our local YMCA, where J. H.-D. plays soccer and basketball, and takes swimming lessons.  Jessi and I also take J. H.-D. to play Kiwanis tee-ball through the Staunton Parks and Recreation Department.  We look forward all week to Friday, which is our "Family Movie Night."

8.      Jessi and I have wished to marry each other for a long time.  In 2006, we decided to have a commitment ceremony to publicly share our love, and to demonstrate our mutual

2

commitment to spending the rest of our lives together—something we each believe to be important prior to starting a family.

9.      Because of the importance of religion to both of us, we saw our pastor for marriage counseling before our commitment ceremony.  We wanted to have the same experience as heterosexual members of our congregation, and in our church that includes marriage counseling to deepen the couple's bond.  Our attempts to recreate the experiences that different-sex fiancés and spouses may take for granted, however, were severely limited by the fact that we could not marry each other.

10.     While the day of our commitment ceremony was one of the happiest of our lives, we both were well aware that despite our display of commitment, we would not be afforded any of the rights that come with being married.

11.     We both remember how completely different it was when Jessi's brother, Matt, got married.  The moment Matt was married he could cover his wife through his health insurance at work, and feel secure that no one would question his right to make medical decisions if she were incapacitated.  Matt also instantly gained the ability to take parenting leave to care for any children he might have with his wife.  As Matt expressed to us, he was very conscious of the fact that he could take those rights for granted, knowing that they were unavailable to Jessi and me.

12.     Jessi and I both worry about the hurtful messages of stigma that our inability to marry sends to J. H.-D.  He is proud of our family, but even at the age of four is very aware that his parents cannot marry.  A picture from our commitment ceremony hangs in our home, and J. H.-D. points to it and says to others, "Mommy and Momma DeeDee got married, and they need to *really* get married."  Jessi and I believe that a state-approved ceremony would carry great significance for him because he has expressed that he wants to be a part of our wedding.  J. H.-D.

proudly told both of us that he went to school one day and said to his friends, "Barack Obama [who supports marriage equality] is president, and hopefully he will help my mommies get married."

13.     The inability to marry leaves our family vulnerable in a range of contexts.  Jessi has no legal relationship to J. H.-D., as she would have if Jessi and I had been married at the time of his birth.  Because we cannot marry in Virginia, Jessi also is unable to adopt J. H.-D. as a co-parent in Virginia.  Jessi and I are terrified about what might happen if, for example, J. H.-D. and I were both in an accident and J. H.-D. needed emergency medical care.  Jessi lacks clear legal authority to authorize such care, and we fear what would happen if I were injured and unable to consent.

14.     This fear is exacerbated by the fact that my relationship with my parents is tenuous, and both Jessi and I worry that my family might seek to override or deny Jessi's role as J. H.-D.'s mother in such circumstances.  Although some other same-sex couples raising children in Virginia have been able to obtain court orders granting some forms of decision-making authority to both parents, at a substantial cost, Jessi and I both know there is no guarantee that such papers would be respected in an emergency situation.  Moreover, under current Virginia law there is no way for Jessi to secure an order recognizing what she is to J. H.-D.:  a co-equal *parent*.

15.     Especially because I have epilepsy, Jessi and I worry that our relationship may be disrespected during a health crisis.  We also are concerned because my mother disagrees with my wishes for end-of-life decision-making.  Jessi fully respects and is prepared to carry out my desire not to receive life-prolonging measures, but my mother has expressed that she would vigorously fight that decision.  I also worry that my family might contest my will, which would

4

inflict significant uncertainty and anxiety during the very moment that Jessi would also be grieving.

16.     Jessi and I have struggled to identify our family on forms that require us to indicate our marital status.  We also are frustrated that Jessi cannot sign forms or make school-related decisions that require a legal parent.  We are unable to have a family membership at the YMCA where J. H.-D. takes classes.  On a daily basis, in ways both profound and mundane, we are reminded that the Commonwealth views us as strangers – to each other, and Jessi to our son. Jessi and I long for the day that our family and commitment to each other can be recognized for what it is:  equally loving and devoted, and worthy of the same vital protections granted to other couples who may marry and their families.

## II.     ELIGIBILITY TO MARRY.

17.     Jessi and I are able and eager to assume the responsibilities of marriage.  We meet all of the requirements to marry under Virginia law, except for the fact that we are a same-sex couple:

       a.     I am 38 years old, and therefore over the age of 18.

       b.     I am legally competent.

       c.     I am not related to Jessi to a prohibited degree.

       d.     I am not married to any other person.

18.     If the law permitted us to marry, Jessi and I would gladly request and complete a marriage license application.

19.     I would willingly provide information about my race (African-American), my social security number, the facts of marriage, and any other information that must be gathered during the application process pursuant to Va. Code § 32.1-267.  I would willingly testify to this

information – and any other information that may be required – in whatever form may be required to apply for a marriage license pursuant to Va. Code Ann. § 20-16.

20.     Jessi and I each possess a driver's license that we can and would produce to identify ourselves.  We are able to and would tender the fee for a marriage license.

21.     On July 29, 2013, I appeared in person with Jessi at the Staunton Circuit Court to apply for a marriage license.  We first spoke with a woman downstairs that I believe to be a staff member of the Staunton Circuit Court, and I said words to the effect of, "I may already know the answer to this question, but we would like to apply for a marriage license."  The woman directed us upstairs, where couples may apply for marriage licenses.

22.     Once upstairs, we spoke with a woman whom I understand, based on an affidavit signed by her that has been filed in this case, is Laura Moran ("Ms. Moran").  Ms. Moran identified herself in her affidavit as a deputy clerk employed by Circuit Court Clerk Thomas E. Roberts ("Mr. Roberts").  I again said words to the effect of, "I may already know the answer to this question, but we would like to apply for a marriage license."  Ms. Moran indicated that she needed to confer with the Circuit Court Clerk, and left to speak with him.

23.     Mr. Roberts then came to speak with Jessi and me, and advised us in person that same-sex couples cannot marry under Virginia law.


I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.


September _26_, 2013                              _____
                                                                 Joanne Harris

6