IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
HARRISONBURG DIVISION

| | |
|---|---|
| JOANNE HARRIS and JESSICA DUFF, and CHRISTY BERGHOFF and VICTORIA KIDD, on behalf of themselves and all others similarly situated,<br><br>*Plaintiffs*,<br><br>v.<br><br>ROBERT F. MCDONNELL, in his official capacity as Governor of Virginia; JANET M. RAINEY, in her official capacity as State Registrar of Vital Records; THOMAS E. ROBERTS, in his official capacity as Staunton Circuit Court Clerk,<br><br>*Defendants*. | No. 5:13-cv-00077 |

## DECLARATION OF JESSICA DUFF

I, Jessica Duff, hereby declare as follows:

1. The testimony set forth in this Declaration is based on first-hand knowledge, about which I could and would testify competently in open Court if called upon to do so.

2. I am a life-long Virginian, and have been in a loving relationship with Joanne Harris ("Joanne") for the past eleven years.

3. I previously worked for many years at an agency serving people with developmental disabilities and now work for child protective services, conducting child abuse investigations with Shenandoah Valley Social Services. I am 33 years old. Together, Joanne and I live in Staunton with our four-year-old son J. H.-D.

1

I.      **FAMILY LIFE WITH MY PARTNER, JOANNE HARRIS, AND OUR SON, J. H.-D.**

4.      I fell in love at first sight with Joanne when we met in 2002 through mutual friends.  When we met in our twenties, I could never have imagined how Joanne could help me grow and mature, and I feel like I am a better person because of her.  I also value deeply that we both share a commitment to our Christian faith.  I cherish the memory of the day in 2006 that we were baptized together in the backyard river of a fellow church member.

5.      Joanne and I both grew up on Virginia farmland.  Joanne's dad is a pig farmer, and my grandfather owned a cow farm.  I remember baling hay and feeding and watering the cows as a child, and I am proud that the farm remains in the family.

6.      Joanne and I have commingled our finances and pledged to support each other financially.  We maintain joint checking and savings accounts, and have designated each other as beneficiaries on our retirement accounts.  We both contribute to a 529 Plan (college savings account) for J. H.-D.

7.      Our lives revolve around J. H.-D.  Joanne is J. H.-D.'s biological mother, and he calls her "Mommy," and calls me "Momma DeeDee," or "DeeDee" (his chosen name for me).  We all are members of our local YMCA, where J. H.-D. plays soccer and basketball, and takes swimming lessons.  Joanne and I also take J. H.-D. to play Kiwanis tee-ball through the Staunton Parks and Recreation Department.  We look forward all week to Friday, which is our "Family Movie Night."

8.      Joanne and I have wished to marry each other for a long time.  In 2006, we decided to have a commitment ceremony to publicly share our love, and to demonstrate our mutual commitment to spending the rest of our lives together—something we each believe to be important prior to starting a family.

9. Because of the importance of religion to both of us, we saw our pastor for marriage counseling before our commitment ceremony. We wanted to have the same experience as heterosexual members of our congregation, and in our church that includes marriage counseling to deepen the couple's bond. Our attempts to recreate the experiences that different-sex fiancés and spouses may take for granted, however, were severely limited by the fact that we could not marry each other.

10. While the day of our commitment ceremony was one of the happiest of our lives, we both were well aware that despite our display of commitment, we would not be afforded any of the rights that come with being married.

11. We both remember how completely different it was when my brother, Matt, got married. The moment Matt was married he could cover his wife through his health insurance at work, and feel secure that no one would question his right to make medical decisions if she were incapacitated. Matt also instantly gained the ability to take parenting leave to care for any children he might have with his wife. As Matt expressed to us, he was very conscious of the fact that he could take those rights for granted, knowing that they were unavailable to Joanne and me.

12. Joanne and I both worry about the hurtful messages of stigma that our inability to marry sends to J. H.-D. He is proud of our family, but even at the age of four is very aware that his parents cannot marry. A picture from our commitment ceremony hangs in our home, and J. H.-D. points to it and says to others, "Mommy and Momma DeeDee got married, and they need to *really* get married." Joanne and I believe that a state-approved ceremony would carry great significance for him because he has expressed that he wants to be a part of our wedding. J. H.-D. proudly told both of us that he went to school one day and said to his friends, "Barack Obama

[who supports marriage equality] is president, and hopefully he will help my mommies get married."

13. The inability to marry leaves our family vulnerable in a range of contexts. I have no legal relationship to J. H.-D., as I would have if Joanne and I had been married at the time of his birth. Because we cannot marry in Virginia, I also am unable to adopt J. H.-D. as a co-parent in Virginia. Joanne and I are terrified about what might happen if, for example, J. H.-D. and Joanne were both in an accident and J. H.-D. needed emergency medical care. I lack clear legal authority to authorize such care, and we fear what would happen if Joanne were injured and unable to consent.

14. This fear is exacerbated by the fact that Joanne's relationship with her parents is tenuous, and both Joanne and I worry that her family might seek to override or deny my role as J. H.-D.'s mother in such circumstances. Although some other same-sex couples raising children in Virginia have been able to obtain court orders granting some forms of decision-making authority to both parents, at a substantial cost, Joanne and I both know there is no guarantee that such papers would be respected in an emergency situation. Moreover, under current Virginia law there is no way for me to secure an order recognizing what I am to J. H.-D.: a co-equal *parent*.

15. Especially because Joanne has epilepsy, Joanne and I worry that our relationship may be disrespected during a health crisis. We also are concerned because Joanne's mother disagrees with her wishes for end-of-life decision-making. I fully respect and am prepared to carry out Joanne's desire not to receive life-prolonging measures, but Joanne's mother has expressed that she would vigorously fight that decision. We also worry that Joanne's family might contest her will, a potential hardship that fills me with dread.

16. Joanne and I have struggled to identify our family on forms that require us to indicate our marital status. We also are frustrated that I cannot sign forms or make school-related decisions that require a legal parent. We are unable to have a family membership at the YMCA where J. H.-D. takes classes. On a daily basis, in ways both profound and mundane, we are reminded that the Commonwealth views us as strangers – to each other, and me to our son. Joanne and I long for the day that our family and commitment to each other can be recognized for what it is: equally loving and devoted, and worthy of the same vital protections granted to other couples who may marry and their families.

## II.   ELIGIBILITY TO MARRY.

17. Joanne and I are able and eager to assume the responsibilities of marriage. We meet all of the requirements to marry under Virginia law, except for the fact that we are a same-sex couple:

   a. I am 33 years old, and therefore over the age of 18.

   b. I am legally competent.

   c. I am not related to Joanne to a prohibited degree.

   d. I am not married to any other person.

18. If the law permitted us to marry, Joanne and I would gladly request and complete a marriage license application.

19. I would willingly provide information about my race (Caucasian), my social security number, the facts of marriage, and any other information that must be gathered during the application process pursuant to Va. Code § 32.1-267. I would willingly testify to this information – and any other information that may be required – in whatever form may be required to apply for a marriage license pursuant to Va. Code Ann. § 20-16.

20. Joanne and I each possess a driver's license that we can and would produce to identify ourselves. We are able to and would tender the fee for a marriage license.

21. On July 29, 2013, I appeared in person with Joanne at the Staunton Circuit Court to apply for a marriage license. We first spoke with a woman downstairs that I believe to be a staff member of the Staunton Circuit Court, and Joanne said words to the effect of, "I may already know the answer to this question, but we would like to apply for a marriage license." The woman directed us upstairs, where couples may apply for marriage licenses.

22. Once upstairs, we spoke with a woman whom I understand, based on an affidavit signed by her that has been filed in this case, is Laura Moran ("Ms. Moran"). Ms. Moran identified herself in her affidavit as a deputy clerk employed by Circuit Court Clerk Thomas E. Roberts ("Mr. Roberts"). Joanne again said words to the effect of, "I may already know the answer to this question, but we would like to apply for a marriage license." Ms. Moran indicated that she needed to confer with the Circuit Court Clerk, and left to speak with him.

23. Mr. Roberts then came to speak with Joanne and me, and advised us in person that same-sex couples cannot marry under Virginia law.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

September 20, 2013

Jessica Duff

6