IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
HARRISONBURG DIVISION

| | | |
|---|---|---|
| JOANNE HARRIS and JESSICA DUFF, and CHRISTY BERGHOFF and VICTORIA KIDD, on behalf of themselves and all others similarly situated, | | |
| *Plaintiffs*, | | No. 5:13-cv-00077 |
| v. | | |
| ROBERT F. MCDONNELL, in his official capacity as Governor of Virginia; JANET M. RAINEY, in her official capacity as State Registrar of Vital Records; THOMAS E. ROBERTS, in his official capacity as Staunton Circuit Court Clerk, | | |
| *Defendants*. | | |

**BRIEF IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, Plaintiffs Joanne Harris and Jessica Duff, and Christy Berghoff and Victoria Kidd, and all others similarly situated (collectively "Plaintiffs"), submit the following brief in support of their motion for summary judgment.

TABLE OF CONTENTS

INTRODUCTION ...................................................................................................1

PROCEDURAL HISTORY.....................................................................................2

BACKGROUND ......................................................................................................3

I.      History of Virginia's Marriage Bans. ...........................................................3

II.     Marriage and Its Purposes Have Evolved in Virginia. .................................8

        A.      Virginia Has Cast Aside Prior Discriminatory Exclusions From Marriage. ...........8

        B.      Marriage in Virginia Today Serves Multiple Interests, and Is Not Limited to Procreative Purposes..................................................................10

STATEMENT OF UNDISPUTED FACTS ..........................................................11

ARGUMENT .........................................................................................................15

I.      Virginia's Marriage Bans Deny Equal Protection of the Law..........................15

        A.      Virginia's Marriage Bans Are Subject to Heightened Scrutiny Because They Discriminate Based on Sexual Orientation.....................................15

                1.      Lesbians and Gay Men Have Suffered a Long History of Discrimination............................................................17

                2.      Sexual Orientation Is Irrelevant to an Individual's Ability to "Contribute to Society."..................................................18

                3.      Lesbians and Gay Men Lack Sufficient Political Power to Protect Themselves Against Invidious Discrimination.........................................19

                4.      Sexual Orientation Is An "Immutable" Or "Defining" Characteristic.......20

        B.      Virginia's Marriage Bans Also Are Subject to Heightened Scrutiny Because They Contain Explicit Sex-Based Classifications and Because They Perpetuate Improper Stereotyped Notions of the Spousal and Parental Roles of Men and Women. ..........................................................23

        C.      Virginia's Constitutional Marriage Ban Also Is Constitutionally Suspect Because it Locks Same-Sex Couples Out of the Normal Political Process and Makes it Uniquely More Difficult to Secure Legislation on Their Behalf.................................................................27

D.     Virginia's Marriage Bans Are Unconstitutional Under Any Standard of Review. ...................................................................................................29

       1.     Virginia's Marriage Bans Cannot Be Justified by an Asserted Interest in Maintaining a Traditional Definition of Marriage. ...................32

       2.     Virginia's Marriage Bans Cannot Be Justified by an Asserted Interest in Encouraging Responsible Procreation by Heterosexual Couples or Promoting a "Conjugal View" of Marriage............................34

       3.     Virginia's Marriage Bans Cannot Be Justified by an Asserted Interest in "Optimal Childrearing."............................................................38

       4.     No Legitimate Interest Overcomes the Primary Purpose and Practical Effect of Virginia's Marriage Bans to Disparage and Demean Same-Sex Couples and Their Families........................................42

II.    Virginia's Marriage Bans Infringe Plaintiffs' Fundamental Rights and Liberty Interests and Thus Violate the Guarantees of Due Process and Equal Protection in the Fourteenth Amendment.................................................................................47

     A.     The Fundamental Right to Marry Includes the Right to Choose One's Spouse Free of Unwarranted Interference by the State. .........................................47

       1.     The Right to Marry Is a Fundamental Right that Belongs to the Individual. .............................................................................................47

       2.     The Scope of a Fundamental Right or Liberty Interest Under the Due Process Clause Does Not Depend on Who Is Exercising that Right.....................................................................................................48

       3.     The Fundamental Right to Marry Is Not Contingent on the Ability to Accidentally Procreate. .............................................................................51

     B.     Virginia's Marriage Bans Infringe the Unmarried Plaintiffs' Fundamental Right to Marry and Other Protected Liberty Interests. ...........................................53

     C.     Virginia's Marriage Bans Also Violate the Equal Protection Clause Because They Unjustifiably Discriminate Against Same-Sex Couples With Regard to the Exercise of Fundamental Rights and Liberty Interests. ...............................55

     D.     The Married Plaintiffs Also Suffer An Unconstitutional Denial of their Fundamental Rights and Liberty Interests. ..........................................................57

     E.     Marriage and Its Recognition Cannot Be Denied to Plaintiffs Absent a Compelling State Interest, Which the Commonwealth of Virginia Cannot Demonstrate. ....................................................................................................57

III.     *Baker v. Nelson* is not Controlling. .....................................................................................58

CONCLUSION ..................................................................................................................60

# TABLE OF AUTHORITIES

Page(s)

C<small>ASES</small>

*Baehr v. Lewin*,
910 P.2d 112 (Haw. 1996) ...................................................................................3

*Baker v. Nelson*,
191 N.W.2d 185 (Minn. 1971), *appeal dismissed*, 409 U.S. 810 (1972) ..........................3, 58

*Board of Trustees of University of Alabama v. Garrett*,
531 U.S. 356 (2001)...........................................................................................30

*Boddie v. Connecticut*,
401 U.S. 371 (1971)...........................................................................................50

*Bottoms v. Bottoms*,
457 S.E.2d 102 (Va. 1995)...................................................................................45

*Bowen v. Gilliard*,
483 U.S. 587 (1987)............................................................................................1

*Bowers v. Hardwick*,
478 U.S. 186 (1986)...........................................................................................15

*Caban v. Mohammed*,
441 U.S. 380 (1979)...........................................................................................26

*Califano v. Goldfarb*,
430 U.S. 199 (1977)............................................................................................9

*Califano v. Webster*,
430 U.S. 313 (1977)...........................................................................................25

*Califano v. Westcott*,
443 U.S. 76 (1979)............................................................................................26

*Carey v. Population Services International*,
431 U.S. 678 (1977)...........................................................................................59

*Centola v. Potter*,
183 F. Supp. 2d 403 (D. Mass. 2002) .....................................................................24

*Christian Legal Society v. Martinez*,
130 S. Ct. 2971 (2010)........................................................................................23

*City of Cleburne v. Cleburne Living Center, Inc.*,
473 U.S. 432 (1985).............................................18, 19, 20, 29, 30, 31, 32, 34, 37

*Coalition to Defend Affirmative Action v. Regents of the University of Michigan*,
    701 F.3d 466 (6thCir. 2012) (en banc), *cert. granted sub nom. Schuette v. Coalition to Defend Affirmative Action* (No. 12-682) ................................................................27, 28, 29

*Cook v. Gates*,
    528 F.3d 42 (1st Cir. 2008) ................................................................................................58

*Department of Human Services. v. Howard*,
    238 S.W.3d 1 (Ark. 2006) ..................................................................................................41

*Dorsey v. Solomon*,
    604 F.2d 271 (4th Cir. 1979) .............................................................................................58

*Eisenstadt v. Baird*,
    405 U.S. 438 (1972) .............................................................. 31, 36-37, 38, 50, 51, 59

*Evans v. Romer*,
    882 P.2d 1335 (Colo. 1994), *aff'd on other grounds* 517 U.S. 620 (1996) ............................28

*Fatin v. INS*,
    12 F.3d 1233 (3d Cir. 1993) ...............................................................................................21

*Frontiero v. Richardson*,
    411 U.S. 677 (1973) .................................................................................................18, 19, 21

*Golinski v. United States Office of Personnel Management*,
    824 F. Supp. 2d 968 (N.D. Cal. 2012) ........................16, 17, 18, 19, 22, 23, 33, 34, 39, 41, 48

*Goodridge v. Department of Public Health*,
    798 N.E.2d 941 (Mass. 2003) ......................................................................................33, 39

*Griswold v. Connecticut*,
    381 U.S. 479 (1965) ...............................................................................................47, 51, 54

*Hawkins v. Freeman*,
    195 F.3d 732 (4th Cir. 1999) (en banc) .............................................................................47

*Heckler v. Mathews*,
    465 U.S. 728 (1984) ...........................................................................................................46

*Heller v. Doe by Doe*,
    509 U.S. 312 (1993) ...........................................................................................................32

*Hernandez v. Robles*,
    855 N.E.2d 1 (N.Y. 2006) ..................................................................................................36

*Hernandez-Montiel v. INS*,
   225 F.3d 1084 (9th Cir. 2000), *overruled on other grounds*, *Thomas v. Gonzales*, 409
   F.3d 1177 (9th Cir. 2005) ..................................................................................................21

*Hicks v. Miranda*,
   422 U.S. 332 (1975)...........................................................................................................58

*High Tech Gays v. Defense Industrial Security Clearance Office*,
   895 F.2d 563 (9th Cir. 1990) ...........................................................................................23

*Hodgson v. Minnesota.*,
   497 U.S. 417 (1990).........................................................................................................48

*Howard v. Child Welfare Agency Review Board*,
   Nos. 1999-9881, 2004 WL 3154530 (Ark. Cir. 2004), *aff'd sub nom. Department of*
   *Human Services v. Howard*, 238 S.W.3d 1 (Ark. 2006)..........................................41

*Hunter v. Erickson*,
   393 U.S. 385 (1969)....................................................................................................27, 28

*In re Adoption of Doe*,
   2008 WL 5006172 (Fla. Cir. Ct. Nov. 25, 2008), *aff'd sub nom. Florida Department*
   *of Children & Families v. Adoption of X.X.G.*, 45 So. 3d 79 (Fla. Dist. Ct. App. 2010) .. 41-42

*In re Balas*,
   449 B.R. 567 (Bankr. C.D. Cal. 2011)...........................................................................17

*In re Marriage Cases*,
   183 P.3d 384 (Cal. 2008) ......................................................17, 22, 33, 35, 36, 46, 48, 49, 52

*J.E.B. v. Alabama ex rel. T.B.*,
   511 U.S. 127 (1994)....................................................................................................24, 25

*Jordan by Jordan v. Jackson*,
   15 F.3d 333 (4th Cir. 1994) .............................................................................................55

*Kerrigan v. Commissioner of Public Health*,
   957 A.2d 407 (Conn. 2008) .....................................................................................17,20, 22, 33

*Knussman v. Maryland*,
   272 F.3d 625 (4th Cir. 2001) ...........................................................................................26

*Kramer v. Union Free School District No. 15*,
   395 U.S. 621 (1969).........................................................................................................57

*Lawrence v. Texas*,
   539 U.S. 558 (2003)..........................15, 22, 33, 37, 38, 43, 44, 46, 48, 49, 50, 51, 52, 54, 59

*Loving v. Virginia*,
    388 U.S. 1 (1967) ..................................................................................8, 24, 47, 48, 55

*Manwani v. United States Department of Justice*,
    736 F. Supp. 1367 (W.D.N.C. 1990) ....................................................................31

*Marsh v. Chambers*,
    463 U.S. 783 (1983) ............................................................................................33

*McLaughlin v. Florida*,
    379 U.S. 184 (1964).............................................................................................24

*Mississippi University for Women v. Hogan*,
    458 U.S. 718 (1982).............................................................................................26

*Moore v. East Cleveland*,
    431 U.S. 494 (1977).......................................................................................47, 55

*Norfolk & W. Railroad Co. v. Prindle*,
    82 Va. 122 (1886) .................................................................................................9

*Nevada Department of Human Resources v. Hibbs*,
    538 U.S. 721 (2003).......................................................................................24, 26

*Nyquist v. Mauclet*,
    432 U.S. 1 (1977).................................................................................................21

*Orr v. Orr*,
    440 U.S. 268 (1979).............................................................................................26

*Padula v. Webster*,
    822 F.2d 97 (D.C. Cir. 1987) ..............................................................................15

*Pedersen v. Office of Personnel Management*,
    881 F. Supp. 2d 294 (D. Conn. 2012)...............................16, 17, 18, 19, 22, 23, 35, 39, 40, 42

*Perry v. Schwarzenegger*,
    704 F. Supp. 2d 921 (N.D. Cal. 2010), *appeal dismissed sub nom. Perry v. Brown*,
    725 F.3d. 1140 (9th Cir. 2013) ....................................................17, 22, 24, 40, 52

*Phan v. Commonwealth of Virginia*,
    806 F.2d 516 (4th Cir. 1986) ..............................................................................31

*Pierce v. Society of the Sisters of the Holy Names of Jesus & Mary*,
    268 U.S. 510 (1925).............................................................................................55

*Planned Parenthood of SE Pennsylvania v. Casey*,
    505 U.S. 833 (1992).......................................................................................40, 49

*Plyler v. Doe*,
    457 U.S. 202 (1982)..........................................................................................21, 39

*Prowel v. Wise Business Forms, Inc.*,
    579 F.3d 285 (3d Cir. 2008)..........................................................................24

*Roberts v. United States Jaycees*,
    468 U.S. 609 (1984)......................................................................................48

*Roe v. Roe*,
    228 Va. 722 (1985) ................................................................................. 44-45

*Roe v. Wade*,
    410 U.S. 113 (1973)......................................................................................59

*Romer v. Evans*,
    517 U.S. 620 (1996)....................................................5, 29, 30, 31, 32, 34, 36

*Rowland v. Mad River Local School District*,
    470 U.S. 1009 (1985)....................................................................................17

*South Carolina Education Ass'n v. Campbell*,
    883 F.2d 1251 (4th Cir. 1989) ......................................................................43

*Santosky v. Kramer*,
    455 U.S. 745 (1982)......................................................................................54

*Scott v. Raub*,
    14 S.E. 178 (Va. 1891)...................................................................................8

*Sell v. United States*,
    539 U.S. 166 (2003)......................................................................................58

*Skinner v. Oklahoma*,
    316 U.S. 535 (1942)......................................................................................55

*Smith Setzer & Sons, Inc. v. South Carolina Procurement Review Panel*,
    20 F.3d 1311 (4th Cir. 1994) ........................................................................29

*Stanley v. Illinois*,
    405 U.S. 645 (1972)......................................................................................26

*Stanton v. Stanton*,
    421 U.S. 7 (1975)..........................................................................................26

*Sylvia Development Corp. v. Calvert County*,
    48 F.3d 810 (4th Cir. 1995) ....................................................................36, 43

*Thomasson v. Perry*,
   80 F.3d 915 (4th Cir. 1996) (en banc) ................................................................15

*Turner v. Safley*,
   482 U.S. 78 (1987) ...................................................47, 48, 50, 51, 52, 55, 59

*United States v. Virginia*,
   518 U.S. 515 (1996) ...........................................................................24, 25

*United States v. Windsor*,
   133 S. Ct. 2675 (2013) ......... 1, 10, 16-17, 29, 30, 32, 34, 36, 37, 38, 39, 43, 44, 46, 47, 54, 57

*United States Dep't of Agriculture v. Moreno*,
   413 U.S. 528 (1973) ...................................................................29, 30, 31, 34

*Vance v. Bradley*,
   440 U.S. 93 (1979) .........................................................................................43

*Varnum v. Brien*,
   763 N.W.2d 862 (Iowa 2009) ......................................17, 25, 33, 34, 35, 39, 41, 42

*Veney v. Wyche*,
   293 F.3d 726 (4th Cir. 2002) ........................................................................15

*Vigilant Insurance Co. v. Bennett*,
   89 S.E.2d 69 (Va. 1955) ..................................................................................9

*Village of Arlington Heights v. Metropolitan Housing Development Corp.*,
   429 U.S. 252, 266-68 (1977) ..................................................................30, 44

*Village of Willowbrook v. Olech*,
   528 U.S. 562 (2000) ........................................................................................42

*Washington v. Glucksberg*,
   521 U.S. 702 (1997) ........................................................................................47

*Washington v. Seattle School District No. 1*,
   458 U.S. 457 (1982) ...................................................................................27, 28

*Watkins v. United States Army*,
   875 F.2d 699 (9th Cir. 1989) ........................................................................21

*Weinberger v. Wiesenfeld*,
   420 U.S. 636 (1975) ..........................................................................................9

*Williams v. Williams*,
   354 S.E.2d 64 (Va. 1987) ........................................................................11, 12, 13

*Windsor v. United States,*
   699 F.3d 169 (2d Cir. 2012)..........................................16, 17, 18, 19, 20, 21, 34, 39, 42, 58, 59

*Witt v. Departmentt of Air Force,*
   527 F.3d 806 (9th Cir. 2008) ...................................................................................58

*Womack and als. v. Tankersley and Wife*, 78 Va. 242 (1883) .....................................10

*Youngberg v. Romeo,*
   457 U.S. 307 (1982).................................................................................................50

*Zablocki v. Redhail,*
   434 U.S. 374 (1978)......................................................................47, 48, 50, 56, 59

CONSTITUTIONAL PROVISIONS

Va. Const. art. I, § 15-A ...............................................................................................4

Va. Const. art. XII, § 2 ..............................................................................................6, 7

STATUTES

Va. Code Ann. § 2.2-2001 ...........................................................................................14

VA Code Ann. § 18.2-361(A)......................................................................................44

Va. Code Ann. § 20-13 ................................................................................................13

Va. Code Ann. § 20-28 ................................................................................................13

Va. Code Ann. § 20-31.1 .............................................................................................10

Va. Code Ann. § 20-45.2 ...............................................................................................3

Va. Code Ann. § 20-45.3 ...............................................................................................4

Va. Code Ann. § 20-96 ................................................................................................14

Va. Code Ann. § 20-107.1 .....................................................................................10, 14

Va. Code Ann. § 20-107.2 .....................................................................................10, 14

Va. Code Ann. § 20-107.3 ...........................................................................................14

Va. Code Ann. § 20-107.3(E) ......................................................................................11

Va. Code Ann. § 27-39 ................................................................................................13

Va. Code Ann. § 32.1-285 ...........................................................................................13

Va. Code Ann. § 32.1-291.9 ...................................................................................13

Va. Code Ann. § 54.1-2986 ...................................................................................13

Va. Code Ann. § 57-27.3 .......................................................................................13

Va. Code Ann. § 58.1-100 et seq. ..........................................................................10

Va. Code Ann. § 58.1-3210 ....................................................................................13

Va. Code Ann. § 58.1-3219.5 .................................................................................13

Va. Code Ann. § 63.2-1201 ....................................................................................10

Va. Code Ann. § 63.2-1202(D) ..............................................................................10

Va. Code Ann. § 63.2-1241 ....................................................................................10

Va. Code Ann. § 64.2-200 ......................................................................................13

Va. Code Ann. § 64.2-302 .................................................................................10, 13

Va. Code Ann. § 64.2-307 ......................................................................................13

Va. Code Ann. § 64.2-311 ......................................................................................13

Va. Code Ann. § 64.2-100 et seq. ..........................................................................10

Va. Code Ann. § 20-45.1 ........................................................................................27

RULES

Fed. R. Civ. P. 23(b)(2) ...........................................................................................2

Fed. R. Civ. P. 56 Advisory Committee Notes for 2009 Amendments .........................2

OTHER AUTHORITIES

Andrew Koppelman, Why Discrimination Against Lesbians and Gay Men Is Sex
    Discrimination, 69. N.Y.U. L. Rev. 197 (1994) ......................................................24

Barbara S. Gamble, *Putting Civil Rights to a Popular Vote*, 41 Am. J. Pol. Sci. 245
    (1997) ...................................................................................................................20

*Bostic v. McDonnell*, No. 2:13-cv-00395-AWA-LRL, ECF No. 14 (E.D. Va.) ............................2

Brief of the American Psychological Association, *et al.*, as *Amici Curiae* on the Merits in Support of Affirmance, 2013 WL 871958 (Mar. 1, 2013)........................................................40

Brief of the American Sociological Ass'n, in Support of Respondent Kristin M. Perry and Respondent Edith Schlain Windsor, 2013 WL 840004 (Feb. 28, 2013) ................................40

Brief of *Amicus Curiae* GLMA: Health Professionals Advancing LGBT Equality (Gay and Lesbian Medical Association) Concerning the Immutability of Sexual Orientation in Support of Affirmance on the Merits, 2013 WL 860299 (Feb. 26, 2013).........................22

Brief of the Organization of American Historians and the American Studies Association as *Amici Curiae* Support of Respondent Edith Windsor, 2013 WL 838150 (Feb. 28, 2013) .................................................................................................... 17-18

Carlos A. Ball, *The Blurring of the Lines: Children and Bans on Interracial Unions and Same-Sex Marriage*, 76 Fordham L. Rev. 2733 (2008).............................................................8

Chemerinsky, Const. Law Principles and Policies .......................................................55

Commonwealth of Virginia, November 7th 2006 – General Election: Official Results, *available at* http://www.sbe.virginia.gov/ElectionResults/2006/Nov/htm/index.htm#141..........................8

Donald P. Haider-Markel et al., *Lose, Win, or Draw?: A Reexamination of Direct Democracy and Minority Rights*, 60 Pol. Res. Q. 304 (2007) ...................................20

Dulcey B. Fowler, *Virginia Family Law: The Effect of The General Assembly's 1975 Revisions*, 1 Va. B. Ass'n J 7 (1975) ........................................................................3

Erwin Chemerinsky, *Constitutional Law Principles and Policies* (3d ed. 2006)........................55

George Washington, *General Orders at Valley Forge on 14 March 1778* (*reprinted in* Washington Papers), *available at* http://founders.archives.gov/documents/Washington/03-14-02-0138#GEWN-03-14-02-0138-fn-0004. ....................................................................................................5

Richard A. Posner, Sex and Reason 291 (1992) ........................................................17

Gregory M. Herek, et al., *Demographic, Psychological, and Social Characteristics of Self-Identified Lesbian, Gay, and Bisexual Adults*, 7 Sex Res. Soc. Policy 176 (2010).........22

Glenda Riley, *Legislative Divorce in Virginia, 1803-1850*, Journal of the Early Republic, Vol. 11, No. 1 (Spring, 1991) ...........................................................................9

Jane Schacter, *Courts and the Politics of Backlash: Marriage Equality Litigation, Then and Now*, 82 S. Cal. L. Rev. 1153 (2009).............................................................3

Merits Brief of Bipartisan Legal Advisory Group in *United States v. Windsor*, 2013 WL 267026 (2013)....................................................................................................................43

Virginia L. Hardwick, *Punishing the Innocent: Unconstitutional Restrictions on Prison Marriage and Visitation*, 60 N.Y.U. L. Rev. 275 (1985) ..........................................................50

Virginia Legislative Information System, 2005 Session, House Joint Resolution 586, *available at* http://lis.virginia.gov/cgi-bin/legp604.exe?051+ful+HJ586H2....................4, 5, 6

Commonwealth of Virginia, November 7th 2006 – General Election: Official Results, *available at* http://www.sbe.virginia.gov/ElectionResults/2006/Nov/htm/index.htm#141......................7, 8

Virginia Legislative Information System, 2004 Session, Senate Bill 477, *available at* http://lis.virginia.gov/cgi-bin/legp604.exe?041+sum+SB477 .................................................45

**INTRODUCTION**

This case involves the exclusion of same-sex couples in Virginia from one of the most profoundly important and cherished relationships of a lifetime:  civil marriage.  As the Supreme Court recently reaffirmed, marriage confers "a dignity and status of immense import," and the state's "historic and essential" role in extending this status uniquely "enhance[s] the recognition, dignity, and protection of [same-sex couples] in their own community."  *United States v. Windsor*, 133 S. Ct. 2675, 2692 (2013).  Virginia denies same-sex couples access to marriage by constitutional amendment and statutory law (collectively, the "marriage bans"), barring same-sex couples both from entering marriage, and from having a valid marriage entered in another jurisdiction recognized as such in the Commonwealth.

Two loving and devoted same-sex couples ("Named Plaintiffs") brought suit challenging Virginia's marriage bans as a violation of federal constitutional guarantees, seeking to represent a class of unmarried same-sex couples in Virginia who wish to marry ("Unmarried Plaintiffs") and same-sex couples validly married elsewhere who wish to have their marriage recognized in Virginia ("Married Plaintiffs") (collectively, including Named Plaintiffs and all other class members, "Plaintiffs").  Plaintiffs' complaint raises two claims challenging the marriage bans as a violation of Equal Protection Clause and Due Process Clause of the Fourteenth Amendment, and Plaintiffs seek summary judgment on both claims as to all defendants.

After describing the procedural history of this case below, this brief sets forth the history of Virginia's marriage bans and describes the evolution of marriage and its purposes in the Commonwealth as well as the harm the bans inflict upon same-sex couples and their children. The brief then explains why Virginia's marriage bans are subject to heightened scrutiny because they discriminate based on both sexual orientation and sex and why the Commonwealth's

constitutional marriage ban is suspect based on how it discriminatorily affects the normal process for political reform.  The brief then demonstrates how the marriage bans are unconstitutional under any standard of review.  Finally, the brief explains how the bans also infringe Plaintiffs' fundamental rights and liberty interests and violate the Fourteenth Amendment's guarantees of due process and equal protection for that reason as well.

## PROCEDURAL HISTORY

Plaintiffs filed this putative class action on August 1, 2013, and moved to certify the case as a class action pursuant to Fed. R. Civ. P. 23(b)(2) on August 16, 2013.  On August 16, Defendant Janet M. Rainey filed an Answer to the Complaint and Defendant Robert F. McDonnell filed a motion to dismiss.  Defendant Thomas E. Roberts filed another motion to dismiss on August 30.  The pending motions are fully briefed and set for argument before this Court on October 29.

Federal Rule of Civil Procedure 56 "allows a party to move for summary judgment at any time, even as early as the commencement of the action."  Fed. R. Civ. P. 56 Advisory Committee Notes for 2009 Amendments.

In separate litigation pending in the Eastern District of Virginia also challenging the constitutionality of Virginia's marriage bans, the parties to that case (including Defendant Rainey) have agreed to file cross-motions for summary judgment on September 30, 2013 without any discovery.  *See Bostic v. McDonnell*, No. 2:13-cv-00395-AWA-LRL, ECF No. 14 (E.D. Va.).  Plaintiffs have filed this motion for summary judgment simultaneously, seeking resolution of their claims on a similar timetable, because the Named Plaintiffs and the class they seek to represent suffer harms no less urgent than those of the plaintiffs in *Bostic*.

## BACKGROUND

### I.     History of Virginia's Marriage Bans.

Virginia's constitutional amendment barring same-sex couples from marrying and refusing to recognize such marriages entered elsewhere is the final result of a long series of legislative actions.  First, in 1975, Virginia adopted a statute providing that "a marriage between persons of the same sex is prohibited."  Va. Code Ann. § 20-45.2.  That enactment was a response to *Baker v. Nelson*, 191 N.W.2d 185 (Minn. 1971), *appeal dismissed*, 409 U.S. 810 (1972), the first freedom-to-marry case filed by a same-sex couple in the U.S.; *see* Va. Code Ann. § 20-45.2; Acts 1975, c. 644; Dulcey B. Fowler, *Virginia Family Law: The Effect of The General Assembly's 1975 Revisions*, 1 Va. B. Ass'n J 7, 8-9 (1975).  In 1997, the legislature added a ban on recognizing same-sex marriages solemnized legally in other states declaring them void: "Any marriage entered into by persons of the same sex in another state or jurisdiction shall be void in all respects in Virginia and any contractual rights created by such marriage shall be void and unenforceable."  Va. Code Ann. § 20-45.2; Acts 1997, c. 354.  This was part of a wave of state and federal legislation in 1996 and 1997 responding to the Hawaii Supreme Court's decision in *Baehr v. Lewin*, 910 P.2d 112 (Haw. 1996).  *See* Jane Schacter, *Courts and the Politics of Backlash: Marriage Equality Litigation, Then and Now*, 82 S. Cal. L. Rev. 1153, 1185-86 (2009).

In 2004, the Commonwealth went a step further by also banning civil unions and domestic partnerships—thus stripping from same-sex couples the possibility of *any* legal recognition of their relationships in the Commonwealth.  That law, sponsored by Delegate Bob Marshall of Prince William and introduced as House Bill 751 (the "Affirmation of Marriage Act"), provides:

> A civil union, partnership contract or other arrangement between persons of the same sex purporting to bestow the privileges or obligations of marriage is prohibited.  Any such civil union, partnership contract or other arrangement entered into by persons of the same sex in another state or jurisdiction shall be void in all respects in Virginia and any contractual rights created thereby shall be void and unenforceable.

Va. Code Ann. § 20-45.3; Acts 2004, c. 983.  The very next year, several state delegates and senators, including Delegate Marshall, proposed competing versions of yet *another* ban on marriage by same-sex couples—this time in the form of an amendment to the Virginia Constitution.  The version ultimately adopted provides:

> That only a union between one man and one woman may be a marriage valid in or recognized by this Commonwealth and its political subdivisions.
>
> This Commonwealth and its political subdivisions shall not create or recognize a legal status for relationships of unmarried individuals that intends to approximate the design, qualities, significance, or effects of marriage.  Nor shall this Commonwealth or its political subdivisions create or recognize another union, partnership, or other legal status to which is assigned the rights, benefits, obligations, qualities, or effects of marriage.

Va. Const. art. I, § 15-A.

The original version of the proposed constitutional amendment, adopted by the Virginia House on February 8, 2005, was narrower in scope than the one ultimately enacted.  First, it included a "Savings Clause" providing that "[a]ny other right, benefit, obligation, or legal status pertaining to persons not married is otherwise not altered or abridged by this section."  Virginia Legislative Information System, 2005 Session, House Joint Resolution 586, *available at* http://lis.virginia.gov/cgi-bin/legp604.exe?051+ful+HJ586H2.  Second, it did not contain the ban on recognition for relationships "that intend[] to approximate the design, qualities, significance, or effects of marriage."  *Compare id. with* Va. Const. art. I, § 15-A.  Finally, it included an introductory clause providing:

> marriage is essential to the liberty, happiness, and prosperity of a free and virtuous people and is, among other things, the natural and optimal institution for uniting the two sexes in a committed, complementary, and conjugal partnership; for begetting posterity; and for providing children with the surest opportunity to be raised by their mother and father.

Virginia Legislative Information System, 2005 Session, House Joint Resolution 586, *available at* http://lis.virginia.gov/cgi-bin/legp604.exe?051+ful+HJ586H2.

The House debate indicates that the "Savings Clause" and this introductory clause, both ultimately rejected, were viewed by some sponsors as critical to demonstrate that the measure was not based on animus towards gay people.  During the consideration of the original measure on the House Floor, Delegate Marshall rejected the notion that the debate was about civil rights. "Homosexuals are supposed to be portrayed as victims of circumstance, victims of bigotry, and mainly seeking their civil rights.  Some might ask, well is this really a civil rights question?" Declaration of Mark P. Gaber ("Gaber Dec.") ¶ 6.  His answer was no.  *Id.* ¶ 7.  He explained to the delegates that he included the introductory clause (referred to in the debates as the "Resolve Clause") *specifically* to insulate the measure against legal challenges, based on the Supreme Court's opinion in *Romer v. Evans*, 517 U.S. 620 (1996), that the bill was intended to reflect animus.  *Id.* ¶ 8.  "We are not here about hatred, we're here about marriage."  *Id.*[1]  He also reasoned that, because of the "Savings Clause" included in the measure, "we're not taking away rights."  *Id.* ¶ 9.

---

[1] Some of Delegate Marshall's comments during the debate belie his assertion that the marriage bans did not reflect hostility toward lesbians and gay men and their relationships.  For example, in discussing marriage, he said "I don't know how you have a same sex marriage.  I can't comprehend the meaning of the term of there being two husbands or two wives."  *Id.* ¶ 10. When asked how same-sex marriage would affect the marriages of heterosexual Virginians, Delegate Marshall quipped, to laughter from other delegates, "the same way that counterfeit money threatens the economy of the Commonwealth."  *Id.* ¶ 11.  And, when another delegate quoted President George Washington in opposing the proposed amendment, Delegate Marshall responded, "[i]s the Gentleman aware of what George Washington did to persons who exercised same-sex persuasions in his units? [laughter]"  *Id.* ¶ 18.  That statement presumably refers to George Washington's court-martial of a Continental Army Lieutenant for attempted sodomy. *See* George Washington, *General Orders at Valley Forge on 14 March 1778* (*reprinted in* Washington Papers), *available at* http://founders.archives.gov/documents/Washington/03-14-02-0138#GEWN-03-14-02-0138-fn-0004.

When the Conference Committee met, it removed both the introductory, "Resolve Clause" and the "Savings Clause." *See* Virginia Legislative Information System, 2005 Session, House Joint Resolution 586, *available at* http://lis.virginia.gov/cgi-bin/legp604.exe?051+ful+HJ586H3. It also *added* the expansive provision barring creation or recognition of relationships "that intend[] to approximate the design, qualities, significance, or effects of marriage." *Id.* Speaking to the Conference Committee provision, Delegate Marshall lamented the new breadth of the measure and how it would reflect the attitude of the legislature in adopting it. "When we get into the word 'design of marriage' or the 'significance of marriage' – ah – if I were with the opponents of this, I would suggest that this is a way to slip in theology, because we in nowhere state in the code what the design of marriage in [sic]." Gaber Dec. at ¶ 14. Regarding the elimination of the "Savings Clause," Marshall noted that "opponents will say 'you see, they really do want to take away some of the rights of persons who are not married.'" *Id.* ¶ 15. Finally, Delegate Marshall noted that the removal of the introductory "Resolve Clause" would lead to the conclusion that the legislature was not concerned with *marriage*, but instead with *animus* towards lesbians and gay men. "That is going to be the prime grounds of attack, I would think, that we're just a bunch of rednecks who don't like homosexuals in Virginia cause we've not defined the purpose of marriage." *Id.* ¶ 16. Warned that these changes would suggest action based on animus, the House nonetheless passed the resolution by a vote of 79-17, and the Senate passed it by a vote of 30-10. *See* Virginia Legislative Information System, 2005 Session, House Joint Resolution 586, *available at*  http://lis.virginia.gov/cgi-bin/legp604.exe?051+sum+HJ586.

The Virginia Constitution requires that proposed amendments be passed by two consecutive sessions of the legislature. Va. Const. art. XII, § 2. Accordingly, the measure was

considered again during the *first week* of the next session.  One of its chief proponents, Delegate

Marshall, said:

> Marriage is a legal and moral union between a man and a woman, which has the form of reproduction and the attendant responsibilities that ensue therefrom, even if the fact of reproduction does not occur.  Therefore *any claim that two men or two women may marry each other is simply nonsense*.  It does not make logical sense.  However there are attempts to radically alter an institution that must antedate history.  And this has come about by *social engineering judges* in Massachusetts, Vermont, and elsewhere who wish to do this.

Gaber Dec. at ¶ 19. (emphasis added).  Marshall contended that the measure did not constitute

discrimination.  "We have the – ah –  notion that Virginia should not discriminate.  Anybody can

apply for a marriage license; there's no inquiry on there as to your *sexual interest or appetites*.

The only qualification is the qualifications of age and sex, nothing else.  And to suggest

otherwise is to itself tamper with this institution."  *Id.* ¶ 20 (emphasis added).

During the debate, Delegate Ebbin of Alexandria argued that the legislature was using

gay people as "scapegoats"  and that the 2004 law was already the *third* time the state had

banned marriage.  *Id.* ¶¶ 12, 21.  Marshall explained the history of Virginia's legislative actions

with respect to marriage between same-sex couples:  "In 1975 when the [Equal Rights

Amendment] was raging, we did define that.  We further modified that to say we're not going to

accept out of state same sex marriages," and "we further modified that to say we won't accept

these *imitations*, which are the further permutations of the legal staff of the Lambda Legal

Defense Fund."  *Id.* ¶ 21 (emphasis added).

Delegate Watts offered an amendment to re-insert the "Savings Clause" language that the

conferees had removed during the 2005 session.  *See Id.* ¶ 22; Virginia Legislative Information

System, 2006 Session, House Joint Resolution 41, Amendments Rejected by the House,

*available at* http://lis.virginia.gov/cgi-bin/legp604.exe?061+amd+HJ41AHR.  The House

rejected the amendment by a 36-60 vote.  *See* Virginia Legislative Information System, 2006

Session, House Joint Resolution 41, *available at* http://lis.virginia.gov/cgi-bin/legp604.exe?061+sum+HJ41.

Ultimately, the amendment passed the House 73-22, and the Senate 29-11.  *See id.*  On November  7, 2006, the measure was approved by Virginia voters by a 57% to 43% vote.[2]

## II.      Marriage and Its Purposes Have Evolved in Virginia.

### A.      Virginia Has Cast Aside Prior Discriminatory Exclusions From Marriage.

Virginia has gradually eliminated restrictions on marriage that excluded minority groups and imposed unequal treatment based on sex.  During slavery, Virginia law provided that "a slave cannot marry, because he cannot make a valid contract, because the duties of a slave are inconsistent with the duties of a husband or a wife, and because a slave is property.  So the marriage of a slave is a mere nullity, though it is allowed a certain moral effect."  *Scott v. Raub*, 14 S.E. 178, 179 (Va. 1891).

Virginia also banned interracial marriage in 1691.  *See* Carlos A. Ball, *The Blurring of the Lines: Children and Bans on Interracial Unions and Same-Sex Marriage*, 76 Fordham L. Rev. 2733, 2740 (2008).  The ban was designed to "prevent . . .  that abominable mixture and spurious issue which hereafter may encrease in this dominion, as well by negroes, mulattoes, and Indians intermarrying with English, or other white women, as by their unlawfull accompanying with one another."  *Id.* (citing An Act for Suppressing Outlying Slaves, *in* 3 Being a Collection of All the Laws of Virginia 86-87 (William Waller Hening ed. 1823)).  That law remained in effect for almost 300 years until the Supreme Court held it unconstitutional in *Loving v. Virginia*, 388 U.S. 1 (1967).

---

[2] Commonwealth of Virginia, November 7th 2006 – General Election: Official Results, *available at* http://www.sbe.virginia.gov/ElectionResults/2006/Nov/htm/index.htm#141.

Virginia's marriage laws also discriminated against women through coverture.  Under this doctrine, a husband and wife were treated as a single entity.  The wife ceded her legal and economic identity to her husband upon marriage and could not own property, represent herself in court, sign a contract, or keep any money she earned.  *See*, *e.g.*, *Vigilant Ins. Co. v. Bennett*, 89 S.E.2d 69, 71-75 (Va. 1955) (describing history of coverture in Virginia).  This inequality, seen as essential to marriage for centuries, was eliminated in response to changing values and Virginia enacted its first statute regarding married women's ownership of their own property in 1877.  *See Norfolk & W. R. R. Co. v. Prindle*, 82 Va. 122, 126 (1886).  Today, Virginia and federal law treat both spouses equally and in gender-neutral fashion with respect to marriage, and the United States Supreme Court has confirmed that such gender-neutral treatment for marital partners is constitutionally required.  *See Califano v. Goldfarb*, 430 U.S. 199 (1977); *Weinberger v. Wiesenfeld*, 420 U.S. 636 (1975).

Finally, Virginia's policy regarding divorce has evolved substantially.  Virginia law initially did not provide for divorce, but in the early nineteenth century the Virginia General Assembly began granting divorces to particular couples interested in terminating their marriages.  1802 Va. Acts 46-47, c. 64.  Gradually, the standards and procedures for obtaining a divorce became less onerous.  Glenda Riley, *Legislative Divorce in Virginia, 1803-1850*, Journal of the Early Republic, Vol. 11, No. 1, at 51 (Spring, 1991).  In 1960, Virginia began treating an extended period of separation as a valid basis for divorce, and in 1975 the legislature reduced the required period of separation to one year, effectively establishing modern no-fault divorce.  1960 Acts, c. 108; 1975 Acts, c. 644.

**B.      Marriage in Virginia Today Serves Multiple Interests, and Is Not Limited to Procreative Purposes.**

In modern times, marriage in Virginia has been understood as a civil contract embodying a couple's free consent to create a long-lasting intimate and economic union.  *See Womack and als. v. Tankersley and Wife*, 78 Va. 242, 243 (1883) (characterizing marriage as a "civil contract").  The institution of marriage has evolved to serve a number of important societal purposes.

First, there are many tangible benefits pursuant to both federal and state laws, which form a safety net for marital couples and households.  The federal General Accounting Office reported in 1997 that there are more than 1,000 references in federal law to marriage, *see Windsor*, 133 S. Ct. at 2683, and the Commonwealth gives special recognition to spouses in areas ranging from tax policy to probate rules.  *See*, *e.g.*, Va. Code Ann. § 58.1-100, *et seq.*; Va. Code Ann. § 64.2-100, *et seq.*

Second, Virginia's marriage laws afford the ability to secure legal recognition of parent-child bonds, including joint adoption, Va. Code Ann. § 63.2-1201; adoption of a spouse's child, Va. Code Ann. § 63.2-1241; legitimization of children through marriage, Va. Code Ann. § 20-31.1; and the presumption of parentage for children born into a marriage, Va. Code Ann. § 63.2-1202(D).  Virginia also makes spouses and parents accountable for economic support through, for example, obligations of spousal and child support.  Va. Code Ann. §§ 20-107.1, 20-107.2.  Such rules have put a critical limit on the public's responsibilities to provide care and financial support for the young and dependent.

Third, marriage organizes households and significantly determines property ownership and inheritance.  These are matters of civil society in which public authorities, including the Commonwealth, are highly interested.  *See*, *e.g.*, Va. Code Ann. § 64.2-302 (allowing surviving

spouse to claim an elective share of deceased spouse's estate); Va. Code Ann. § 20-107.3(E) (requiring courts to consider various factors to arrive at an equitable monetary award between divorcing spouses); *Williams v. Williams*, 354 S.E.2d 64, 66 (Va. 1987) (Virginia law "is intended to recognize a marriage as a partnership and to provide a means to divide equitably the wealth accumulated").

The ability or willingness to bear children has never been a prerequisite for marriage in the United States or Virginia. Women have never been barred from marrying past their reproductive years, nor has menopause ever offered legal grounds for a man to divorce his wife. In contrast to the ability to have intimate relations—which has been an expectation in marriage— men or women known to be sterile have not been prevented from marrying, nor could a marriage be annulled for an inability to bear or beget children.

## STATEMENT OF UNDISPUTED FACTS[3]

The Plaintiffs and their children are harmed daily by Virginia's discriminatory marriage bans.

1.     Joanne Harris and Jessica Duff have been in a committed relationship for eleven years, Declaration of Jessica Duff ("Duff Dec") ¶ 4; Declaration of Joanne Harris ("Harris Dec.") ¶ 4, and together have a four-year-old son J. H.-D., *Id.* ¶ 3.

2.     Unlike Jessica's brother Matt, who is able to cover his wife under his health insurance and knows that no one can challenge his ability to make medical decisions for her in an emergency, Jessica and Joanne do not have these automatic rights. *Id.* ¶ 11.

3.     Joanne and Jessica's son is harmed too—even at his young age, he is aware of the stigma surrounding the marriage ban. When he sees the picture of his moms' commitment

---

[3] Referred to herein as "SUF."

ceremony, he says "Mommy and Momma DeeDee got married, and they need to *really* get married." *Id.* ¶ 12. Jessica has no legal relationship with J. H.-D., as she could if she and Joanne could marry. *Id.* ¶ 13.

4.     Joanne and Jessica fear what might happen if Joanne and J. H.-D. were to be in an accident—it would not be clear that Jessica had the authority to make medical decisions. *Id.* Joanne's tenuous relationship with her parents exacerbates this concern—the couple understandably fears that Joanne's family may seek to deny Jessica's role as J. H.-D.'s mother. *Id.* ¶ 14.

5.     For Joanne and Jessica, the ability to make medical decisions for each other is not academic; Joanne has epilepsy and her mother has expressed that she would not respect Joanne's desire not to receive life-prolonging measures should she experience a health crisis. *Id.* ¶ 15.

6.     The harm comes in smaller ways too. Matters such as describing the family on school forms, obtaining family memberships at organizations like the YMCA, and making school-related decisions are all made more difficult because of the marriage ban. *Id.* ¶ 16.

7.     Christy Berghoff and Victoria Kidd have been in a committed relationship for nine years, Declaration of Christy Berghoff ("Berghoff Dec.") at ¶ 2; Declaration of Victoria Kidd ("Kidd Dec.") ¶ 2, were legally married in Washington, D.C. in 2011, *Id.* ¶ 9, and together have an infant daughter L. B.-K., *Id.* ¶ 11.

8.     Because Virginia does not recognize their marriage, Christy and Victoria have spent hundreds of dollars obtaining co-custodianship documents for Victoria, *Id.* ¶ 12, but they fear those papers will not be respected in an emergency, *id.* They face the prospect of additional costs associated with securing wills, living wills, powers of attorney, and other legal

documents—all because they cannot receive the same protections and rights that other married couples receive.  *Id.* ¶ 13.

9.      When Victoria and Christy sought a home loan guaranteed by the federal Department of Veterans Affairs, they were unable to obtain it because lenders were unwilling to issue loans with a V.A. guarantee covering only half the loan amount—due to their marriage not being recognized by Virginia.  *Id.* ¶ 14.

10.     The threat of being prevented from making medical decisions is real for Victoria and Christy too—Victoria suffered a minor stroke last year, and they had already experienced disrespect during the birth of their daughter.  *Id.* ¶ 15.

11.     More generally, all Plaintiffs face a host of harms at the state and federal level based on their exclusion from the right to marry:  they lack the ability to solemnize their relationships through state-sanctioned ceremonies, Va. Code Ann. § 20-13; the ability to celebrate their marriage in their chosen faith tradition or civil ceremony, because those authorized to conduct marriages are prohibited, under threat of criminal sanction, from using the word "marriage," Va. Code Ann. § 20-28; the ability to safeguard family resources under an array of laws that protect spousal finances, such as through exemption or deferral of taxes on the property of certain elderly or disabled residents, Va. Code Ann. § 58.1-3210, and through property tax exemptions for the surviving spouse of an eligible veteran, Va. Code Ann. § 58.1-3219.5; the automatic ability and priority to make caretaking decisions in times of death and disaster, *see* Va. Code Ann. §§ 54.1-2986, 32.1-285, 57-27.3, 32.1-291.9; the right of inheritance under the laws of intestacy and other rights related to estates, *see* Va. Code Ann. §§ 64.2-200, 64.2-302, 64.2-307, 64.2-311, 27-39; benefits for surviving spouses of military service members killed in action, such as educational benefits, home loan guarantees, and real estate tax

exemptions, *see e.g.*, Va. Code Ann. § 2.2-2001; access to an orderly dissolution process in the event a couple separates, Va. Code Ann. §§ 20-96, 20-107.3; and the ability to hold a partner accountable for child support, Va. Code Ann. §§ 20-107.1, 20-107.2.

12.     Virginia's marriage bans also render Plaintiffs unable to benefit from a host of federal rights that turn on marital status—under more than 1,000 statutes and numerous federal regulations—including laws pertaining to Social Security, housing, taxes, criminal sanctions, copyright, and veterans' benefits.

13.     In addition to these tangible harms, Plaintiffs suffer from the harm of being excluded from the unique social recognition that marriage conveys.  Without access to the familiar language and legal label of marriage, Plaintiffs are unable instantly or adequately to communicate to others the depth of their commitment, or obtain respect for that commitment, as other do by simply invoking their married status.  Plaintiffs wish to express the nature, depth, and quality of their lifelong commitment to each other in the way that they, their family, their friends, and society at large best understand.  *See, e.g.*, Harris Dec. ¶¶ 4, 8, 9; Duff Dec. ¶¶ 4, 8, 9.

14.     Children of same-sex couples in Virginia are likewise harmed; the exclusion of their parents from marriage reinforces the view held by some that the family bonds that tie same-sex parents and their children are less consequential, enduring, and meaningful that those of different-sex parents and their children.  And the children must live with the stress of knowing their legal relationship with one of their parents is tenuous—and may not be respected—in social, legal, educational, or medical settings.

These harms—both tangible and intangible—are profoundly damaging and demand a prompt remedy.

**ARGUMENT**

I.     **Virginia's Marriage Bans Deny Equal Protection of the Law.**

    A.     **Virginia's Marriage Bans Are Subject to Heightened Scrutiny Because They Discriminate Based on Sexual Orientation.**

There is no controlling law in the Fourth Circuit regarding the appropriate level of scrutiny for classifications based on sexual orientation.  The only Fourth Circuit decisions to address the issue—*Thomasson v. Perry*, 80 F.3d 915, 928-29 (4th Cir. 1996) (en banc), and *Veney v. Wyche*, 293 F.3d 726, 732 (4th Cir. 2002)—were decided before the Supreme Court, in *Lawrence v. Texas*, 539 U.S. 558 (2003), overruled *Bowers v. Hardwick*, 478 U.S. 186 (1986).  Like every other circuit court to address the issue before *Lawrence*, the Fourth Circuit in *Thomasson* reasoned that, because the government could constitutionally criminalize private, consensual sex between gay people, sexual orientation could not be considered a suspect or quasi-suspect classification for purpose of equal protection.  *See Thomasson*, 80 F.3d at 928-29 ("Given that it is legitimate for Congress to proscribe homosexual acts, it is also legitimate for the government to seek to forestall these same dangers by trying to prevent the commission of such acts." (citations omitted)); *accord Padula v. Webster*, 822 F.2d 97, 103 (D.C. Cir. 1987) ("After all, there can hardly be more palpable discrimination against a class than making the conduct that defines the class criminal.").  In 2002, the Fourth Circuit relied on *Thomasson* as precedent without conducting an independent analysis.  *See Veney*, 293 F.3d at 731 n.4.

In 2003, however, the Supreme Court overruled *Bowers* and emphatically declared that it "was not correct when it was decided and is not correct today."  *Lawrence*, 539 U.S. at 578.  In repudiating the *Bowers* decision, the Court stated that "[i]ts continuance as precedent demeans the lives of homosexual persons" and represents "an invitation to subject homosexual persons to discrimination both in the public and in the private spheres."  *Id.*  By overruling *Bowers*, the

15

Supreme Court in *Lawrence* necessarily abrogated *Thomasson*, *Veney*, and other decisions that

relied on *Bowers* to foreclose the possibility of heightened scrutiny for sexual orientation

classifications.  *See Pedersen v. Office of Pers. Mgmt.*, 881 F. Supp. 2d 294, 312 (D. Conn.

2012) ("The Supreme Court's holding in *Lawrence* 'remov[ed] the precedential underpinnings of

the federal case law supporting the defendants' claim that gay persons are not a [suspect or]

quasi-suspect class.'" (citations omitted)); *Golinski v. U.S. Office of Pers. Mgmt.*, 824 F. Supp.

2d 968, 984 (N.D. Cal. 2012). ("[T]he reasoning in [prior circuit court decisions], that laws

discriminating against gay men and lesbians are not entitled to heightened scrutiny because

homosexual conduct may be legitimately criminalized, cannot stand post-*Lawrence*.")

Now that *Lawrence* has overruled *Bowers*, lower courts without controlling post-

*Lawrence* precedent on the issue must apply the criteria mandated by the Supreme Court to

determine whether sexual orientation classifications should receive heightened scrutiny.

> The Supreme Court uses certain factors to decide whether a new classification qualifies
> as a [suspect or] quasi-suspect class.  They include: A) whether the class has been
> historically "subjected to discrimination,"; B) whether the class has a defining
> characteristic that "frequently bears [a] relation to ability to perform or contribute to
> society,"; C) whether the class exhibits "obvious, immutable, or distinguishing
> characteristics that define them as a discrete group;" and D) whether the class is "a
> minority or politically powerless."

*Windsor v. United States*, 699 F.3d 169, 181 (2d Cir. 2012) (quoting *Bowen v. Gilliard*, 483 U.S.

587, 602 (1987), and *Cleburne v. Cleburne Living Ctr., Inc.,* 473 U.S. 432, 440-41 (1985)

(citations omitted)).  Of these considerations, the first two are the most important.  *See id.*

("Immutability and lack of political power are not strictly necessary factors to identify a suspect

class."); *accord Golinski*, 824 F. Supp. 2d at 987.

As several federal and state courts have recently recognized, any faithful application of

those factors leads to the inescapable conclusion that sexual orientation classifications must be

recognized as suspect or quasi-suspect and subjected to heightened scrutiny.  *See*, *e.g.*, *Windsor*,

16

699 F.3d at 181-85; *Golinski*, 824 F. Supp. 2d at 985-90; *Pedersen*, 881 F. Supp. 2d at 310-33;

*Perry v. Schwarzenegger*, 704 F. Supp. 2d 921, 997 (N.D. Cal. 2010), *appeal dismissed sub nom.*

*Perry v. Brown*, 725 F.3d. 1140 (9th Cir. 2013); *In re Balas*, 449 B.R. 567, 573-75 (Bankr. C.D.

Cal. 2011) (decision of 20 bankruptcy judges); *Varnum v. Brien*, 763 N.W.2d 862, 885-96 (Iowa

2009); *In re Marriage Cases*, 183 P.3d 384, 441-44 (Cal. 2008); *Kerrigan v. Comm'r of Pub.*

*Health*, 957 A.2d 407, 425-31 (Conn. 2008).

### 1. Lesbians and Gay Men Have Suffered a Long History of Discrimination.

There can be no doubt that lesbians and gay men historically have been, and continue to

be, the target of purposeful and often grievously harmful discrimination because of their sexual

orientation. For centuries, the prevailing attitude toward gay persons has been "one of strong

disapproval, frequent ostracism, social and legal discrimination, and at times ferocious

punishment." Richard A. Posner, Sex and Reason 291 (1992); *see also Rowland v. Mad River*

*Local Sch. Dist.*, 470 U.S. 1009, 1015 (1985) (Brennan, J., dissenting from denial of cert.) (gay

people "have historically been the object of pernicious and sustained hostility."). As the Second

Circuit concluded, "It is easy to conclude that homosexuals have suffered a history of

discrimination. *Windsor* and several amici labor to establish and document this history, but we

think it is not much in debate." *Windsor*, 699 F.3d at 182; *see Pedersen*, 881 F. Supp. 2d at 318

("The long history of anti-gay discrimination which evolved from conduct-based proscriptions to

status or identity-based proscriptions perpetrated by federal, state and local governments as well

as private parties amply demonstrates that homosexuals have suffered a long history of invidious

discrimination."); *United States v. Windso*r, No-12-307, Brief of the Organization of American

Historians and the American Studies Association as *Amici Curiae* Support of Respondent Edith

Windsor, 2013 WL 838150 (Feb. 28, 2013) (summarizing history of discrimination against gay people in America).

### 2. Sexual Orientation Is Irrelevant to an Individual's Ability to "Contribute to Society."

The other essential factor in the Court's heightened scrutiny analysis is whether the group in question is distinctively different from other groups in a way that "frequently bears [a] relation to ability to perform or contribute to society." *City of Cleburne v. Cleburne Living Center, Inc.,* 473 U.S. 432, 440-41 (1985) (citation omitted); *see also Frontiero v. Richardson*, 411 U.S. 677, 686 (1973) (plurality) ("[W]hat differentiates sex from such nonsuspect statuses as intelligence or physical disability, and aligns it with the recognized suspect criteria, is that the sex characteristic frequently bears no relation to ability to perform or contribute to society.").

Courts discussing this prong have agreed with near unanimity that homosexuality is irrelevant to one's ability to perform or contribute to society. "There are some distinguishing characteristics, such as age or mental handicap, that may arguably inhibit an individual's ability to contribute to society, at least in some respect. But homosexuality is not one of them." *Windsor*, 699 F.3d at 682; *accord Golinski*, 824 F. Supp. 2d at 986 ("[T]here is no dispute in the record or the law that sexual orientation has no relevance to a person's ability to contribute to society."); *Pedersen*, 881 F. Supp. 2d at 320 ("Sexual orientation is not a distinguishing characteristic like mental retardation or age which undeniably impacts an individual's capacity and ability to contribute to society. Instead like sex, race, or illegitimacy, homosexuals have been subjected to unique disabilities on the basis of stereotyped characteristics not truly indicative of their abilities."). *See also* Am. Psychiatric Ass'n, Position Statement On Homosexuality and Civil Rights, 131 Am. J. Psychiatry 436, 497 (1974). In this respect, sexual orientation is akin to race, gender, alienage, and national origin, all of which "are so seldom

relevant to the achievement of any legitimate state interest that laws grounded in such

considerations are deemed to reflect prejudice and antipathy." *Cleburne*, 473 U.S. at 440.

> ### 3.      Lesbians and Gay Men Lack Sufficient Political Power to Protect Themselves Against Invidious Discrimination.

Lack of political power is not essential for recognition as a suspect or quasi-suspect class.

*See Windsor*, 699 F.3d at 181.  But the limited ability of gay people as a group to protect

themselves in the political process also weighs in favor of heightened scrutiny of laws that

discriminate based on sexual orientation.  In analyzing this factor, "[t]he question is not whether

homosexuals have achieved political successes over the years; they clearly have.  The question is

whether they have the strength to politically protect themselves from wrongful discrimination."

*Id.* at 184.

The political influence of lesbians and gay men today stands in sharp contrast to the

political power of women in 1973, when a plurality of the Court concluded in *Frontiero* that sex-

based classifications required heightened scrutiny.  411 U.S. at 688.  After all, Congress had

already passed Title VII of the Civil Rights Act of 1964 and the Equal Pay Act of 1963, both of

which protect women from discrimination in the workplace.  *See id.* at 687-88.  In contrast, there

is still no express federal ban on sexual orientation discrimination in employment, housing, or

public accommodations, and twenty-nine states have no such protections either.  *See Golinski*,

824 F. Supp. 2d at 988-89; *Pedersen*, 881 F. Supp. 2d at 326-27.  As political power has been

defined by the Court for purposes of heightened scrutiny analysis, lesbians and gay men do not

have it.[4]

---

[4] Similarly, while there has been some improvement in recent years, lesbians and gay men
remain "vastly under-represented in this Nation's decisionmaking councils."  No openly gay
person has ever served in the United States Cabinet.  In 2008, of the more than half a million
people who then held political office at the local, state, and national levels in this country, only

Moreover, while there have been recent successes in securing antidiscrimination legislation (and even marriage equality) in some parts of the nation, those limited successes do not alter the conclusion that lesbians and gay men "are not in a position to adequately protect themselves from the discriminatory wishes of the majoritarian public." *Windsor*, 699 F.3d at 185.   Thus, in the last two decades, more than two-thirds of ballot initiatives that proposed to enact (or prevent the repeal of) basic antidiscrimination protections for gay and lesbian individuals have failed.  Gay people "have seen their civil rights put to a popular vote more often than any other group." Barbara S. Gamble, *Putting Civil Rights to a Popular Vote*, 41 Am. J. Pol. Sci. 245, 257 (1997).; *see also* Donald P. Haider-Markel et al., *Lose, Win, or Draw?: A Reexamination of Direct Democracy and Minority Rights*, 60 Pol. Res. Q. 304 (2007).

Indeed, the notion that gay people are too politically powerful to warrant applying heightened scrutiny is particularly misplaced because, by enshrining Virginia's marriage bans in the state constitution, Virginia has effectively locked gay people out of the normal political process.  *See infra* Argument, Part I.C (discussing why this "fencing out " violates equal protection).  Having disabled gay people from remedying discrimination through the normal legislative process, Virginia can hardly argue that this discrimination is likely "to be soon rectified by legislative means." *Cleburne*, 473 U.S. at 440.

### 4.    Sexual Orientation Is An "Immutable" Or "Defining" Characteristic.

The heightened scrutiny inquiry sometimes also considers whether laws discriminate on the basis of "'immutable . . . or distinguishing characteristics that define [persons] as a discrete

---

about 400 were openly gay. *See Kerrigan*, 957 A.2d at 446; *see also Windsor*, 699 F.3d at 184-85 (underrepresentation of lesbians and gay men in positions of power "is attributable either to a hostility that excludes them or to a hostility that keeps their sexual preference private – which, for our purposes [assessing their political power], amounts to much the same thing").

group.'"  *Bowen v. Gilliard*, 483 U.S. 587, 602 (1987) (citation omitted).  This consideration

derives from the "basic concept of our system that legal burdens should bear some relationship to

individual responsibility." *Frontiero*, 411 U.S. at 626; *see also Plyler v. Doe*, 457 U.S. 202, 220

(1982) (noting that illegal alien children "have little control" over that status).  But there is no

requirement that a characteristic be immutable in order to trigger heightened scrutiny.

Heightened scrutiny applies to classifications based on alienage and legitimacy, even though

"[a]lienage and illegitimacy are actually subject to change."  *Windsor*, 699 F.3d at 183 n.4; *see*

*Nyquist v. Mauclet*, 432 U.S. 1, 9 n.11 (1977) (rejecting the argument that alienage did not

deserve strict scrutiny because it was mutable).

      To the extent that "immutability" is relevant to the inquiry of whether to apply

heightened scrutiny, the question is not whether a characteristic is strictly unchangeable—it is

whether the characteristic is a core trait or condition that one cannot or should not be required to

abandon.  *See Fatin v. INS*, 12 F.3d 1233, 1240 (3d Cir. 1993) (Alito, J.) (characteristic is

"'immutable'" when "'the members of the group either cannot change, or should not be required

to change because it is fundamental to their individual identities or consciences'") (citation

omitted); *Hernandez-Montiel v. INS*, 225 F.3d 1084, 1093 (9th Cir. 2000) ("[S]exual orientation

and sexual identity are immutable; they are so fundamental to one's identity that a person should

not be required to abandon them."), *overruled on other grounds*, *Thomas v. Gonzales*, 409 F.3d

1177 (9th Cir. 2005); *Watkins v. United States Army*, 875 F.2d 699, 726 (9th Cir. 1989) (Norris,

J., concurring in judgment) ("It is clear that by 'immutability' the [Supreme] Court has never

meant strict immutability in the sense that members of the class must be physically unable to

change or mask the trait defining their class. . . .  the Supreme Court is willing to treat a trait as

21

effectively immutable if changing it would involve great difficulty, such as requiring a major physical change or a traumatic change of identity.").

Under any definition of immutability, sexual orientation clearly qualifies.  There is now broad medical and scientific consensus that sexual orientation is immutable.  *See Perry*, 704 F. Supp. 2d at 966 ("No credible evidence supports a finding that an individual may, through conscious decision, therapeutic intervention or any other method, change his or her sexual orientation."); *accord Golinski*, 824 F. Supp. 2d at 986; *Pedersen*, 881 F. Supp. 2d at 320-24; *see also* Gregory M. Herek, et al., *Demographic, Psychological, and Social Characteristics of Self-Identified Lesbian, Gay, and Bisexual Adults*, 7 Sex Res. Soc. Policy 176 (2010); *United States v. Windsor*, Brief of *Amicus Curiae* GLMA: Health Professionals Advancing LGBT Equality (Gay and Lesbian Medical Association) Concerning the Immutability of Sexual Orientation in Support of Affirmance on the Merits, 2013 WL 860299 (Feb. 26, 2013).

Even more importantly, as the Supreme Court has acknowledged, sexual orientation is so fundamental to a person's identity that one ought not be forced to choose between one's sexual orientation and one's rights as an individual—even if such a choice could be made.  *See Lawrence*, 539 U.S. at 576-77 (recognizing that individual decisions by consenting adults concerning the intimacies of their physical relationships are "an integral part of human freedom"); *see also In re Marriage Cases*, 183 P.3d at 442 ("Because a person's sexual orientation is so integral an aspect of one's identity, it is not appropriate to require a person to repudiate or change his or her sexual orientation in order to avoid discriminatory treatment."); *Kerrigan*, 957 A.2d at 438 ("In view of the central role that sexual orientation plays in a person's fundamental right to self-determination, we fully agree with the plaintiffs that their sexual orientation represents the kind of distinguishing characteristic that defines them as a discrete

22

group for purposes of determining whether that group should be afforded heightened protection

under the equal protection provisions of the state constitution."); *accord Golinski*, 824 F. Supp.

2d at 987; *Pedersen*, 881 F. Supp. 2d at 325.[5]

Sexual orientation discrimination accordingly meets not only the two essential criteria for

receipt of heightened scrutiny, but *all* considerations the Supreme Court has identified, and thus

defendants must sustain their burden to justify the Virginia marriage bans.

**B.    Virginia's Marriage Bans Also Are Subject to Heightened Scrutiny Because
They Contain Explicit Sex-Based Classifications and Because They
Perpetuate Improper Stereotyped Notions of the Spousal and Parental Roles
of Men and Women.**

Virginia's marriage bans must be subjected to heightened scrutiny for two additional

reasons:  they classify explicitly based on gender, and they reflect stereotyped notions of the

proper role of men and women in the marital and family contexts.  There is nothing inconsistent

about subjecting the Virginia marriage restrictions both to the scrutiny due classifications based

on sex and to the scrutiny due classifications based on sexual orientation.  The confluence of

discrimination based on both sex and sexual orientation here is not mere happenstance; sexual

orientation is defined by one's sex relative to the sex of those to whom one is attracted and the

---

[5] In the past, some courts have asserted that sexual orientation is not immutable by
arguing that sexual orientation refers merely to the conduct of engaging in sexual activity.
*See, e.g.*, *High Tech Gays v. Def. Indus. Sec. Clearance Office*, 895 F.2d 563, 573-74 (9th
Cir. 1990) (arguing that homosexuality "is behavioral and hence is fundamentally
different from traits such as race, gender, or alienage, which define already existing
suspect and quasi-suspect classes.").  But the Supreme Court has now rejected that
artificial distinction between the conduct of engaging in same-sex activity and the status
of being gay, explaining that "[o]ur decisions have declined to distinguish between status
and conduct in this context."  *Christian Legal Soc'y v. Martinez*, 130 S. Ct. 2971, 2990
(2010); *see Pedersen*, 881 F. Supp. 2d at 325 ("Supreme Court precedent has since
rejected the artificial distinction between status and conduct in the context of sexual
orientation.  Consequently, the precedential underpinnings of those cases declining to
recognize homosexuality as an immutable characteristic have been significantly eroded."
(citations omitted)).

opprobrium visited on lesbians and gay men by society is in large part because of their

contravention of gender norms and stereotypes.[6]

There can be no doubt that Virginia's marriage bans contain explicit gender

classifications.  They only allow a person to marry if the person's sex is different from that of the

person's intended spouse.  Such a distinction requires heightened scrutiny.  *United States v.*

*Virginia*, 518 U.S. 515, 555 (1996) ("The Fourth Circuit plainly erred in exposing Virginia's

VWIL plan to a deferential analysis, for 'all gender-based classifications today' warrant

'heightened scrutiny.'" (quoting *J.E.B. v. Ala. ex rel. T.B.*, 511 U.S. 127, 136 (1994)); *Nev. Dep't*

*of Human Res. v. Hibbs*, 538 U.S. 721, 728 (2003) ('Statutory classifications that distinguish

between males and females are subject to heightened scrutiny.").  "'[O]ur Nation has had a long

and unfortunate history of sex discrimination,' . . . a history which warrants the heightened

scrutiny we afford all gender-based classifications today."  *J.E.B. v. Ala. ex rel. T.B.*, 511 U.S.

127, 136 (1994) (quoting *Frontiero*, 411 U.S. at 684).[7]

---

[6] *See Perry*, 704 F. Supp. 2d at 996; *see also Prowel v. Wise Bus. Forms, Inc.*, 579 F.3d 285, 291
(3d Cir. 2008) (reversing summary judgment for the employer on the gay male employee's claim
of discrimination based on failure to conform to gender stereotypes; "the line between sexual
orientation discrimination and discrimination 'because of sex' can be difficult to draw.");
*Centola v. Potter*, 183 F. Supp. 2d 403, 410 (D. Mass. 2002) ("Sexual orientation harassment is
often, if not always, motivated by a desire to enforce heterosexually defined gender norms.  In
fact, stereotypes about homosexuality are directly related to our stereotypes about the proper
roles of men and women."); Andrew Koppelman, Why Discrimination Against Lesbians and
Gay Men Is Sex Discrimination, 69. N.Y.U. L. Rev. 197, 202-03 (1994) ("In the same way that
the prohibition of miscegenation preserved the polarities of race on which white supremacy
rested, the prohibition of homosexuality preserves the polarities of gender on which rests the
subordination of women. . . . [S]tigmatization of gays in contemporary American society
functions as part of a larger system of social control based on gender.").

[7] Virginia's restriction on marriage is no less invidious because it equally denies men and
women the right to marry a same-sex life partner.  *Loving* discarded "the notion that the mere
'equal application' of a statute containing racial classifications is enough to remove the
classifications from the Fourteenth Amendment's proscription of all invidious racial
discriminations."  388 U.S. at 8; *see also McLaughlin v. Florida*, 379 U.S. 184, 191 (1964)

Virginia's marriage bans should be subject to heightened scrutiny for the additional reason that they reflect and seek to enforce the perpetuation of sex stereotypes in life roles, which the Supreme Court has held to be constitutionally impermissible. *See, e.g., Virginia*, 518 U.S. at 533 (justifications for gender classifications "must not rely on overbroad generalizations about the different talents, capacities, or preferences of males and females"); *Califano v. Webster*, 430 U.S. 313, 317 (1977) (under heightened scrutiny, a court looks at whether a gender classification is the "result of 'archaic and overbroad generalizations' about women or of 'the role-typing society has long imposed' upon women").

Indeed, one of the asserted justifications for Virginia's marriage bans is the notion that "optimal parenting" requires two parents of different sexes. See Ans. ¶¶ 62, 68. As discussed below, that premise flies in the face of the overwhelming scientific consensus that has developed through decades of rigorous studies. *See infra* Argument, Part I.D.3. As the Supreme Court of Iowa explained: "The research appears to strongly support the conclusion that same-sex couples foster the same wholesome environment as opposite-sex couples and suggests that the traditional notion that children need a mother and a father to be raised into healthy, well-adjusted adults is based more on stereotype than anything else." *Varnum*, 763 N.W.2d at 899 n.26. A law enforcing that stereotype must be subjected to heightened scrutiny.

---

(holding that equal protection analysis "does not end with a showing of equal application among the members of the class defined by the legislation"), *and J.E.B. v. Ala. ex rel. T.B.*, 511 U.S. 127 (1994) (holding that the government may not strike jurors based on sex, even though such a practice, as a whole, does not favor one sex over the other). Nor was the context of race central to *Loving*'s holding, which expressly found that, even if race discrimination had not been at play and the Court presumed "an even-handed state purpose to protect the integrity of all races," Virginia's anti-miscegenation statute still was "repugnant to the Fourteenth Amendment." *Id.* at 12 n.11.

The Supreme Court has made emphatically clear that gender classifications cannot be based on or validated by "fixed notions concerning the roles and abilities of males and females." *Miss. Univ. for Women v. Hogan*, 458 U.S. 718, 724-25 (1982).  And in the context of parenting responsibilities, the Supreme Court has rejected the notion of "any universal difference between maternal and paternal relations at every phase of a child's development."  *Caban v. Mohammed*, 441 U.S. 380, 388-89 (1979); *see also Stanley v. Illinois*, 405 U.S. 645 (1972) (finding that a state law presumption that unmarried fathers were unfit violated Due Process and Equal Protection Clauses).  The Court also has recognized that stereotypes about distinct parenting roles for men and women foster discrimination in the workplace and elsewhere.  *Hibbs*, 538 U.S. at 736 ("Stereotypes about women's domestic roles are reinforced by parallel stereotypes presuming a lack of domestic responsibilities for men. . . . These mutually reinforcing stereotypes created a self-fulfilling cycle of discrimination that forced women to continue to assume the role of primary family caregiver, and fostered employers' stereotypical views about women's commitment to work and their value as employees.").  Thus, "generalizations about typical gender roles in the raising and nurturing of children" are constitutionally insufficient bases for differential treatment of the sexes.  *Knussman v. Maryland*, 272 F.3d 625, 636 (4th Cir. 2001) (upholding liability of state agency under the Equal Protection Clause for refusing to grant father paid leave as primary caregiver for newborn).[8]

---

[8] *See also Califano v. Westcott*, 443 U.S. 76, 89 (1979) (finding unconstitutional a federal statute providing for support in event of father's unemployment, but not mother's unemployment; describing measure as based on stereotypes that father is principal provider "while the mother is the 'center of home and family life'"); *Orr v. Orr*, 440 U.S. 268, 283 (1979) (invalidating a measure imposing alimony obligations on husbands, but not on wives, because it "carries with it the baggage of sexual stereotypes"); *Stanton v. Stanton*, 421 U.S. 7, 14-15 (1975) (finding unconstitutional a statute assigning different age of majority to girls than to boys and stating,

As a result of these decisions and attendant legislative reforms, laws relating to marriage have become wholly gender-neutral, apart from their frequent exclusion of same-sex couples. Men and women entering into marriage today have the liberty to determine for themselves the responsibilities each will shoulder as parents, wage earners, and family decision-makers, regardless of whether these responsibilities conform to or depart from traditional arrangements. Laws based on the assumption that, for every family, the spousal and parental roles have to be performed by a man and a woman must be tested under heightened scrutiny.

C.   **Virginia's Constitutional Marriage Ban Also Is Constitutionally Suspect Because it Locks Same-Sex Couples Out of the Normal Political Process and Makes it Uniquely More Difficult to Secure Legislation on Their Behalf.**

The Virginia marriage ban is unconstitutional for an additional reason: it discriminatorily fences out of the normal political process any citizen of the Commonwealth seeking to change the law to allow marriage for same-sex couples by enshrining Virginia's exclusion of same-sex couples from marriage—and none of Virginia's other marriage regulations—in the Virginia Constitution. Unlike a citizen seeking to effect a different change in the Commonwealth's marriage eligibility rules, such as someone wishing to lower the age at which persons may marry without parental consent (currently age 18 under Va. Code Ann. § 20-45.1), Plaintiffs cannot simply lobby the General Assembly to change the Virginia Code. Instead, they are uniquely burdened with having to amend the Virginia Constitution.

It is well established that such a selective disparity in the ability to advocate for a change in the law, disadvantaging a single class of people, is constitutionally suspect. *See Washington v. Seattle Sch. Dist. No. 1*, 458 U.S. 457 (1982); *Hunter v. Erickson*, 393 U.S. 385 (1969); *Coal. to*

---

"[n]o longer is the female destined solely for the home and the rearing of the family, and only the male for the marketplace and the world of ideas").

*Defend Affirmative Action v. Regents of the Univ. of Mich.*, 701 F.3d 466, 477 (6th Cir. 2012) (en banc), *cert. granted sub nom. Schuette v. Coal. to Defend Affirmative Action* (No. 12-682); *Evans v. Romer*, 882 P.2d 1335 (Colo. 1994), *aff'd on other grounds* 517 U.S. 620, 633 (1996). Thus, as Justice Harlan put it in *Hunter*, there is a clear distinction between general rules of governance, such as the procedure for passing a law or amending a state constitution, that are presumptively valid even if they sometimes make it more difficult for a particular group to further its aims, and a law structured to prevent one single group from achieving its goals. 393 U.S. at 393 (Harlan, J., concurring). The latter type of provision has "the clear purpose of making it more difficult for . . . minorities to further their political aims" and thus is discriminatory on its face. *Id.*; *see also Seattle Sch. Dist. No. 1*, 458 U.S. at 470 (adopting Justice Harlan's concurrence); *Evans*, 882 P.2d at 1339 ("[T]he Equal Protection Clause of the United States Constitution protects the fundamental right to participate equally in the political process, and . . . any legislation or state constitutional amendment which infringes on this right by 'fencing out' an independently identifiable class of persons must be subject to strict judicial scrutiny." (internal quotation marks and citation omitted)).

Legislative history makes clear that the reason the marriage bans were incorporated into the Virginia Constitution was a recognition that the reversal of statutory bans was a central goal of lesbians and gay men—and a desire to thwart the efforts of people like Plaintiffs to persuade a majority of their elected representatives to change the law. Like the constitutional amendment at issue in *Coalition to Defend Affirmative Action*, Virginia's constitutional marriage ban creates a "comparative structural burden," 701 F.3d at 470, imposed by the majority on the minority to prevent them from using the normal processes of democratic governance to achieve their goals.

Such a selective burden "undermines the Equal Protection Clause's guarantee that all citizens ought to have equal access to the tools of political change." *Coal. to Defend*, 701 F.3d at 470.

### D.   Virginia's Marriage Bans Are Unconstitutional Under Any Standard of Review.

If the requisite heightened scrutiny is applied, there is no possibility that Virginia marriage bans can be viewed as consistent with the Commonwealth's duty to accord equal protection of the laws to all persons. But, regardless of whether heightened scrutiny is applied, the marriage bans violate the Constitution's equal protection guarantee. "Even in the ordinary equal protection case calling for the most deferential of standards, [the Court] insist[s] on knowing the relation between the classification adopted and the object to be attained." *Romer*, 517 U.S. at 632. "[S]ome objectives . . . are not legitimate state interests" and, even when a law is justified by an ostensibly legitimate purpose, "[t]he State may not rely on a classification whose relationship to an asserted goal is so attenuated as to render the distinction arbitrary or irrational." *Cleburne*, 473 U.S. at 446-47. "Because all, or almost all, state action results in some persons being benefitted while others are burdened, the Equal Protection Clause stands to ensure that the line drawn between the two groups has some modicum of principled validity, through its scrutiny of both the purpose animating the statute as well as the way the line is set." *Smith Setzer & Sons, Inc. v. S.C. Procurement Rev. Panel*, 20 F.3d 1311, 1321 (4th Cir. 1994).

At the most basic level, by requiring that classifications be justified by an independent and legitimate purpose, the Equal Protection Clause prohibits classifications from being drawn for "the purpose of disadvantaging the group burdened by the law." *Romer*, 517 U.S. at 633; *see also Windsor*, 133 S. Ct. at 2693; *Cleburne*, 473 U.S. at 450; *U.S. Dep't of Agriculture v. Moreno*, 413 U.S. 528, 534 (1973). The Supreme Court invoked this principle most recently in

*Windsor* when it held that the principal provision of the federal Defense of Marriage Act ("DOMA") violated equal protection principles because the "purpose and practical effect of the law . . . [was] to impose a disadvantage, a separate status, and so a stigma upon all who enter into same-sex marriages." *Windsor*, 133 S. Ct. at 2693.  The Court explained that the statute was not sufficiently connected to a legitimate governmental purpose because its "interference with the equal dignity of same-sex marriages . . . was more than an incidental effect of the federal statute. It was its essence." *Id.*  The Supreme Court has sometimes described this impermissible purpose as "animus" or a "bare … desire to harm a politically unpopular group." *Windsor*, 133 S. Ct. at 2693; *Romer*, 517 U.S. at 633; *Cleburne*, 473 U.S. at 447; *Moreno*, 413 U.S. at 534.  But an impermissible motive does not always reflect "malicious ill will." *Bd. of Trustees of Univ. of Ala. v. Garrett*, 531 U.S. 356, 374 (2001) (Kennedy, J., concurring).  It can also take the form of "negative attitudes," *Cleburne*, 473 U.S. at 448, "fear," *id.*, "irrational prejudice," *id.* at 450, or "some instinctive mechanism to guard against people who appear to be different in some respects from ourselves," *Garrett*, 531 U.S. at 374 (Kennedy, J., concurring).[9]

_____

[9] In determining whether a law is based on such an impermissible purpose, the Court has looked to a variety of direct and circumstantial evidence, including the text of a statute and its obvious practical effects, *see, e.g.*, *Windsor*, 133 S. Ct. at 2693; *Romer*, 517 U.S at 633; *Village of Arlington Heights v. Metro. Housing Dev. Corp.*, 429 U.S. 252, 266-68 (1977), statements by legislators during floor debates or committee reports, *see, e.g.*, *Windsor*, 133 S. Ct. at 2693; *Moreno*, 413 U.S. at 534-35, the historical background of the challenged statute, *see, e.g.*, *Windsor*, 133 S. Ct. at 2693; *Arlington Heights*, 429 U.S. at 266-68, and a history of discrimination by the relevant governmental entity, *see, e.g. Arlington Heights*, 429 U.S. at 266-68.  Finally, even without direct evidence of discriminatory intent, the absence of any logical connection to a legitimate purpose can lead to an inference of an impermissible intent to discriminate.  *See Romer*, 517 U.S. at 632 (reasoning that the law's "sheer breadth is so discontinuous with the reasons offered for it that the amendment seems inexplicable by anything but animus toward the class it affects"); *Cleburne*, 473 U.S. at 448-50 (reasoning that because a home for developmentally disabled adults did posed no threat to city's interests other than those also posed by permitted uses, requiring a special zoning permit in this case "appears to us to rest on an irrational prejudice").

In addition, even when the government offers an ostensibly legitimate purpose, "the simple articulation of a justification for a challenged classification does not conclude the judicial inquiry." *Phan v. Com. of Va.*, 806 F.2d 516, 521 n.6 (4th Cir. 1986).  The court must also examine the statute's connection to that purpose to assess whether it is too "attenuated" to rationally advance the asserted governmental interest.  *Cleburne*, 473 U.S. at 446; *see, e.g.*, *Moreno*, 413 U.S. at 535-36 (invalidating law on rational-basis review because "even if we were to accept as rational the Government's wholly unsubstantiated assumptions concerning [hippies] . . . we still could not agree with the Government's conclusion that the denial of essential federal food assistance . . . constitutes a rational effort to deal with these concerns"); *Eisenstadt v. Baird*, 405 U.S. 438, 448-49 (1972) (invalidating law on rational-basis review because, even if deterring premarital sex is a legitimate governmental interest, "the effect of the ban on distribution of contraceptives to unmarried persons has at best a marginal relation to the proffered objective"); *see also Manwani v. U.S. Dep't of Justice*, 736 F. Supp. 1367, 1390 (W.D.N.C. 1990) ("[T]he government must do more than articulate reasons why the stated purpose . . . is rational.  The inquiry that is constitutionally required is whether Congress' *response* . . . rationally furthers the congressional purpose.") (emphasis in original).  This search for a meaningful connection between a classification and the asserted governmental interest also provides an additional safeguard against intentional discrimination.  As the Supreme Court has explained, "[b]y requiring that the classification bear a rational relationship to an independent and legitimate legislative end, we ensure that classifications are not drawn for the purpose of disadvantaging the group burdened by the law."  *Romer*, 517 U.S. at 633.[10]

---

[10] The Supreme Court has been particularly likely to find a classification too attenuated to serve an asserted government interest when the law imposes a sweeping disadvantage on a group that

Virginia's marriage bans share all the hallmarks of irrational discrimination that have been present in prior Supreme Court cases that struck down laws violating even the lowest level of equal protection scrutiny.  Even if the Court does not apply heightened scrutiny (although it should), none of the proffered rationales for Virginia's marriage bans can withstand constitutional review.

>### 1.      Virginia's Marriage Bans Cannot Be Justified by an Asserted Interest in Maintaining a Traditional Definition of Marriage.

In order to survive constitutional scrutiny, Virginia's marriage bans must be justified by some legitimate state interest other than simply maintaining a "traditional" definition of marriage.  "Ancient lineage of a legal concept does not give it immunity from attack for lacking a rational basis."  *Heller v. Doe by Doe*, 509 U.S. 312, 326-27 (1993).  Indeed, the fact that a form of discrimination has been "traditional" is a reason to be *more* skeptical of its rationality.  "The Court must be especially vigilant in evaluating the rationality of any classification involving a group that has been subjected to a tradition of disfavor for a traditional classification is more likely to be used without pausing to consider its justification than is a newly created classification."  *Cleburne*, 473 U.S. at 454 n.6 (Stevens, J., concurring) (alterations incorporated;

---

is grossly out of proportion to accomplishing that purpose.  For example, in *Romer*, the Court invalidated a Colorado constitutional amendment excluding gay people from eligibility for nondiscrimination protections because, the law "identifie[d] persons by a single trait and then denie[d] them protection across the board."  517 U.S. at 633.  Similarly, in *Windsor* the Supreme Court invalidated the challenged section of DOMA as not sufficiently related to any legitimate governmental purpose in part because it was "a system-wide enactment with no identified connection" to any particular government program.  *Windsor*, 133 S. Ct. at 2694.  In such situations, the law's breadth may "outrun and belie any legitimate justifications that may be claimed for it."  *Romer*, 517 U.S. at 635; *see also id.* ("The breadth of the amendment is so far removed from these particular justifications that we find it impossible to credit them.").  Virginia's sweeping marriage bans likewise exclude same-sex couples and their children system-wide from the protections and benefits afforded married couples and their families under Virginia and federal law.

internal quotation marks omitted); *see also Marsh v. Chambers*, 463 U.S. 183, 791-92 (1983) (even longstanding practice should not be "taken thoughtlessly, by force of long tradition and without regard to the problems posed by a pluralistic society"); *In re Marriage Cases*, 183 P.3d at 853-54 ("[E]ven the most familiar and generally accepted of social practices and traditions often mask an unfairness and inequality that frequently is not recognized or appreciated by those not directly harmed by those practices or traditions."). As the Supreme Court has explained, "times can blind us to certain truths and later generations can see that laws once thought necessary and proper in fact serve only to oppress." *Lawrence*, 539 U.S. at 579.

Regarding laws that exclude same-sex couples from marriage, "the justification of 'tradition' does not explain the classification; it merely repeats it. Simply put, a history or tradition of discrimination — no matter how entrenched — does not make the discrimination constitutional. . . ." *Kerrigan*, 957 A.2d at 478 (citation omitted); *accord Goodridge v. Dep't of Pub. Health*, 798 N.E.2d 941, 961 n.23 (Mass. 2003) ("[I]t is circular reasoning, not analysis, to maintain that marriage must remain a heterosexual institution because that is what it historically has been."); *Varnum*, 763 N.W.2d at 898 (asking "whether restricting marriage to opposite-sex couples accomplishes the governmental objective of maintaining opposite-sex marriage" results in "empty analysis"); *see also Golinski*, 824 F. Supp. 2d at 993 ("Tradition alone . . . cannot form an adequate justification for a law. . . . Instead, the government must have an interest separate and apart from the fact of tradition itself.") (citations omitted).

Ultimately, "'preserving the traditional institution of marriage' is just a kinder way of describing the [s]tate's *moral disapproval* of same-sex couples." *Lawrence*, 539 U.S. at 601 (Scalia, J., dissenting) (emphasis in original). That intent to discriminate is not a rational basis

33

for perpetuating discrimination.  *See Windsor,* 133 S. Ct. at 2692; *Romer*, 517 U.S. at

633; *Cleburne*, 473 U.S. at 450; *Moreno,* 413 U.S. at 534.

>       2.      **Virginia's Marriage Bans Cannot Be Justified by an Asserted Interest in Encouraging Responsible Procreation by Heterosexual Couples or Promoting a "Conjugal View" of Marriage.**

There is no rational connection between Virginia's marriage bans and an asserted state

interest in encouraging responsible procreation by heterosexual couples.  To the extent that the

benefits and protections accompanying  marriage encourage heterosexual couples to marry

before procreating, those incentives existed before Virginia passed its statutory ban in 1975,

before it reaffirmed its statutory ban in 1997 and again in 2004, and before it passed its

constitutional amendment in 2006.  And those incentives will still exist if the marriage bans are

stuck down.  *See Varnum*, 763 N.W.2d at 901-02 ("While heterosexual marriage does lead to

procreation, the argument by the County fails to address the real issue[:] . . .  whether *exclusion*

of gay and lesbian individuals from the institution of civil marriage will result in *more*

procreation?  If procreation is the true objective, then the proffered classification must work to

achieve that objective."); *see also Windsor*, 699 F.3d at 188 ("DOMA does not provide any

incremental reason for opposite-sex couples to engage in 'responsible procreation.'  Incentives

for opposite-sex couples to marry and procreate (or not) were the same after DOMA was enacted

as they were before." (footnotes omitted)); *Golinski*, 824 F. Supp. 2d at 998 ("Denying federal

benefits to same-sex married couples has no rational effect on the procreation and child-rearing

practices of opposite-sex married (or unmarried) couples.").

In her Answer, Defendant Rainey does not attempt to take on the impossible task of

arguing that allowing same-sex couples to marry will discourage different-sex couples from

procreating responsibly.  Instead, she asserts it is rational to exclude gay couples from marriage

because allowing them to marry will not affirmatively advance the governmental interest in

34

responsible procreation. *See* Ans. ¶ 64 (asserting that "the inquiry is not whether a same sex marriage interferes with the purposes advanced by the traditional classification but whether it advances them"). That argument fails on multiple levels.

As an initial matter, Defendant Rainey's assertion that the governmental interest in responsible procreation somehow does not apply to gay people is simply wrong. Lesbian and gay couples have children through assisted reproduction and through adoption, and the government has just as strong an interest in encouraging such procreation and child-rearing to take place in the stable context of marriage. *See Varnum*, 763 N.W.2d at 902 ("Conceptually, the promotion of procreation as an objective of marriage is compatible with the inclusion of gays and lesbians within the definition of marriage. Gay and lesbian persons are capable of procreation."); *In re Marriage Cases*, 183 P.3d at 433 ("[A] stable two-parent family relationship, supported by the state's official recognition and protection, is equally as important for the numerous children . . . who are being raised by same-sex couples as for those children being raised by opposite-sex couples (whether they are biological parents or adoptive parents)."); *see also Pedersen*, 881 F. Supp. 2d at 339 ("Assuming, as Congress has, that the marital context provides the optimal environment to rear children as opposed to non-marital circumstances, it is irrational to strive to incentivize the rearing of children within the marital context by affording benefits to one class of marital unions in which children may be reared while denying the very same benefits to another class of marriages in which children may also be reared.").

Alternatively, by invoking an interest in "responsible procreation," Defendant Rainey may be alluding to the "accidental procreation" theory that was adopted by some courts in the previous decade as a basis for limiting marriage to heterosexual couples. According to this theory, the purpose of marriage is ostensibly to ensure that couples are in stable relationships if

they accidentally procreate, and because same-sex couples cannot procreate by accident, it is argued that it is rational not to include same-sex couples within the definition of marriage.  *See, e.g.*, *Hernandez v. Robles*, 855 N.E.2d 1, 7 (N.Y. 2006).  But whether or not encouraging accidental procreation to take place in the context of a stable relationship might be considered by some people to be *one* of the purposes of marriage, it is indisputably not the *only* purpose that marriage serves for Virginia families today.  "[M]arriage is more than a routine classification for purposes of certain statutory benefits" and is "a far-reaching legal acknowledgment of the intimate relationship between two people."  *Windsor*, 133 S. Ct. at 2692.  Marriage in Virginia is tied a wide array of governmental programs and protections that have nothing to do with procreation (let alone, accidental procreation).  *See supra* Background, Part II.B; *see also In re Marriage Cases*, 183 P.3d at 432 ("[A]lthough promoting and facilitating a stable environment for the procreation and raising of children is unquestionably one of the vitally important purposes underlying the institution of marriage and the constitutional right to marry . . . this right is not confined to, or restrictively defined by, that purpose alone.").

The fact that same-sex couples cannot procreate by accident does not provide a rational basis for excluding those couples from all the other protections that marriage provides in modern society.  Under rational-basis review, it is not enough for the government to identify some difference between two classes; it must be "'a ground of difference having a fair and substantial relation to the object of the legislation.'"  *Sylvia Dev. Corp. v. Calvert County*, 48 F.3d 810, 818 (4th Cir. 1995) (quoting *Royster Guano Co. v. Virginia*, 253 U.S. 412, 415 (1920)).  As in *Romer*, "[t]he breadth of the [marriage bans] is so far removed from these particular justifications that [it is] impossible to credit them."  *Romer*, 517 U.S. at 635; *see also Eisenstadt*, 405 U.S. at 449 (finding law discriminating between married and unmarried individuals in access

36

to contraceptives "so riddled with exceptions" that the interest claimed by the government "cannot reasonably be regarded as its aim").

In any event, Virginia's marriage bans simply do not classify based on the ability to accidentally procreate; they classify based on the sex of the partners regardless of their procreative abilities.  *See Lawrence*, 539 U.S. at 604 (Scalia, J., dissenting) ("[W]hat justification could there possibly be for denying the benefits of marriage to homosexual couples exercising '[t]he liberty protected by the Constitution'?  Surely not the encouragement of procreation, since the sterile and the elderly are allowed to marry.").  Because Virginia does not condition the right to marry on procreative ability, the Commonwealth cannot selectively rely on accidental procreation only when it comes to same-sex couples.  *Cf. Cleburne*, 473 U.S. at 450 ("[T]he expressed worry about fire hazards, the serenity of the neighborhood, and the avoidance of danger to other residents fail rationally to justify singling out a home [for people with disabilities] for the special use permit, yet imposing no such restrictions on the many other uses freely permitted in the neighborhood.").

In a variation of the "accidental procreation" argument, Defendant Rainey also draws on Justice Alito's dissenting opinion in *Windsor* to argue that it is not irrational for Virginia to choose to adopt a "conjugal" vision of marriage instead of a "consent-based" vision.  Def. Ans. ¶¶ 101-04, 107-10; *Windsor*, 133 S. Ct. at 2718 (Alito, J., dissenting) (contrasting a "conjugal" or "traditional" view, which "sees marriage as an intrinsically opposite-sex institution" that is "inextricably linked to procreation and biological kinship," and a "consent-based" vision, which sees marriage as "the solemnization of mutual commitment" between two persons).  Framing this argument in philosophical terms does not rescue this procreation-based rationale.  It fails for all of the same reasons discussed above.  Moreover, Virginia has long held the "consent-based"

37

vision of marriage for heterosexual couples.  *See supra* Background, Part II.A (discussing history

of Virginia laws creating gender parity in marriage, abolishing doctrine of coverture, and

instituting no-fault divorce).  As Justice Alito noted, "[a]t least as it applies to heterosexual

couples, this [consent-based] view of marriage now plays a very prominent role in the popular

understanding of the institution.  Indeed, our popular culture is infused with this understanding of

marriage."  *Windsor*, 133 S. Ct. at 2718 (Alito, J., dissenting).

On this equal-protection challenge, the question is not whether Virginia may in the

abstract adopt a "conjugal view" of marriage for everyone, but whether Virginia may impose a

"conjugal" vision of marriage when it comes to the rights of same-sex couples while adopting a

consent-based vision of marriage for everyone else.  *See Eisenstadt*, 405 U.S. at 454 (*quoting Ry.

Express Agency v. New York*, 336 U.S. 106, 112-13 (1949) (Jackson, J., concurring)); *accord

Lawrence*, 539 U.S. at 585 (O'Connor, J., concurring).

### 3.     Virginia's Marriage Bans Cannot Be Justified by an Asserted Interest in "Optimal Childrearing."

Defendant Rainey asserts that Virginia's marriage bans also are justified by a state

interest in optimal parenting, which presumably refers to the notion that it is in the best interest

of children to be raised by married heterosexual parents rather than by two parents of the same

sex.  But even if it were rational for legislators to speculate that children raised by heterosexual

couples are better adjusted than children raised by gay ones—and it is not—there is simply no

rational connection between Virginia's marriage bans and the asserted goal.  As Defendant

Rainey concedes, the marriage bans are not "law[s] respecting parenting."  Ans. ¶ 70.  Virginia's

marriage bans do not prevent gay couples from having children.  And excluding same-sex

couples from marrying does nothing to prevent heterosexual couples from procreating out of

wedlock or encourage them to procreate within marriage.  *See Windsor*, 699 F.3d at 188;

38

*Golinski*, 824 F. Supp. 2d at 998; *Pedersen*, 881 F. Supp. 2d at 340-41; *Varnum*, 763 N.W.2d at 901.

The only effect that Virginia's marriage bans have on children's well-being is that they *harm* the children of same-sex couples who are denied the protection and stability of having parents who are married.  *See, e.g.*, SUF ¶¶ 3, 4, 10, 13-14.  Like the DOMA statute invalidated in *Windsor*, Virginia's marriage bans serve only to "humiliate" the  "children now being raised by same-sex couples" and "make[] it even more difficult for the children to understand the integrity and closeness of their own family and its concord with other families in their community and in their daily lives."  *Windsor*, 133 S. Ct. at 2694; *see also, e.g.*, SUF ¶¶ 3, 14.  "Excluding same-sex couples from civil marriage will not make children of opposite-sex marriages more secure, but it does prevent children of same-sex couples from enjoying the immeasurable advantages that flow from the assurance of a stable family structure in which children will be reared, educated, and socialized."  *Goodridge*, 798 N.E.2d at 964 (internal quotation marks and citation omitted)).  To the extent that Virginia's marriage bans visit these harms on children as a way to attempt (albeit irrationally) to deter other same-sex couples from having children, the Supreme Court has invalidated similar attempts to incentivize parents by punishing children as "'illogical and unjust.'"  *Plyler*, 457 U.S. at 220 (quoting *Weber v. Aetna Cas. & Sur. Co.*, 406 U.S. 164, 175 (1972)).  "'Obviously, no child is responsible for his birth and penalizing the . . . child is an ineffectual—as well as unjust—way of deterring the parent.'"  *Id.* (quoting *Weber*, 406 U.S. at 175).[11]

---

[11]Moreover, any law adopted with the purpose of burdening gay people's ability to procreate would also demand strict scrutiny for implicating the fundamental right to decide "'whether to bear or beget a child.'"  *Planned Parenthood of SE Penn. v. Casey*, 505 U.S. 833, 851 (1992) (quoting *Eisenstadt*, 405 U.S. at 453); *see Pedersen*, 881 F. Supp. 2d at 341.

The lack of rational connection between the marriage bans and the asserted goals of encouraging children to be raised by heterosexual couples is sufficient to render the marriage bans unconstitutional, even without considering whether the government has a legitimate basis for preferring different-sex over same-sex parents.  But the overwhelming scientific consensus, based on decades of peer-reviewed scientific research, shows unequivocally that children raised by same-sex couples are just as well adjusted as those raised by heterosexual couples.  This consensus has been recognized by every major professional organization dedicated to children's health and welfare, including the American Academy of Pediatrics, American Academy of Child and Adolescent Psychiatry, the American Psychiatric Association, the American Psychological Association, the American Psychoanalytic Association, and the Child Welfare League of America.  *See United States v. Windsor*, No. 12-307, Brief of the American Psychological Association, *et al.*, as *Amici Curiae* on the Merits in Support of Affirmance, 2013 WL 871958, at *14-26 (Mar. 1, 2013) (discussing this scientific consensus); *Hollingsworth v. Perry*, No. 12-144, and *United States v. Windsor*, No. 12-307, Brief of the American Sociological Ass'n, in Support of Respondent Kristin M. Perry and Respondent Edith Schlain Windsor, 2013 WL 840004, at *6-14 (Feb. 28, 2013).

This consensus has also been recognized by numerous courts.  *See Perry*, 704 F. Supp. 2d at 980 (finding that the research supporting the conclusion that "[c]hildren raised by gay or lesbian parents are as likely as children raised by heterosexual parents to be healthy, successful and well-adjusted" is "accepted beyond serious debate in the field of developmental psychology"); *In re Adoption of Doe*, 2008 WL 5006172, at *20 (Fla. Cir. Ct. Nov. 25, 2008) ("[B]ased on the robust nature of the evidence available in the field, this Court is satisfied that the issue is so far beyond dispute that it would be irrational to hold otherwise; the best interests

of children are not preserved by prohibiting homosexual adoption."), *aff'd sub nom. Fla. Dep't of*

*Children & Families v. Adoption of X.X.G.*, 45 So.3d 79 (Fla. Dist. Ct. App. 2010); *Howard v.*

*Child Welfare Agency Rev. Bd.*, Nos. 1999-9881, 2004 WL 3154530, at *9 and 2004 WL

3200916, at *3-4 (Ark. Cir. Ct. Dec. 29, 2004) (holding based on factual findings regarding the

well-being of children of gay parents that "there was no rational relationship between the

[exclusion of gay people as foster parents] and the health, safety, and welfare of the foster

children."), *aff'd sub nom. Dep't of Human Servs. v. Howard*, 238 S.W.3d 1 (Ark. 2006);

*Varnum*, 763 N.W.2d at 899 and n.26 (concluding, after reviewing "an abundance of evidence

and research," that "opinions that dual-gender parenting is the optimal environment for children .

. . is based more on stereotype than anything else"); *Golinski*, 824 F. Supp. 2d at 991 ("More

than thirty years of scholarship resulting in over fifty peer-reviewed empirical reports have

overwhelmingly demonstrated that children raised by same-sex parents are as likely to be

emotionally healthy, and educationally and socially successful as those raised by opposite-sex

parents.").

    In any event, even without considering the scientific consensus regarding parenting by

same-sex couples, the marriage bans still fail constitutional review as a matter of law because

there is no rational connection between the marriage bans and the asserted governmental interest

in optimal parenting,  Children being raised by different-sex couples are unaffected by whether

same-sex couples can marry, and children raised by same-sex couples will not end up being

raised by different-sex couples because their current parents cannot marry.  *See Golinski*, 824 F.

Supp. 2d at 997 ("Even if the Court were to accept as true, which it does not, that opposite-sex

parenting is somehow superior to same-sex parenting, DOMA is not rationally related to this

alleged governmental interest."); *accord Windsor*, 699 F.3d at 188; *Pedersen*, 881 F. Supp. 2d at 340-41; *Varnum*, 763 N.W.2d at 901.

      **4.**     **No Legitimate Interest Overcomes the Primary Purpose and Practical Effect of Virginia's Marriage Bans to Disparage and Demean Same-Sex Couples and Their Families.**

Because there is no rational connection between Virginia's marriage bans and any of the asserted state interests, this Court can conclude that the marriage bans violate equal protection even without considering whether they are motivated by an impermissible purpose.  *See Vill. of Willowbrook v. Olech*, 528 U.S. 562, 565 (2000) (allegations of irrational discrimination "quite apart from the Village's subjective motivation, are sufficient to state a claim for relief under traditional equal protection analysis").  In this case, however, the lack of any connection between Virginia's marriage bans and any legitimate state interest also confirms the inescapable conclusion that they were passed—and reaffirmed multiple times—because of, not in spite of, the harm they would inflict on same-sex couples.  And, even if it were possible to hypothesize a rational connection between Virginia's marriage bans and some legitimate governmental interest—and there is none—Virginia's marriage bans would still violate equal protection because no hypothetical justification can overcome the unmistakable primary purpose and practical effect of the marriage bans to disparage and demean the dignity of same-sex couples in the eyes of the Commonwealth and the wider community.

The Supreme Court in *Windsor* recently reaffirmed that when the primary purpose and effect of a law is to harm an identifiable group, the fact that the law may also incidentally serve some other neutral governmental interest cannot save it from unconstitutionality.  In defending the constitutionality of DOMA, the Bipartisan Legal Advisory Group ("BLAG") argued that the statute helped serve a variety of federal interests in promoting efficiency and uniformity, as well

42

as the same purported state interests that Defendant Rainey relies upon in this case.  According

to BLAG's merits brief:

> Congress could rationally decide to retain the traditional definition for the same basic
> reasons that states adopted the traditional definition in the first place and that many
> continue to retain it: There is a unique relationship between marriage and procreation that
> stems from marriage's origins as a means to address the tendency of opposite-sex
> relationships to produce unintended and unplanned offspring. There is nothing irrational
> about declining to extend marriage to same-sex relationships that, whatever their other
> similarities to opposite-sex relationships, simply do not share that same tendency.
> Congress likewise could rationally decide to foster relationships in which children are
> raised by both of their biological parents.

*See* Merits Brief of Bipartisan Legal Advisory Group in *United States v. Windsor*, 2013 WL

267026, at *21 (2013).  But the Supreme Court held that none of BLAG's rationalizations could

save the law.  The Court explained that "[t]he principal purpose [of DOMA] [was] to impose

inequality, not for other reasons like governmental efficiency," and "no legitimate purpose

overcomes the purpose and effect to disparage and injure" same-sex couples and their families.

*Windsor*, 133 S. Ct at 2694, 2696; *see also Vance v. Bradley*, 440 U.S. 93, 97 (1979) (rational-

basis review is deferential "absent some reason to infer antipathy"); *Lawrence*, 539 U.S. at 580

(O'Connor, J., concurring) ("When a law exhibits such a desire to harm a politically unpopular

group, we have applied a more searching form of rational basis review to strike down such laws

under the Equal Protection Clause.").

It is indisputable that Virginia's marriage bans were enacted because of, not in spite, of

their adverse effect on same-sex couples.  Although courts are reluctant to examine the intent

behind legislation in other contexts, when a constitutional claim is based on equal protection,

legislative intent "may be relevant insofar as the Court has held that unlawful motive is a specific

element of the test of constitutionality."  *S.C. Educ. Ass'n v. Campbell*, 883 F.2d 1251, 1259 n.6

(4th Cir. 1989); *see  Sylvia Dev. Corp.*, 48 F.3d at 819 (discussing "factors [that] have been

recognized as probative of whether a decisionmaking body was motivated by a discriminatory intent").

The historical background of each of the marriage bans reflects a targeted attempt to exclude same-sex couples, not a mere side-effect of some broader public policy. *Cf. Windsor*, 133 S. Ct. at 2693 (examining historical context of DOMA); *Arlington Heights*, 429 U.S. at 266-67 (explaining "historical background of the decision" is relevant when determining legislative intent). The marriage bans were not enacted long ago at a time when "many citizens had not even considered the possibility that two persons of the same sex might aspire to occupy the same status and dignity as that of a man and woman in lawful marriage." *Windsor*, 133 S. Ct. at 2689. They were enacted as specific responses to developments in other jurisdictions where same-sex couples sought the freedom to marry. *See supra* Background, Part I. In each case, the marriage bans did not simply represent a failure to include same-sex couples within the broader public policies advanced by marriage; they were specific, targeted efforts to exclude same-sex couples.

Indeed, in targeting the relationships of same-sex couples as unworthy of equal dignity and respect, the marriage bans were just part of a broader Virginia public policy to disparage gay people and same-sex couples by declaring their sexual intimacy to be punishable as "crimes against nature." VA Code Ann. § 18.2-361(A). Like other sodomy statutes, Virginia's ban imposed a far-reaching social stigma on gay people that serves as an "invitation to subject homosexual persons to discrimination both in the public and in the private spheres." *Lawrence*, 539 U.S. at 575.[12]

---

[12] Most dramatically, the criminal sodomy ban was frequently invoked by Virginia courts in family law disputes to deny gay people custody of their children. In 1985, the Virginia Supreme Court held that awarding custody to a gay father who shared a bedroom with his partner—or even allowing visitation in the father's home—"flies in the face . . . of society's mores." *Roe v.*

The legislative debates similarly reflect an intent to disparage same-sex relationships as "counterfeit" or "imitation[]" marriages driven solely by "sexual interest[s] or appetites." *See* Gaber Dec. ¶¶ 11, 20, 21. Most tellingly, as discussed above, although the proponents of the constitutional amendment initially included a "Savings Clause" to clarify that the amendment did not alter "[a]ny other right, benefit, obligation, or legal status" of unmarried persons—such as the ability to control who may make medical decisions on one's behalf—that purported "Savings Clause" was stricken from the bill (along with an introductory provision setting forth the purported purposes of marriage) and sweeping new language was added, barring creation or recognition of relationships "that intend[] to approximate the design, qualities, significance, or effects of marriage." *See supra* Background, Part I. The legislature adopted these modifications despite warnings from the one of the bill's chief sponsors that doing so would support arguments

---

*Roe*, 228 Va. 722, 726 (1985) (internal quotation marks omitted). The court reasoned that the father's "immoral and illicit relationship render[ed] him an unfit and improper custodian as a matter of law;" described the "relative degree of abhorrence by which our society regards" same-sex relationships by pointing to Virginia's felony sodomy law, "which is prosecuted with considerable frequency and vigor;" and claimed that the father's relationship placed an "intolerable burden upon [the daughter] by reason of the social condemnation attached to them." *Id.* at 727-28. In another widely publicized case, a Virginia trial court in 1993 granted a grandmother's petition to take Sharon Bottoms' son away from her because, as the trial court judge explained, her lesbian "conduct is illegal . . . a Class 6 felony in the Commonwealth of Virginia." *Bottoms v. Bottoms*, 457 S.E.2d 102, 109 (Va. 1995) (Keenan, J., dissenting) (quoting trial transcript); see *id.* (trial judge went on to declare "that her conduct is immoral" and "renders her an unfit parent."). The Virginia Supreme Court upheld the trial court's decision terminating the mother's custody despite the presumption favoring her as a natural parent. Among the factors it relied on was its assumption that having a lesbian mother would subject the child to social condemnation and thus disturb his relationships with peers and the community at large. *Id.* at 419-420.

After the Supreme Court invalidated Texas's criminal sodomy statute in *Lawrence*, a bill was introduced in the Virginia Senate in 2004 to bring Virginia's statute into compliance with the Constitution, but Virginia's legislature refused to remove the unconstitutional and stigmatizing law from its books during the same legislative session that it passed the Marriage Affirmation Act. See Virginia Legislative Information System, 2004 Session, Senate Bill 477, *available at* http://lis.virginia.gov/cgi-bin/legp604.exe?041+sum+SB477.

that the legislature was motivated primarily by animus toward gay people.  *See* Gaber Dec. at ¶¶

14-16.

      In addition to all the other contemporaneous evidence of an impermissible purpose, the

inescapable "practical effect" of Virginia's marriage bans is "to impose a disadvantage, a

separate status, and so a stigma upon" same-sex couples in the eyes of the state and the broader

community.  *Windsor*, 133 S. Ct at 2693; *see also Heckler v. Mathews*, 465 U.S. 728, 739-40

(1984) ("[A]s we have repeatedly emphasized, discrimination itself, by perpetuating 'archaic and

stereotypic notions' or by stigmatizing members of the disfavored group as 'innately inferior'

and therefore as less worthy participants in the political community . . . can cause serious

noneconomic injuries to those persons who are personally denied equal treatment solely because

of their membership in a disfavored group.") (footnote and citations omitted).  The marriage bans

collectively "diminish[] the stability and predictability of basic personal relations" of gay people

and "demeans the couple, whose moral and sexual choices the Constitution protects."  *Windsor*,

133 S. Ct.  at 2694 (citing *Lawrence*, 539 U.S. 558 (2003)).  The marriage bans thus constitute an

"official statement that the family relationship of same-sex couples is not of comparable stature

or equal dignity to the family relationship of opposite-sex couples" and that "that it is

permissible, under the law, for society to treat gay individuals and same-sex couples differently

from, and less favorably than, heterosexual individuals and opposite-sex couples."  *In re*

*Marriage Cases*, 183 P.3d 384 at 452.  That official statement of inequality is "in and of itself is

an invitation to subject homosexual persons to discrimination both in the public and in the

private spheres."  *Lawrence*, 539 U.S. at 575.

      The unmistakable intent of the marriage bans is to impose inequality on gay people and

their intimate relationships.  As noted above, Virginia's marriage bans are not rationally related

to any legitimate purpose.  But even if there were a rational connection to the marriage bans and

some legitimate purpose, that incidental connection could not "overcome[] the purpose and

effect to disparage and to injure" same-sex couples and their families.  *Windsor*, 133 S. Ct at

2696.

**II.     Virginia's Marriage Bans Infringe Plaintiffs' Fundamental Rights and Liberty Interests and Thus Violate the Guarantees of Due Process and Equal Protection in the Fourteenth Amendment.**

**A.     The Fundamental Right to Marry Includes the Right to Choose One's Spouse Free of Unwarranted Interference by the State.**

**1.     The Right to Marry Is a Fundamental Right that Belongs to the Individual.**

"The freedom to marry has long been recognized as one of the vital personal rights

essential to the orderly pursuit of happiness by free men."  *Loving*, 388 U.S. at 12 (citation

omitted); *accord Zablocki v. Redhail*, 434 U.S. 374, 383 (1978); *see generally Hawkins v.

Freeman*, 195 F.3d 732, 747 (4th Cir. 1999) (en banc) (listing the right "to marry" first among

"the relatively few, more generally shared, unenumerated rights that over time have been found

by the Supreme Court (and not without difficulty) to have that 'fundamental' quality.") (citation

omitted).[13]

Although states have a legitimate interest in regulating and promoting marriage, the

fundamental right to marry belongs to the individual.  "[T]he regulation of constitutionally

---

[13] Many other cases describe the right to marry as fundamental.  *Turner v. Safley*, 482 U.S. 78, 95 (1987) ("The decision to marry is a fundamental right"); *Moore v. East Cleveland*, 431 U.S. 494, 503 (1977) ("[T]he Constitution protects the sanctity of the family precisely because the institution of the family is deeply rooted in this Nation's history and tradition"); *Griswold v. Connecticut*, 381 U.S. 479, 485-486 (1965) (intrusions into the "sacred precincts of marital bedrooms" offend rights "older than the Bill of Rights"); *id.*, at 495-496 (Goldberg, J., concurring) (the law in question "disrupt[ed] the traditional relation of the family--a relation as old and as fundamental as our entire civilization"); *see generally Washington v. Glucksberg*, 521 U.S. 702, 727 n.19 (1997) (citing cases).

protected decisions, such as where a person shall reside or whom he or she shall marry, must be predicated on legitimate state concerns other than disagreement with the choice the individual has made." *Hodgson v. Minnesota*., 497 U.S. 417, 435 (1990); *see also Loving*, 388 U.S. at 12 ("Under our Constitution, the freedom to marry, or not marry, a person of another race resides with the individual and cannot be infringed by the State."); *Roberts v. United States Jaycees*, 468 U.S. 609, 620 (1984) (""[T]he Constitution undoubtedly imposes constraints on the State's power to control the selection of one's spouse . . . .").

### 2.   The Scope of a Fundamental Right or Liberty Interest Under the Due Process Clause Does Not Depend on Who Is Exercising that Right.

This case is about the fundamental right to marry—not, as Defendant Rainey attempts to reframe the issue, the "right to same sex marriage."  Rainey Ans. at ¶ 118.  The Supreme Court has consistently refused to narrow the scope of the fundamental right to marry by reframing a plaintiff's asserted right to marry as a more limited right that is about the characteristics of the couple seeking marriage.  Supreme Court cases addressing "the fundamental right to marry" do not recast it as merely "the right to interracial marriage," "the right to inmate marriage," or "the right of people owing child support to marry."  *See Golinski*, 824 F. Supp. 2d at 982 n.5 (citing *Loving*, 388 U.S. at 12; *Turner*, 482 U.S. at 94-96; *Zablocki*, 434 U.S. at 383-86; *accord In re Marriage Cases*, 183 P.3d at 421 n.33 (*Turner* "did not characterize the constitutional right at issue as 'the right to inmate marriage.'").

Indeed, Defendant Rainey's argument is exactly the same argument that the Supreme Court squarely rejected in *Lawrence* when it overruled *Bowers*.  *Lawrence* explained that the *Bowers* decision was flawed from the very outset in trying to distinguish the Court's liberty interest jurisprudence by characterizing the inquiry as "whether the Federal Constitution confers a fundamental right upon homosexuals to engage in sodomy."  *Lawrence*, 539 U.S. at 566-67

(quoting *Bowers*, 478 U.S. at 190).  In doing so, *Bowers* "fail[ed] to appreciate the extent of the liberty at stake," *Lawrence*, 539 U.S. at 567, just as does Rainey's attempt to recharacterize Plaintiffs' claims as seeking the "right to same-sex marriage."

    *Lawrence* held that the right of consenting adults (including same-sex couples) to engage in private, sexual intimacy is protected by the Fourteenth Amendment's protection of liberty, notwithstanding the historical existence of sodomy laws and their use against gay people.  For the same reasons, the fundamental right to marry is "deeply rooted in this Nation's history and tradition" for purposes of constitutional protection even though same-sex couples have not historically been allowed to exercise that right.  *See* Ans. ¶ 85.  "[H]istory and tradition are the starting point but not in all cases the ending point of the substantive due process inquiry." *Lawrence*, 539 U.S. at 572 (citation omitted).  While courts use history and tradition to identify the interests that due process protects, they do not carry forward historical limitations, either traditional or arising by operation of prior law, on which Americans may exercise a right once that right is recognized as one that due process protects.  This critical distinction—that history guides the *what* of due process rights, but not the *who* of which individuals have them—is central to due process jurisprudence.  "'Fundamental rights, once recognized, cannot be denied to particular groups on the ground that these groups have historically been denied those rights.'" *In re Marriage Cases*, 183 P.3d at 430 (quoting *Hernandez*, 855 N.E.2d at 23 (Kaye, C.J., dissenting) (brackets omitted)).

    For example, when the Court held that anti-miscegenation laws violated the fundamental right to marry in *Loving*, it did so despite a long tradition of excluding interracial couples from marriage.  *See supra* Background, Part II.A; *Planned Parenthood v. Casey*, 505 U.S. 833, 847-48 (1992) ("[I]nterracial marriage was illegal in most States in the 19[th] century, but the Court was

no doubt correct in finding it to be an aspect of liberty protected against state interference by the substantive component of the Due Process Clause in *Loving* . . . ."); *Lawrence*, 539 U.S. at 577-78 ("[N]either history nor tradition could save a law prohibiting miscegenation from constitutional attack.") (citation omitted).

Cases subsequent to *Loving* have similarly confirmed that the fundamental right to marry is available to even those who have not traditionally been eligible to exercise that right. The traditional right to marry did not include a right to divorce and marry a second time, as divorce was rare and difficult in the eighteenth and early nineteenth centuries in Virginia as elsewhere. *See supra*, Background, Part II.A. But in the modern era, the Supreme Court has repeatedly held that states may not burden an individual's right to remarry. *Boddie v. Connecticut*, 401 U.S. 371, 376 (1971) (states may not require indigent individuals to pay court fees in order to obtain a divorce, since doing so unduly burdened their fundamental right to marry again); *see also Zablocki*, 434 U.S. at 388-90 (state may not condition ability to marry on fulfillment of existing child support obligations). Similarly, the right to marry as traditionally understood in this country did not extend to people in prison. *See* Virginia L. Hardwick, *Punishing the Innocent: Unconstitutional Restrictions on Prison Marriage and Visitation*, 60 N.Y.U. L. Rev. 275, 277-79 (1985). Nevertheless, in *Turner v. Safley*, 482 U.S. 78, 95-97 (1987), the Supreme Court held that a state cannot restrict a prisoner's ability to marry without sufficient justification.[14]

--------

[14] When analyzing other fundamental rights and liberty interests in other contexts, the Supreme Court has consistently adhered to the principle that a fundamental right, once recognized, properly belongs to everyone. For example, in *Youngberg v. Romeo*, 457 U.S. 307, 315-16 (1982), the Supreme Court held that an individual involuntarily committed to a custodial facility because of a disability retained liberty interests including a right to freedom from bodily restraint, thus departing from a longstanding historical tradition in which people with serious disabilities were not viewed as enjoying such substantive due process rights and were routinely subjected to bodily restraints in institutions. Similarly, in *Eisenstadt*, 405 U.S. at 438, the

In sum, because the fundamental right to marry is firmly rooted in our nation's history, that right cannot be denied to interracial couples, divorced couples, prisoners, or same-sex couples simply because they have historically been prevented from exercising that right.

### 3.      The Fundamental Right to Marry Is Not Contingent on the Ability to Accidentally Procreate.

Defendant Rainey appears to argue that because same-sex couples cannot accidentally procreate, they are incapable of exercising the fundamental right to marry. That argument echoes statements made by the co-sponsor of the 2004 marriage ban and constitutional amendment asserting that marriages between same-sex couples were "counterfeit" marriages. *See* Background, Part I. But even if the ability to accidentally procreate were somehow an essential attribute of marriage—and it is not—the Supreme Court in *Turner v. Safley*, 482 U.S. 78 (1987), rejected the notion that the freedom to marry could be denied because the people seeking to marry could not engage in particular activities traditionally associated with a marital relationship. Under the policy struck down in *Turner*, prisoners were permitted to marry only in circumstances involving a pre-existing "pregnancy or the birth of an illegitimate child." *Turner*, 482 U.S. at 82. But the Supreme Court held that prisoners' freedom to marry could not be so restricted. Instead, the *Turner* Court methodically chronicled aspects of the marital relation that remain unaffected by incarceration and determined that the sum total of the other attributes was a

---

Supreme Court struck down a ban on distributing contraceptives to unmarried persons, building on its prior holding in *Griswold*, 381 U.S. at 486, that states could not prohibit the use of contraceptives by married persons. Importantly, the *Eisenstadt* Court did not suggest that this country had a specific history of protecting the sexual privacy of unmarried people. Rather, the Court held that, "[i]f the right to privacy means anything, it is the right of the individual, married or single, to be free from unwarranted governmental intrusion into matters so fundamentally affecting a person as the decision whether to bear or beget a child." *Eisenstadt*, 405 U.S. at 453. And in *Lawrence*, the Court followed *Eisenstadt* and other due process cases in holding that lesbian and gay Americans could not be excluded from the existing fundamental right to sexual intimacy, even though historically they had often been prohibited from full enjoyment of that right. *Lawrence*, 539 U.S. at 566-67.

marital relationship entitled to constitutional protection. *Id*. at 95 (while acknowledging the "substantial restrictions as a result of incarceration, . . . [m]any important attributes of marriage remain, however, after taking into account the limitations imposed by prison life."); *cf. Lawrence*, 539 U.S. at 578 ("decisions by married persons, concerning the intimacies of their physical relationship, even when not intended to produce offspring, are a form of 'liberty' protected by the Due Process Clause of the Fourteenth Amendment.").

The marriages that Plaintiffs seek to enter into, which enjoy all of the legal and social attributes of marriages of different-sex couples, save for the ability to beget children together as the two biological parents, involve the same fundamental right to marriage invoked since *Loving*, and Virginia's restriction should be evaluated for what it is, a burden on the exercise of that fundamental right. *See Perry*, 704 F. Supp. 2d at 993 ("same-sex couples are situated identically to opposite-sex couples in terms of their ability to perform the rights and obligations of marriage under California law. . . . Plaintiffs do not seek recognition of a new . . . "right to same-sex marriage" . . . . Rather, plaintiffs ask California to recognize their relationships for what they are: marriages."); *In re Marriage Cases*, 183 P.3d at 451 ("same-sex couples who choose to enter into the relationship with that designation will be subject to the same duties and obligations to each other, to their children, and to third parties that the law currently imposes upon opposite-sex couples who marry.").

In short, "[t]he personal enrichment afforded by the right to marry may be obtained by a couple whether or not they choose to have children, and the right to marry never has been limited to those who plan or desire to have children." *In re Marriage Cases*, 183 P.3d at 432. Of course, the Named Plaintiffs and countless other class members are in fact raising children, and they seek the benefits of marriage in large part for their children. But the absence of children,

52

now or in the future and biological or otherwise, does not vitiate the basic liberty and

fundamental right to marry all people enjoy.

      **B.**    **Virginia's Marriage Bans Infringe the Unmarried Plaintiffs' Fundamental Right to Marry and Other Protected Liberty Interests.**

Virginia's marriage bans violate the due process rights of the Unmarried Plaintiffs, by

denying each the right to marry his or her chosen partner.  Plaintiffs wish to express the nature,

depth, and quality of their lifelong commitment to each other in the way that they, their family,

their friends, and society at large best understand.  *See* SUF ¶ 13.  They wish to protect each

other, and their children, in a host of tangible ways through marriage.  *Id.* ¶¶ 2-6, 8-12.  Those

Plaintiffs who have or wish to have children seek to ensure that their children do not grow up

feeling as though their family is less legitimate than other families. *Id.* ¶ 14.  Above all, they

wish to marry or have their marriages recognized because they love each other, and because they

wish to spend the rest of their lives committed to each other.  *Id.* ¶¶ 1, 7.

Same-sex and different-sex couples seek to marry for the same reasons, and marriage

benefits spouses and their children in both tangible and intangible ways that are equally

important to same-sex and different-sex couples and their families.  Just as heterosexual persons

do, lesbian and gay individuals form loving and lasted committed relationships, which serve

basic human needs for love, attachment, and intimacy.  Like heterosexual individuals, lesbian

and gay people benefit not only from close intimate relationships but from social, emotional, and

material support for their relationships.  Marriage affords material benefits to spouses, fostering

psychological well-being, physical health, and longevity.  Marriage would provide Plaintiffs and

other same-sex couples with a well-understood social network of in-laws, friends, and others

who can provide emotional support and tangible assistance to them as a married couple, and

allow them to draw upon shared cultural expectations and respect for the relationship.  *See*

*generally* SUF ¶ 13.  In all of these ways, Plaintiffs' liberty interests in marrying the person each Plaintiff loves are the same as all other Virginians' liberty interests.

By denying the Unmarried Plaintiffs access to marriage (as well as to any equivalent relationship status recognized by the state), Virginia's marriage bans infringe not only their fundamental right to marry, but also a host of other related fundamental liberty interests.  The marriage bans burden the Unmarried Plaintiffs' protected interest in autonomy over "personal decisions relating to . . . family relationships," *Lawrence*, 539 U.S. at 573; *see also Santosky v. Kramer*, 455 U.S. 745, 753 (1982) ("freedom of personal choice in matters of family life is a fundamental liberty interest protected by the Fourteenth Amendment").  The marriage bans additionally impair Plaintiffs' ability to identify themselves to others as married couples and to participate fully in society as married couples, thus burdening their fundamental liberty interests in intimate association and self-definition.  *See Griswold*, 381 U.S. at 482-83 (discussing evolving concept of a protected liberty interest in intimate association); *Windsor*, 133 S. Ct. at 2689 (marriage permits same-sex couples "to define themselves by their commitment to each other" and "so live with pride in themselves and their union and in a status of equality with all other married persons.")

In addition, the marriage bans interfere with constitutionally protected interests in family integrity and association by precluding the Unmarried Plaintiffs from securing legal recognition of their relationships with their children.  By foreclosing the possibility that a parent like plaintiff Jessica Duff can marry her partner and then become a legal parent of the child they are raising together through a presumption of parenthood, adoption, or any other procedure, the marriage bans impair the ability of these parents to make decisions with regard to their children's school enrollment, travel, health care, and other important matters, thus infringing their fundamental

54

liberty interest in "direct[ing] the upbringing and education" of their children. *Pierce v. Soc'y of the Sisters of the Holy Names of Jesus & Mary*, 268 U.S. 510, 534-35 (1925). Such infringements on the bonds between children and the parents raising them violate the core of the substantive guarantees of the Due Process Clause as recognized by the Supreme Court. *Moore*, 431 U.S. at 503 ("Our decisions establish that the Constitution protects the sanctity of the family precisely because the institution of the family is deeply rooted in this Nation's history and tradition."); *see also Jordan by Jordan v. Jackson*, 15 F.3d 333, 343 (4th Cir. 1994) ("The bonds between parent and child are, in a word, sacrosanct").

Because the Unmarried Plaintiffs share the same fundamental interests as other Virginians in accessing marriage, Virginia's exclusion of same-sex couples, and therefore lesbian and gay individuals, from the freedom to marry infringes the Unmarried Plaintiffs' due process rights in the same ways prior attempts to exclude particular individuals and couples from the institution of marriage have infringed the due process rights of those individuals and couples. *See Turner*, 482 U.S. at 94-97; *Loving*, 388 U.S. at 12.

### C. Virginia's Marriage Bans Also Violate the Equal Protection Clause Because They Unjustifiably Discriminate Against Same-Sex Couples With Regard to the Exercise of Fundamental Rights and Liberty Interests.

Virginia's marriage bans discriminate against Plaintiffs in their exercise of their fundamental rights and liberty interests, and therefore implicate *both* the Due Process Clause and the Equal Protection Clause. *See Skinner v. Oklahoma*, 316 U.S. 535, 541 (1942) (it is "essential" that courts employ strict scrutiny when a state law denies "groups or types of individuals" rights such as "[m]arriage and procreation [that] are fundamental"); *see also* Erwin Chemerinsky, *Constitutional Law Principles and Policies* 793 (3d ed. 2006) ("[o]nce a right is deemed fundamental, under due process or equal protection, strict scrutiny is generally used."). Specifically with respect to classifications restricting who can enter into marriage, the Court has

55

held that "the right to marry is of fundamental importance, and since the classification at issue here significantly interferes with the exercise of that right, we believe that 'critical examination' of the state interests advanced in support of the classification is required." *Zablocki*, 434 U.S. at 383 (citation omitted).

At issue in *Zablocki* was Wisconsin's rule that no state resident under a court order to support a child not in his custody could marry without court permission, to be granted only upon proof of compliance with the support obligation, and a showing that his children were not presently, nor likely to become, public charges. *Id*. at 375. The Supreme Court assumed that Wisconsin's proffered goals of collecting child support and counseling those entering marriage of its financial consequences "are legitimate and substantial interests, but, since the means selected by the State for achieving these interests unnecessarily impinge on the right to marry, the statute cannot be sustained." *Id*. at 388. The Court explained that, for those who could not or would not satisfy the state's concern of providing for existing offspring, the absolute prevention of marriage was improper because it did not promote the welfare of those children and it well might lead to harm for future children a man might beget, for whom the law's "only result [is] in the children being born out of wedlock, as in fact occurred in appellee's case." *Id*. at 390. Just as Wisconsin's "carrot and stick" approach was deemed a bad fit for the state's objectives, similarly, the Virginia marriage bans fail any measure of scrutiny, in that it is irrational either to attempt to encourage lesbians and gay men to marry someone of a different sex or to impose legal disabilities on them and their children because their family unit differs from some ideal model proffered by the state.

**D.**     **The Married Plaintiffs Also Suffer An Unconstitutional Denial of their Fundamental Rights and Liberty Interests.**

Even though the Married Plaintiffs have validly married one another in jurisdictions that do not exclude same-sex couples from the freedom to marry, the Married Plaintiffs continue to suffer the practical and dignitary harms of being denied recognition of their marriage by their home state of Virginia. *See, e.g.*, SUF ¶¶ 8, 13. The Supreme Court recently considered the issue of refusal to recognize the valid marriages of same-sex couples in the context of a constitutional challenge to DOMA. In striking down the statutory provision that had denied gay and lesbian couples recognition of their otherwise valid marriages, the Court observed:

> [The discriminatory statute] tells those couples, and all the world, that their otherwise valid marriages are unworthy of . . . recognition. This places same-sex couples in an unstable position of being in a second-tier marriage. The differentiation demeans the couple, whose moral and sexual choices the Constitution protects . . . . And it humiliates tens of thousands of children now being raised by same-sex couples. The law in question makes it even more difficult for the children to understand the integrity and closeness of their own family and its concord with other families in their community and in their daily lives.

*Windsor*, 133 S. Ct. at 2694. Virginia's refusal to honor the marriages of those Plaintiffs who have married in other jurisdictions similarly demeans them, humiliates their children, and complicates the children's understanding of their own families' integrity, and in all of these ways infringes Plaintiffs' liberty and equality interests as protected by the Due Process and Equal Protection Clauses.

**E.**     **Marriage and Its Recognition Cannot Be Denied to Plaintiffs Absent a Compelling State Interest, Which the Commonwealth of Virginia Cannot Demonstrate.**

Because the marriage bans discriminatorily burden Plaintiffs' fundamental liberty interests, they are subject to strict scrutiny. State infringement of fundamental rights is constitutionally permissible only when "necessary to promote a compelling state interest." *Kramer v. Union Free Sch. Dist. No. 15*, 395 U.S. 621, 627 (1969). And even if marriage were

not a "fundamental right," in order to justify infringing upon the "significant constitutionally protected liberty interest at stake," the marriage bans would, at a minimum, have to be necessary to significantly serve important governmental interests in accordance with the heightened scrutiny balancing test used in *Sell v. United States*, 539 U.S. 166, 179 (2003). *See also Witt v. Dep't of Air Force*, 527 F.3d 806, 818-19 (9th Cir. 2008); *Cook v. Gates*, 528 F.3d 42, 55 (1st Cir. 2008). As discussed in Argument, Part I.C *supra*, not even a legitimate state interest, much less a compelling or significant one, exists to justify the marriage bans. Virginia's constitutional and statutory exclusion of Plaintiffs from the freedom to marry and from full recognition of their valid marriages cannot survive any level of scrutiny, and therefore violates the Due Process and Equal Protection guarantees of the U.S. Constitution.

### III.   *Baker v. Nelson* is not Controlling.

Defendant Rainey's Answer prominently invokes the Supreme Court's 1972 summary dismissal of the appeal for want of a substantial federal question in *Baker v. Nelson*, 191 N.W.2d 185 (1971), *appeal dismissed w/o op.*, 409 U.S. 810 (1972). But the Supreme Court has cautioned that, "'when doctrinal developments indicate otherwise,'" the lower federal courts should not "'adhere to the view that if the Court has branded a question as unsubstantial, it remains so.'" *Hicks v. Miranda*, 422 U.S. 332, 344 (1975) (quoting *Port Auth. Bondholders Protective Comm. v. Port of N.Y. Auth.*, 387 F.2d 259, 263 n.3 (2d Cir. 1967)); *see Dorsey v. Solomon*, 604 F.2d 271, 274-75 (4th Cir. 1979) (following guidance from "the Court's subsequent, reasoned opinion" as "better authority" than an earlier summary affirmance).

As the Second Circuit has explained, "In the forty years after Baker, there have been manifold changes to the Supreme Court's equal protection jurisprudence." *Windsor*, 699 F.3d at 178-79. "When Baker was decided in 1971, 'intermediate scrutiny' was not yet in the Court's vernacular. Classifications based on illegitimacy and sex were not yet deemed quasi-suspect.

58

The Court had not yet ruled that "a classification of [homosexuals] undertaken for its own sake" actually lacked a rational basis.  And, in 1971, the government could lawfully 'demean [homosexuals'] existence or control their destiny by making their private sexual conduct a crime.'" *Id.* at 179 (citations omitted).  *Baker* did not and could not address how any of these doctrinal developments bear on Plaintiffs' equal protection claims.  Similarly, *Baker* could not and did not address how Plaintiffs' substantive due process claims should be evaluated in light of the court's intervening decisions in *Eisenstadt v. Baird*, 405 U.S. 438 (1972), *Roe v. Wade*, 410 U.S. 113 (1973), *Carey v. Population Services Int'l*, 431 U.S. 678 (1977), *Zablocki v. Redhail*, 434 U.S. 374 (1978); *Turner v. Safley*, 482 U.S. 78 (1987), and *Lawrence v. Texas*, 539 U.S. 558 (2003).  For all these reasons, *Baker* is irrelevant.

# CONCLUSION

For the foregoing reasons, Plaintiffs request the Court enter summary judgment in their favor.


Dated: September 30, 2013

Respectfully submitted,
AMERICAN CIVIL LIBERTIES UNION
OF VIRGINIA FOUNDATION, INC.


_____/s/_____
Rebecca K. Glenberg (VSB No. 44099)
701 E. Franklin Street, Suite 1412
Richmond, Virginia 23219
Phone: (804) 644-8080
Fax: (804) 649-2733
rglenberg@acluva.org



LAMBDA LEGAL DEFENSE AND EDUCATION
FUND, INC.

Gregory R. Nevins, *pro hac vice*
730 Peachtree Street, NE, Suite 1070
Atlanta, Georgia 30308
Phone: (404) 897-1880
Fax: (404) 897-1884
gnevins@lambdalegal.org

Tara L. Borelli, *pro hac vice*
3325 Wilshire Boulevard, Suite 1300
Los Angeles, California 90010
Phone: (213) 382-7600
Fax: (213) 351-6050
tborelli@lambdalegal.org

*Counsel for Plaintiffs*


AMERICAN CIVIL LIBERTIES UNION
FOUNDATION

James D. Esseks, *pro hac vice*
Amanda C. Goad, *pro hac vice*
Joshua A. Block, *pro hac vice*
125 Broad Street, 18th Floor
New York, New York 10004
Phone: (212) 549-2500
Fax:  (212) 549-2650
jesseks@aclu.org
agoad@aclu.org
jblock@aclu.org


JENNER & BLOCK LLP

Paul M. Smith, *pro hac vice*
Luke C. Platzer, *pro hac vice*
Mark P. Gaber, *pro hac vice*
1099 New York Avenue, NW Suite 900
Washington, D.C. 20001-4412
Phone: (202) 639-6000
Fax: (202) 639-6066
psmith@jenner.com
lplatzer@jenner.com
mgaber@jenner.com

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the 30th day of September 2013, I effected service upon counsel for Defendants by electronically filing the foregoing with the Clerk of the Court using the CM/ECF system.

E. Duncan Getchell, Jr.
Solicitor General of Virginia
Office of the Attorney General
900 East Main Street
Richmond, Virginia 23219
(804) 786-7240
dgetchell@oag.state.va.us

Rita W. Beale
Deputy Attorney General
rbeale@oag.state.va.us

Allyson K. Tysinger
Senior Assistant Attorney General/Chief
atysinger@oag.state.va.us

Michael H. Brady
Assistant Solicitor General
mbrady@oag.state.va.us

*Counsel for Defendants Robert F. McDonnell and Janet M. Rainey*

Rosalie Pemberton Fessier
Timberlake, Smith, Thomas & Moses, P.C.
25 North Central Avenue
P.O. Box 108
Staunton, VA 24402-0108
(540) 885-1517
rfessier@tstm.com

*Counsel for Defendant Thomas E. Roberts*

September 30, 2013                                      _____/s/_____
                                                       Rebecca K. Glenberg (VSB No. 44099)
                                                       701 E. Franklin Street, Suite 1412
                                                       Richmond, Virginia 23219
                                                       Phone: (804) 644-8080
                                                       Fax: (804) 649-2733
                                                       rglenberg@acluva.org