IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
HARRISONBURG DIVISION

JOANNE HARRIS and JESSICA DUFF, and
CHRISTY BERGHOFF and VICTORIA KIDD,
on behalf of themselves and all others similarly
situated,

                *Plaintiffs*,

        v.

ROBERT F. MCDONNELL, in his official
capacity as Governor of Virginia; JANET M.
RAINEY, in her official capacity as State Registrar
of Vital Records; THOMAS E. ROBERTS, in his
official capacity as Staunton Circuit Court Clerk,

                *Defendants*.

No. 5:13-cv-00077

---

**REPLY BRIEF IN FURTHER SUPPORT OF
PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

       Pursuant to Rule 56 of the Federal Rules of Civil Procedure and the Court's Order dated

October 18, 2013, Plaintiffs Joanne Harris and Jessica Duff, and Christy Berghoff and Victoria

Kidd, and all others similarly situated (collectively "Plaintiffs"), submit the following reply brief

in further support of their motion for summary judgment.

<u>TABLE OF CONTENTS</u>

Argument ........................................................................................................................3

I.   *Baker v. Nelson* Does Not Apply...............................................................................3

II.  Virginia's Marriage Bans Violate the Fundamental Right to Marry. .......................6

III. Virginia's Marriage Bans Also Violate Equal Protection. .....................................10

    a.   Virginia's Marriage Bans Trigger Heightened Scrutiny Because They
        Discriminate Based on Sexual Orientation...................................................10

    b.   The Marriage Bans Trigger Heightened Scrutiny Because They Classify Based
        on Sex and Discriminate Based on Sex Stereotypes. ....................................13

    c.   The Constitutional Marriage Bans Triggers Heightened Scrutiny Because They
        Excludes Lesbians and Gay Men From Equal Participation in the Political
        Process. .........................................................................................................15

    d.   The Marriage Bans Are Not Rationally Related to Any Legitimate
        Governmental Purpose. .................................................................................16

        i.   The Marriage Bans Cannot Be Justified By an Asserted Interest in
            Preserving Historical Discrimination, Preventing Judicial Activism, or
            Federalism. ...........................................................................................16

        ii.  The Marriage Bans Cannot Be Justified By an Asserted Interest in Optimal
            Parenting, Responsible Procreation, or Promoting a "Conjugal Vision" of
            Marriage. ...............................................................................................20

        iii. The Primary Purpose and Effect of the Marriage Bans Is to Discriminate.............24

IV.  Plaintiffs' Injuries Are Redressable and Their Claims Do Not Implicate Section Two
     of the Defense of Marriage Act. ............................................................................26

V.   Plaintiffs Harris and Duff are Also Entitled to Summary Judgment on Their Claims
     Against Defendant Roberts in His Official Capacity as Staunton Circuit Court Clerk..........27

CONCLUSION.............................................................................................................30

i

## <u>TABLE OF AUTHORITIES</u>

Page(s)

CASES

*Ali v. Tenn. Department of Corrections*,
  No. 97-6234, 1998 U.S. App. LEXIS 28336 (6th Cir. Tenn. Nov. 5, 1998) ...........................9

*Andersen v. King County*,
  138 P.3d 963 (Wash. 2006), *rev'd*, 138 P.3d 963 (Wash. 2006) ........................................2, 18

*Arch Mineral Corp. v. Babbitt*,
  104 F.3d 660 (4th Cir. 1997) ................................................................................................28

*Baehr v. Lewin*,
  852 P.2d 44 (Haw. 1993), *superseded by* Haw. Const. Amend. 2.........................................13

*Baker v. Nelson*,
  191 N.W.2d 185 (Minn. 1971), *appeal dismissed*, 409 U.S. 810 (1972) ....................1, 3, 4, 6

*Block v. Rutherford*,
  468 U.S. 576 (1984)................................................................................................................9

*Brause v. Bureau of Vital Statistics*,
  No. 3AN–95–6562 CI, 1998 WL 88743 (Alaska Super. Ct. Feb. 27, 1998),
  *superseded by* Alaska Const. Art I § 25.................................................................................1

*Califano v. Webster*,
  430 U.S. 313 (1977) .............................................................................................................14

*Castle v. State*,
  No. 04-2-00614-4 2004 WL 1985215 (Wash. Super. Ct. 2004), *rev'd sub nom*,
  *Anderson v. King Cnty.*, 138 P.3d 963 (Wash. 2006) .............................................................2

*Christian Legal Society v. Martinez*,
  130 S. Ct. 2971 (2010).........................................................................................................13

*Citizens for Equal Protection v. Bruning*,
  455 F.3d 859 (8th Cir. 2006) ..........................................................................................11, 15

*City of Cleburne v. Cleburne Living Center.*,
  473 U.S. 432 (1985)........................................................................................................11, 21

*Clark v. Jeter*,
  486 U.S. 456 (1988)..............................................................................................................12

*Cook v. Gates*,
528 F.3d 42 (1st Cir. 2008).............................................................................11

*CSX Transp., Inc. v. Board of Public Works of State of West Virginia*,
138 F.3d 537 (4th Cir. 1998) ..........................................................................29

*Dorsey v. Solomon*,
604 F.2d 271 (4th Cir. 1979) .............................................................................5

*Dragovich v. United States Department of Treasury*,
872 F. Supp. 2d 954 (N.D. Cal. 2012) ...........................................................22

*Eisenstadt v. Baird*,
405 U.S. 438 (1972)......................................................................................9, 21

*Ex parte Young*,
209 U.S. 123 (1908)................................................................................3, 28, 29

*Faulkner v. Jones*,
51 F.3d 440 (4th Cir. 1995) .........................................................................14, 15

*Finberg v. Sullivan*,
634 F.2d 50 (3d Cir. 1980)..............................................................................29

*Garden State Equality v. Dow*,
NO. CIV.A. MER-L-1729-11, 2012 WL 540608 (N.J. Super. Ct. Feb. 21, 2012) ..................4

*Golinski v. United States Office of Personnel Management*,
824 F. Supp. 2d 968 (N.D. Cal. 2012) .........................................................13, 21

*Griswold v. Connecticut*,
381 U.S. 479 (1965)...........................................................................................9

*Hernandez v. Coughlin*,
18 F.3d 133 (2nd Cir. 1994)..............................................................................9

*Hernandez v. Robles*,
7 Misc.3d 459, 794 N.Y.S.2d 579 (N.Y. Sup. Ct.), *rev'd*, 805 N.Y.S.2d 354 (N.Y.
App. Div. 2005), *aff'd*, 855 N.E.2d 1 (NY. 2006) ..................................................2

*Hernandez v. Robles*,
855 N.E.2d 1 (N.Y. 2006)................................................................................18

*Hicks v. Miranda*,
422 U.S. 332 (1975).......................................................................................4, 5

*Hollingsworth v. Perry*,
133 S. Ct. 2652 (2013)......................................................................................4

*Holloway v. Arthur Andersen & Co.*,
566 F.2d 659, (9th Cir. 1977) ..................................................................................13

*Hooper v. Bernalillo County Assessor*,
472 U.S. 612 (1985).................................................................................................21

*Hunter v. Erickson*,
393 U.S. 385 (1969).................................................................................................15

*Illinois State Board of Elections v. Socialist Workers Party*,
440 U.S. 173 (1979)...................................................................................................5

*In re Anderson*,
No. 08-1831, 296 Fed. Appx. 347 (4th Cir. Oct. 16, 2008)......................................8

*In re Balas*,
449 B.R. 567 (Bankr. C.D. Cal. 2011).....................................................................13

*In re Coordination Proceeding, Special Title Rule 1550(c)*,
No. 4365, 2005 WL 583129 (Cal. Super. Ct. 2005), *rev'd sub nom.*, *In re Marriage Cases*, 49 Cal. Rptr. 3d 675 (Cal. App. 1st Dist. 2006), *rev'd*, 149 P.3d 737 (Cal. 2008) .........................................................................................................................2

*In re Kandu*,
315 B.R. 123 (Bkrtcy. W.D. Wash. 2004) ................................................................4

*In re Levenson*,
560 F.3d 1145 (9th Cir. EDR Op. 2009) .................................................................13

*In re Marriage Cases*,
183 P.3d 384 (Cal. 2008) .........................................................................................22

*Jackson v. Abercrombie*,
884 F. Supp. 2d 1065 (D. Haw. 2012), *appeal docketed*, Nos. 12-16995, 12-16998 (9th Cir. Sept. 10, 2012)...........................................................................................18

*Johnson v. California*,
543 U.S. 499 (2005).................................................................................................12

*Johnson v. Johnson*,
385 F.3d 503 (5th Cir. 2004) ...................................................................................11

*Johnson v. Robison*,
415 U.S. 361 (1974).................................................................................................21

*Jones v. Bates*,
127 F.3d 839 (9th Cir. 1997) .....................................................................................5

*Lawrence v. Texas*,
    539 U.S. 558 (2003)................................................................................................. passim

*Lee v. Nyquist*,
    318 F. Supp. 710 (W.D.N.Y. 1970), *summarily aff'd*, 402 U.S. 935 (1971)..........................15

*Lewis v. Harris*,
    908 A.2d 196 (N.J. 2006)...................................................................................................2

*Lofton v. Secretary of the Department of Children & Family Services*,
    358 F.3d 804 (11th Cir. 2004) ........................................................................................11

*Loving v. Virginia*,
    147 S.E.2d 78 (Va. 1966), *rev'd sub nom.*, *Loving v. Virginia*, 388 U.S. 1 (1967)................19

*Loving v. Virginia*,
    388 U.S. 1 (1967)......................................................................................6, 17, 19, 20

*Mandel v. Bradley*,
    432 U.S. 173 (1977)........................................................................................................5

*Massachusetts v. United States Department of Health & Human Services*,
    682 F.3d 1 (1st Cir. 2012)..............................................................................................20

*Metro Broadcasting, Inc. v. FCC*,
    497 U.S. 547 (1990), *overruled*, *Adarand Constructors, Inc. v. Pena*, 515 U.S. 200
    (1995)..........................................................................................................................13

*Northeastern Florida Chapter of the Associated General Contractors of America v.*
    *Jacksonville*, 508 U.S. 656 (1993) ..................................................................................15

*Pedersen v. Office of Personnel Management*,
    881 F. Supp. 2d 294 (D. Conn. 2012)............................................................................22

*Perry v. Brown*,
    671 F.3d 1052 (9th Cir. 2012), *vacated on jurisdictional grounds sub nom.*
    *Hollingsworth v. Perry*, 133 S. Ct. 2652 (2013).................................................................3

*Perry v. Schwarzenegger*,
    704 F. Supp. 2d 921 (N.D. Cal. 2010) ...........................................................................13

*Personnel Administrator of Massachusetts v. Feeney*,
    442 U.S. 256 (1979)......................................................................................................18

*Planned Parenthood of Southeastern Pennsylvania v. Casey*,
    505 U.S. 833 (1992)...............................................................................................7, 9, 10

*Plessy v. Ferguson*,
  163 U.S. 537 (1896)........................................................................................19

*Plyler v. Doe*,
  457 U.S. 202 (1982)........................................................................................12

*Poe v. Ullman*, 367 U.S. 497, 542 (1961)...................................................................7

*Price-Cornelison v. Brooks*,
  524 F.3d 1103 (10th Cir. 2008) .......................................................................11

*Roe v. Wade*,
  410 U.S. 113 (1973)..........................................................................................9

*Romer v. Evans*,
  517 U.S. 620 (1996)..........................................................................13, 24, 25

*Safley v. Turner*,
  586 F. Supp. 589 (W.D. Mo. 1984), *aff'd*, 777 F.2d 1307 (8th Cir. 1985), *aff'd in relevant part*, 482 U.S. 78 (1987) ..................................................................8

*Scarbrough v. Morgan County Board of Education*,
  470 F.3d 250 (6th Cir. 2006) ...........................................................................11

*Sevcik v. Sandoval*,
  911 F. Supp. 2d 996 (D. Nev. 2012), *appeal docketed*, No. 12-17668 (9th Cir. Dec. 14, 2012) ......................................................................................................18

*Shaw v. Reno*,
  509 U.S. 630 (1993)..........................................................................................14

*Smelt v. County of Orange*,
  374 F. Supp. 2d 861 (C.D. Cal. 2005), *vacated on other grounds*, 447 F.3d 673 (9th Cir. 2006) .................................................................................................4, 5

*Soto-Lopez v. New York City Civil Service Commission*,
  755 F.2d 266 (2d Cir. 1985)...............................................................................5

*Taylor v. Ouachita Parish School Board*,
  648 F.2d 959 (5th Cir. 1981) ............................................................................17

*Tenafly Eruv Association, Inc. v. Borough of Tenafly*,
  309 F.3d 144 (3d Cir. 2002)................................................................................5

*Texas Monthly, Inc. v. Bullock*,
  489 U.S. 1 (1989)..............................................................................................17

*Thomasson v. Perry,*
    80 F.3d 915 (4th Cir. 1996) ...........................................................................................10

*Townes v. Jarvis,*
    577 F.3d 543 (4th Cir. 2009) .........................................................................................28

*Triche-Wilson v. Shewry,*
    2006 U.S. Dist. LEXIS 92126 (E.D. Cal. 2006) ...........................................................29

*Turner v. Safley,*
    482 U.S. 78 (1987) ..............................................................................................8, 9, 22

*United States Department of Agriculture v. Moreno,*
    413 U.S. 528 (1973) ..................................................................................................21, 25

*United States v. Virginia,*
    518 U.S. 515 (1996) ..................................................................................................12, 14

*United States v. Windsor,*
    133 S. Ct. 2675 (2013) .......................................................................................22, 25, 27

*Virginia Office for Protection & Advocacy v. Stewart,*
    131 S.Ct. 1632 (2011) ...................................................................................................29

*Varnum v. Brien,*
    763 N.W.2d 862 (Iowa 2009) ....................................................................................21, 22

*Veney v. Wyche,*
    293 F.3d 726 (4th Cir. 2002) .........................................................................................10

*Washington v. Seattle School District No. 1,*
    458 U.S. 457 (1982) ......................................................................................................15

*Wildlife Federation. v. Limehouse,*
    549 F.3d 324 (4th Cir. 2008) .........................................................................................28

*Williams v. Illinois,*
    399 U.S. 235 (1970) ......................................................................................................17

*Windsor v. United States,*
    699 F.3d 169 (2d Cir. 2012) ...................................................................................passim

*Witt v. Department of Air Force,*
    527 F.3d 806 (9th Cir. 2008) .........................................................................................11

*Wright v. Collins,*
    766 F.2d 841 (4th Cir. 1985) .........................................................................................28

CONSTITUTIONAL PROVISIONS

Haw. Const. Article I, § 23 ..................................................................................19

Haw. Const. Amendment 2 .............................................................................14, 19

U.S. Const. Article IV § 1 ...................................................................................27

Va. Const. Article I, § 15-A ...........................................................................18, 24

STATUTES

28 U.S.C. § 1738C ................................................................................................27

42 U.S.C. § 1983 ..................................................................................................28

Va. Code Ann. § 20-45.2 ........................................................................................1

Va. Code Ann. § 20-45.3 ................................................................................18, 24

OTHER AUTHORITIES

Arthur S. Leonard, *Exorcising the Ghosts of Bowers v. Hardwick: Uprooting Invalid Precedents*, 84 Chi-Kent L. Rev. 519 (2009) ........................................................11

Brief of the American Psychological Association, *et al.*, as *Amici Curiae* on the Merits in Support of Affirmance, 2013 WL 871958 (Mar. 1, 2013)......................................22

Brief of the American Sociological Ass'n, in Support of Respondent Kristin M. Perry and Respondent Edith Schlain Windsor, 2013 WL 840004 (Feb. 28, 2013) ..........................22, 23

D.E. Sherkat, *The Editorial Process and Politicized Scholarship: Monday Morning Editorial Quarterbacking and a Call for Scientific Vigilance*, 41 Soc. Sci. Res. 1346 (2012)...................................................................................................................23

Douglas W. Allen, *High School Graduation Rates Among Children of Same-Sex Households*, REV. ECON. HOUSEHOLD (Sept. 2013)........................................................23

Dulcey B. Fowler, *Virginia Family Law: The Effect of The General Assembly's 1975 Revisions*, 1 Va. B. Ass'n J 7, 8-9 (1975) ..............................................................1

Kristen Anderson Moore, et al., *Marriage from a Child's Perspective: How Does Family Structure Affect Children, and What Can We Do About It*, Child Trends Research Br. (June 2002)............................................................................................................23

M. Regnerus, *How Different are the Adult Children of Parents Who Have Same-Sex Relationships? Findings from the New Family Structures Study*, 41 Soc. Sci. Res. 752 (2012)...................................................................................................................23

NBC4/NBC News/Marist Poll (Sept. 2013) at 19, *available at*
   http://maristpoll.marist.edu/wp-
   content/misc/VAPolls/VA130917/Complete%20September%202013%20Virginia_N
   BC4_NBC%20%20News_Marist%20Poll%20Tables.pdf#page=21.....................................16

S.B. 1, 27 Leg., Spec. Sess. (Haw. 2013) ....................................................................................19

Virginia Legislative Information System, 2005 Session, House Joint Resolution 586,
   *available at* http://lis.virginia.gov/cgi-bin/legp604.exe?051+ful+HJ586H2............................7

Virginia Legislative Information System, 2005 Session, House Joint Resolution 586,
   *available at* http://lis.virginia.gov/cgi-bin/legp604.exe?051+ful+HJ586H3............................7

<u>RESPONSE TO STATE DEFENDANTS'</u>
<u>STATEMENT OF UNDISPUTED FACTS</u>

1-15.   Undisputed.

16.   Plaintiffs do not dispute that Defendants have accurately quoted Noah Webster, An American Dictionary of the English Language, Vol. II (1st ed. 1828).

17.   Plaintiffs do not dispute that Defendants have accurately quoted Noah Webster, An American Dictionary of the English Language, Vol. II (1st ed. 1828).

18-36.  Undisputed.

37.   Plaintiffs do not dispute that in 1975 the marriage laws were amended to make them more gender-neutral in language and more gender-equitable in burden, obligations, and requirements.  Plaintiffs dispute Defendants' legal assertions regarding how "the rational basis test" applies to the amended statutes and assertions regarding what the purpose of the new statute, Va. Code Ann. § 20-45.2; Acts 1975, c. 644, prohibiting marriage between persons of the same sex "must be deemed to be."   As discussed in Plaintiffs' opening brief, that enactment was a response to *Baker v. Nelson*, 191 N.W.2d 185 (Minn. 1971), *appeal dismissed*, 409 U.S. 810 (1972), the first freedom-to-marry case filed by a same-sex couple in the United States.  *See* Dulcey B. Fowler, *Virginia Family Law: The Effect of The General Assembly's 1975 Revisions*, 1 Va. B. Ass'n J 7, 8-9 (1975).

38-42.  Undisputed.

43.   Plaintiffs dispute that "[a]s of 2006 'state courts in four states, Vermont Massachusetts, Hawaii, and Maryland" had "altered or struck down statutory definitions of marriage.'" Quoting 2006 Op. Va. Att'y Gen. 55, 58 (06-003).  As of 2006, statutory exclusions of same-sex couples from marriage had also been altered or struck down by, *inter alia*, *Brause v. Bureau of Vital Statistics*, No. 3AN–95–6562 CI, 1998 WL 88743 (Alaska Super. Ct.  Feb. 27,

1998), *superseded* by Alaska Const. art. I, § 25; *In re Coordination Proceeding, Special Title Rule 1550(c)*, No. 4365, 2005 WL 583129 (Cal. Super. Ct. 2005), *rev'd sub nom.*, *In re Marriage Cases*, 49 Cal. Rptr. 3d 675 (Cal. App. 1st Dist. 2006), *rev'd*, 149 P.3d 737 (Cal. 2008); *Lewis v. Harris*, 908 A.2d 196 (N.J.  2006); *Hernandez v. Robles*, 7 Misc.3d 459, 794 N.Y.S.2d 579, (N.Y. Sup. Ct.), *rev'd*, 805 N.Y.S.2d 354 (N.Y. App. Div. 2005), *aff'd*, 855 N.E.2d 1 (NY. 2006); *Andersen v. King Cnty.*, No. 04-2-04964-4-SEA, 2004 WL 1738447 (Wash. Super. Ct. 2004), *rev'd*, 138 P.3d 963 (Wash. 2006); and *Castle v. State*, No. 04-2-00614-42004 WL 1985215 (Wash. Super. Ct. 2004), *rev'd sub nom.*, *Andersen v. King Cnty.*, 138 P.3d 963 (Wash. 2006); Plaintiffs also dispute Defendants' legal assertions about both the rational basis test and the "purpose" of the constitutional amendment.

44.     Plaintiffs admit that Attachment 1 is the explanation issued by the State Board of Elections.  Plaintiffs dispute that the constitutional marriage ban merely constitutionalized the statutory definition of marriage.  The constitutional amendment also constitutionalized a statutory ban on civil unions or other relationships approximating marriage and constitutionalized a statutory ban on recognizing legally valid marriages from other jurisdictions. Plaintiffs do not dispute that the amendment was ratified on November 7, 2006.  Plaintiffs dispute that the purpose and effect of the constitutional marriage ban was "process-oriented"; the amendment prohibits all branches of government from extending marriage to same-sex couples, not just the judiciary.  Plaintiffs also dispute that insulating a statute from judicial review is, in itself, a legitimate governmental interest.

45-47.  Undisputed.

## ARGUMENT

In opposing Plaintiffs' motion for summary judgment, the State Defendants rely solely on legal arguments and do not assert that there is any factual dispute preventing this Court from resolving this case on summary judgment. Defendant Roberts asserts that a factual dispute exists with respect to whether the named Plaintiffs actually applied for a marriage license, but that dispute is not material because even based on Defendant Roberts' version of events, he is still subject to suit in his official capacity under *Ex parte Young*, 209 U.S. 123 (1908). In short, Defendants do not dispute the relevant facts and they are wrong about the relevant law. Plaintiffs' motion for summary judgment should be granted.

I.    *Baker v. Nelson* Does Not Apply.

In arguing that the outcome of this case is controlled by *Baker v. Nelson*, 191 N.W.2d 185 (Minn.1971), *appeal dismissed for want of substantial federal question*, 409 U.S. 810 (1972), Defendants egregiously distort the case law from other courts. State Def. Br. 18. Defendants cite the Second Circuit's decision in *Windsor* as authority that *Baker* forecloses constitutional challenges to state marriage bans. In fact, the Second Circuit held that *Baker* did not apply *both* because it involved a challenge to a state law instead of a federal one *and* because "[i]n the forty years after *Baker*, there have been manifold changes to the Supreme Court's equal protection jurisprudence." *Windsor v. United States*, 699 F.3d 169, 178-79 (2d Cir. 2012); *accord id.* at 179 ("These doctrinal changes constitute another reason why *Baker* does not foreclose our disposition of this case."). Defendants also assert that the Ninth Circuit held in *Perry* that *Baker* forecloses constitutional challenges to state marriage laws. In fact, the Ninth Circuit held in that now-vacated decision that it did not need to reach the question whether *Baker* applied because California's Proposition 8 withdrew a right to marry that had already been granted. *See Perry v. Brown*, 671 F.3d 1052, 1082 n.14 (9th Cir. 2012) ("Whether or not the

constitutionality of any ban on same-sex marriage was 'presented and necessarily decided' in *Baker*, and whether or not *Baker* would govern that question in light of subsequent 'doctrinal developments,' we address no such question here."), *vacated on jurisdictional grounds sub nom. Hollingsworth v. Perry*, 133 S. Ct. 2652 (2013).  Defendants' assertion that "every circuit which has spoken to the bar of *Baker v. Nelson* after *Lawrence* has recognized its continuing vitality" is simply false.  State Def. Br. 51.

As explained in Plaintiffs' opening brief, "'when doctrinal developments indicate otherwise,'" the lower federal courts should not "adhere to the view that if the Court has branded a question as unsubstantial, it remains so."  *Hicks v. Miranda*, 422 U.S. 332, 344 (1975) (internal quotation marks omitted).  *Baker* says nothing about whether Minnesota's law would be constitutional under precedent handed down after 1971.  *See Windsor*, 699 F.3d at 179; *see also Smelt v. County of Orange*, 374 F. Supp. 2d 861, 873 (C.D. Cal. 2005) ("Doctrinal developments show it is not reasonable to conclude the questions presented in the *Baker* jurisdictional statement would still be viewed by the Supreme Court as "'unsubstantial.'"), *vacated on other grounds*, 447 F.3d 673 (9th Cir. 2006); *In re Kandu*, 315 B.R. 123, 138 (Bkrtcy. W.D. Wash. 2004) (explaining that "*Baker* is not binding precedent" because of, among other things, "the possible impact of recent Supreme Court decisions, particularly as articulated in *Lawrence*"); *Garden State Equality v. Dow*, NO. CIV.A. MER-L-1729-11,  2012 WL 540608, at *4 (N.J. Super. Ct. Feb. 21, 2012) ("The United States Supreme Court has decided several pertinent cases both contemporaneous with *Baker* and more recently which indicate that the issue of denying same-sex couples access to the institution of marriage would not be considered 'unsubstantial' today.").

Defendants argue that, even if *Baker* has been overtaken by other doctrinal developments in the past 40 years, lower courts must continue to follow *Baker* until the Supreme Court

explicitly overrules it.  State Def. Br. 19.  But that rule applies only to published opinions; it does not apply to summary affirmances like *Baker*.  The Supreme Court has been crystal clear that "summary affirmances have considerably less precedential value than an opinion on the merits." *Ill. State Bd. of Elec. v. Socialist Workers Party*, 440 U.S. 173, 180-81 (1979).  For summary affirmances, a lower court is *required* to independently examine a question in light of subsequent "doctrinal developments" even when the case has not been explicitly overruled.  *Hicks*, 422 U.S. at 344.  "In contrast to full opinions of the Supreme Court, the Court also has stated doctrinal developments may show a summary dismissal is no longer binding."  *Smelt*, 374 F. Supp. 2d at 874; *see Dorsey v. Solomon*, 604 F.2d 271, 274-75 (4th Cir. 1979) (following subsequent reasoned opinion as "better authority" than prior summary affirmance); *see also Tenafly Eruv Ass'n, Inc. v. Borough of Tenafly*, 309 F.3d 144, 173 n.33 (3d Cir. 2002) ("[S]ubsequent doctrinal developments remove whatever precedential authority a summary disposition inconsistent with them might have"); *Jones v. Bates,* 127 F.3d 839, 851 n.13 (9th Cir. 1997) ("[E]ven if we were to assume that [a summary affirmance] concerned precisely the same issues involved here, extensive intervening doctrinal developments . . . strongly suggest that continued reliance on [the summary affirmance] is unwarranted"); *Soto-Lopez v. N.Y. City Civil Serv. Comm'n*, 755 F.2d 266, 273 (2d Cir. 1985) (holding that summary affirmance in 1974 is no longer binding in light of intervening precedent from 1982).

Moreover, even without these additional doctrinal developments, *Baker* is not controlling because it involved different  issues.  "Summary actions . . .  should not be understood as breaking new ground but as applying principles established by prior decisions to the particular facts involved."  *Mandel v. Bradley*, 432 U.S. 173, 176 (1977).  In the Minnesota law at issue in *Baker*, there was an "absence of an express statutory prohibition against same-sex marriages" that would reflect a deliberate effort to single out same-sex couples for exclusion.  *Baker*, 191

N.W.2d at 185.  *Baker* thus does not address the constitutionality of laws that explicitly exclude same-sex couples and that were repeatedly reaffirmed with the specific purpose of blocking same-sex couples from marrying, or laws that refuse to recognize the valid marriages of same-sex couples entered into in other jurisdictions, or laws that exclude same-sex couples from eligibility for any legal status similar to marriage, or laws that enshrine the exclusion of same-sex couples from marriage in a state constitution.  For all these reasons, *Baker* is irrelevant.

II.     Virginia's Marriage Bans Violate the Fundamental Right to Marry.

As explained in Plaintiffs' opening brief, by attempting to reframe the right at stake in this case as the right to "same-sex marriage," Defendants "fail[] to appreciate the extent of the liberty at stake." *Lawrence*, 539 U.S. 558, 567 (2003); *see* Pls. Br. 48-49.  The fundamental right to marry cannot be denied to certain groups based on the fact that they have been denied that right in the past.  Pls. Br. 48-50.  Defendants' opposition brief only reinforces that point by cataloguing a long history of discriminatory marriage provisions in Virginia law that would be plainly unconstitutional if enforced today.  *See* Def. SOUF ¶ 3 (discussing statute "provid[ing] for ministers of the established church to have a monopoly on celebrating marriages"); *id.* at ¶ 4 (discussing statute requiring that marriages be performed in accordance with the 1662 Book of Common Prayers); *id.* at ¶ 24 (noting that Virginia prohibited slaves from marrying before the Civil War); *id.* at ¶ 30 (discussing Virginia's eugenics statute prohibiting people with mental disabilities from marrying unless the woman was over 45 years old); *id.* at ¶ 37 (noting that, until 1975, Virginia's marriage laws imposed unequal "burdens, obligations, and requirements" on men and women).  One glaring omission from this collection of unconstitutional marriage laws, of course, is Virginia's anti-miscegenation statute, which was invalidated by the Supreme Court in *Loving v. Virginia*, 388 U.S. 1 (1967).  The fact that Virginia's marriage bans are part of a long history of unjust marriage restrictions is a reason to strike them down, not a reason to

uphold them. *See Planned Parenthood of Se. Penn. v. Casey*, 505 U.S. 833, 850 (1992)

(explaining that substantive due process must be determined by "having regard to what history

teaches are the traditions from which it developed as well as the traditions from which it broke"

(citing *Poe v. Ullman*, 367 U.S. 497, 542 (1961) (Harlan, J., dissenting on jurisdictional

grounds)).  Defendants' recitation of discarded marriage laws from years past only underscores

the fact that the historical roots of marriage do not define the institution that is protected by the

Constitution.

      Defendants also demean the liberty at stake with respect to the right to marry more

generally by characterizing marriage as an institution whose sole purpose is to "regulate the

consequences of man/woman intercourse."   State Def. Br. 32.  As the Supreme Court noted in

*Lawrence,* "it would demean a married couple were it to be said that marriage is simply about the

right to have sexual intercourse." *Lawrence*, 539 U.S. at 567.  Few, if any, different-sex couples

would describe their marriage in those terms. *See Windsor*, 133 S. Ct. 2675, 2718 (2013) (Alito,

J., dissenting).  Indeed, when the sponsor of the marriage amendment tried to include an

introductory preamble reciting a reproduction-based purpose for marriage, the legislature

rejected it. *Compare* Virginia Legislative Information System, 2005 Session, House Joint

Resolution 586, *available at* http://lis.virginia.gov/cgi-bin/legp604.exe?051+ful+HJ586H2

(asserting that the purpose of marriage is to "unit[e] the two sexes in a committed,

complementary, and conjugal partnership; for begetting posterity; and for providing children

with the surest opportunity to be raised by their mother and father") *with* Virginia Legislative

Information System, 2005 Session, House Joint Resolution 586, *available at*

http://lis.virginia.gov/cgi-bin/legp604.exe?051+ful+HJ586H3 (substituting new text that omits

the preamble recitation of marriage's purpose); *see also* Pls' Br. at 5-6 (summarizing legislative history of the amendment).[1]

Defendants' attempt to elevate potential procreation by different-sex spouses as essential to the existence of a constitutionally protected marital relationship is also flatly contrary to *Turner v. Safley*, a case that Defendants almost completely ignore. The challenged prison regulations in *Turner* allowed an inmate to get married if "the relationship had resulted in a pregnancy or an illegitimate child prior to the request." *Safley v. Turner*, 586 F. Supp. 589, 592 (W.D. Mo. 1984), *aff'd*, 777 F.2d 1307 (8th Cir. 1985), *aff'd in relevant part*, 482 U.S. 78 (1987). Because the prison was already facilitating marriages that ameliorated the effects of nonmarital procreation, the marriages sought by the plaintiffs in that case did not advance that interest. Nevertheless, a unanimous Supreme Court held that prison officials were violating the inmates' fundamental right to marry because even without the possibility of accidental procreation, the marriages of inmates retained an "important and significant aspect of the marital relationship," including "expressions of emotional support and public commitment," "an exercise of religious faith as well as an expression of personal dedication," and "a precondition to the receipt of government benefits." *See Turner v. Safely*, 482 U.S. 78, 95-96 (1987). *Turner* thus definitively establishes the error of assuming that one's fundamental right to marry vanishes if the relationship cannot lead to accidental biological procreation.[2]

---

[1] Even Defendants' own recitation of facts refutes the notion that the right to marry in Virginia has always been conditioned on procreative capacity. As Defendants note, Virginia's notorious eugenics statute prohibited people with mental disabilities from marrying unless the woman being married was over 45 years old and therefore beyond childbearing age. Def. SOF ¶ 30. In other words, Virginia allowed certain marriages only if the couple was *unable* to procreate.

[2] Further undermining the supposed indispensability of potential procreation to a protected constitutional marital relationship are the cases before and after *Turner* holding that a married inmate has no right to conjugal visits in pursuit of the right to procreate with his or her non-inmate spouse. *See In re Anderson*, No. 08-1831, 296 Fed. Appx. 347 (4th Cir. Oct. 16, 2008)

Boiled down to its essentials, Defendants' argument is that even if there is in fact no inextricable connection between marriage and biological procreation for different-sex couples, it is important to exclude same-sex couples from the institution in order to reinforce a "norm" that marriage *should be* linked to biological procreation.  State Def. Br. 32.  But "[i]t is settled now . . . that the Constitution places limits on a State's right to interfere with a person's most basic decisions about family and parenthood."  *Casey*, 505 U.S. at 849.  Unless it can satisfy the strict scrutiny required of laws restricting fundamental rights, Virginia does not have the power to enforce that norm by prohibiting same-sex couples from marrying, just as it does not have the power to enforce that norm by prohibiting married couples from using birth control, *Griswold v. Connecticut*, 381 U.S. 479 (1965), by prohibiting unmarried people from using birth control, *Eisenstadt v. Baird*, 405 U.S. 438 (1972), by prohibiting women from terminating an unwanted pregnancy, *Roe v. Wade*, 410 U.S. 113 (1973), by preventing prisoners from marrying unless their circumstances involve pregnancy or the birth of an illegitimate child, *Turner v. Safley*, 482 U.S. 78 (1987), or by preventing people from engaging in private consensual sexual activity outside the context of marriage, *Lawrence v. Texas*, 539 U.S. 558 (2003).  There may be philosophical disagreements about the link between marriage and procreation in modern society, but the government cannot "resolve these philosophic questions" by restricting the liberty of individuals to make their own decisions or control their own destinies.  *Casey*, 505 U.S at 850; *see id.* ("Our obligation is to define the liberty of all, not to mandate our own moral code.").

According to Defendants, "[t]he traditional definition of marriage is a reflection of the community's understanding of the human person and the ideal ordering of human relationships.

---

("The Constitution does not guarantee conjugal visitation privileges to incarcerated persons."); *Ali v. Tenn. Dep't of Corr.*, No. 97-6234, 1998 U.S. App. LEXIS 28336 (6th Cir. Tenn. Nov. 5, 1998); *Hernandez v. Coughlin*, 18 F.3d 133, 137 (2nd Cir. 1994); *see generally Block v. Rutherford*, 468 U.S. 576 (1984).

These are deep questions of identity and meaning that are not easily subject to measurement."
State Def. Br. 33.  Under our constitutional structure, however, individuals have the liberty to
resolve those "deep questions of identity and meaning" for themselves.  "These matters,
involving the most intimate and personal choices a person may make in a lifetime, choices
central to personal dignity and autonomy, are central to the liberty protected by the Fourteenth
Amendment. . . . Beliefs about these matters could not define the attributes of personhood were
they formed under compulsion of the State."  *Casey*, 505 U.S. at 851.  Whether or not Virginia
believes that same-sex couples reflect "the ideal ordering of human relationships," State Def. Br.
33, as the Supreme Court explained in *Lawrence* with respect to sodomy laws, the
Commonwealth cannot "cannot demean their existence or control their destiny" by denying them
the freedom to marry.  *Lawrence*, 539 U.S. at 578.

III.    Virginia's Marriage Bans Also Violate Equal Protection.

   a.    Virginia's Marriage Bans Trigger Heightened Scrutiny Because They
         Discriminate Based on Sexual Orientation.

As discussed in Plaintiffs' opening brief, *Thomasson v. Perry*, 80 F.3d 915 (4th Cir.
1996) (en banc), and *Veney v. Wyche*, 293 F.3d 726, 732 (4th Cir. 2002), are no longer good law,
and the standard of scrutiny for sexual orientation classifications is an open question in the
Fourth Circuit.  Pls. Br. 15-16.  Defendants incorrectly assert that no federal circuit court of
appeals has applied heightened scrutiny to sexual orientation classifications, State Def. Br. 23,
curiously overlooking the Second Circuit's decision in *Windsor*, which explained in detail why
heightened scrutiny is required.  *See Windsor*, 699 F.3d at 181-85.  The overwhelming majority
of the other decisions cited by Defendants erroneously relied (often in dicta) on pre-*Lawrence*
precedent holding that sexual orientation classifications could not be deemed suspect because

10

intimate same-sex conduct could itself be made a crime.[3]  No circuit court after *Lawrence* has examined the four factors relevant to applying heightened scrutiny and concluded that those factors do not apply to sexual orientation classifications.

Defendants' meager attempts to argue that sexual orientation does not satisfy the traditional heightened-scrutiny considerations all fall flat.  Although Defendants do not appear to dispute that lesbians and gay men have suffered a history of discrimination, they attempt to argue that sexual orientation is relevant to their ability to contribute to society because same-sex couples do not have "the procreative capacity of opposite-sex unions."  State Def. Br. 24.  But that misunderstands the proper inquiry.  *See Windsor*, 699 F.3d at 182-83 (rejecting a similar argument).  The relevant question for heightened scrutiny is whether, as a general matter, a classification usually bears on a person's ability to contribute to society – not whether a classification is *always* irrelevant in all contexts.  *See City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 446 (1985) (noting that courts "should look to the likelihood that governmental action premised on a particular classification is valid as a general matter, not merely to the specifics of the case before us" as the proper question is whether a characteristic  is one that "the

---

[3]  *See, e.g.*, *Cook v. Gates*, 528 F.3d 42, 61 (1st Cir. 2008) (relying on pre-*Lawrence* precedent); *Witt v. Dep't of Air Force*, 527 F.3d 806, 821 (9th Cir. 2008) (same); *Price-Cornelison v. Brooks*, 524 F.3d 1103, 1113 n.9 (10th Cir. 2008) (same); *Scarbrough v. Morgan Cnty. Bd. of Educ.*, 470 F.3d 250, 261 (6th Cir. 2006) (same); *Lofton v. Sec'y of the Dep't of Children & Family Servs.*, 358 F.3d 804, 818 & n.16 (11th Cir. 2004); *see generally* Arthur S. Leonard, *Exorcising the Ghosts of* Bowers v. Hardwick*:  Uprooting Invalid Precedents*, 84 Chi.-Kent L. Rev. 519 (2009).

In addition to cases that explicitly relied on pre-*Lawrence* precedent, the Eighth Circuit in *Citizens for Equal Protection v. Bruning*, 455 F.3d 859 (8th Cir. 2006), held that rational-basis review applies but did not consider the four heightened scrutiny considerations in reaching that conclusion.  The Fifth Circuit in *Johnson v. Johnson*, 385 F.3d 503, 532 (5th Cir. 2004), also held, in the context of ruling on qualified immunity, that the level of scrutiny during the period from 2000 to 2002 was rational-basis review, but the court did not address what the standard of scrutiny should be after *Lawrence*.  The Seventh and D.C. Circuits have not issued any decisions after *Lawrence* addressing the standard of scrutiny for sexual orientation classifications.  And the Third Circuit has not issued any decisions on the issue either before or after *Lawrence*.

government may legitimately take into account in a wide range of decisions"); *Clark v. Jeter*, 486 U.S. 456, 461 (1988) (explaining that classifications based on illegitimacy receive intermediate scrutiny even though "it might be appropriate to treat illegitimate children differently in the support context because of 'lurking problems with respect to proof of paternity'"); *United States v. Virginia*, 518 U.S. 515, 533 (1996) (stating that, even though sex-based classifications receive heightened scrutiny, there remain certain "inherent differences" between men and women).  The purpose of applying heightened scrutiny is to acknowledge that "[s]ome classifications are more likely than others" to be used illegitimately and must therefore be examined more closely.  *Plyler v. Doe*, 457 U.S. 202, 216 n.14 (1982); *cf. Johnson v. California*, 543 U.S. 499, 506 (2005) ("We . . . apply strict scrutiny to all racial classifications to 'smoke out' illegitimate uses of race by assuring that [government] is pursuing a goal important enough to warrant use of a highly suspect tool."  (internal quotation marks omitted)).  Whether a use of the classification in a particular context is or is not legitimate is then tested within the heightened-scrutiny framework.  *See Windsor*, 699 F.3d at 183.

Defendants also assert that lesbians and gay men have political power because "same-sex marriage is the subject of ongoing political debate."  State Def. Br. 25.  But claims about political power cannot by themselves justify putting basic constitutional rights up for popular vote.  In any event, as explained in Plaintiffs' opening brief, the limited advances that gay people have secured pale in comparison to the political power of women at the time sex was recognized as a quasi-suspect classification, and those limited successes do not alter the conclusion that lesbians and gay men "are not in a position to adequately protect themselves from the discriminatory wishes of the majoritarian public."  *Windsor*, 699 F.3d at 185.

Finally, Defendants assert that Plaintiffs' "immutability point is weak" but do not explain how that is so.  State Def. Br. 25.  Citing to a Ninth Circuit decision regarding transsexuals,

which has since been overruled, Defendants also assert that there would be "complexities involved merely in defining the applicable group term" for a sexual orientation classification. State Def. Br. 25 (citing *Holloway v. Arthur Andersen & Co.*, 566 F.2d 659, 663 (9th Cir. 1977) (brackets omitted), *abrogated by Schwenk v. Hartford*, 204 F.3d 1187 (9th Cir. 2000)). But classifications based on race receive heightened scrutiny even though racial categories are a notoriously imprecise and scientifically inaccurate concept. *See Metro Broad., Inc. v. FCC*, 497 U.S. 547, 663 n.1 (1990) (Kennedy, J., dissenting) (citing not only legal but "practical" difficulties with government racial classifications, citing as an example a 500-year genealogical survey to determine whether an applicant was Hispanic), *overruled*, *Adarand Constructors, Inc. v. Pena*, 515 U.S. 200 (1995). In any event, Defendants do not explain how it is difficult to identify laws that classify based on sexual orientation, especially given that courts have had no trouble identifying such laws and holding them unconstitutional. *See, e.g.*, *Romer v. Evans*, 517 U.S. 620 (1996); *Christian Legal Soc'y v. Martinez*, 130 S. Ct. 2971, 2990 (2010) (recognizing that policies targeting conduct engaged in by same-sex couples discriminate against gay people).

b.   The Marriage Bans Trigger Heightened Scrutiny Because They Classify Based on Sex and Discriminate Based on Sex Stereotypes.

Virginia's marriage bans are also subject to heightened scrutiny because they explicitly classify based on sex and discriminate based on sex stereotypes. *See Perry v. Schwarzenegger*, 704 F. Supp. 2d 921, 996 (N.D. Cal. 2010); *Golinski v. U.S. Office of Pers. Mgmt.*, 824 F. Supp. 2d 968, 982 n.4 (N.D. Cal. 2012); *In re Balas*, 449 B.R. 567, 577-78 (Bankr. C.D. Cal. 2011*); In re Levenson*, 560 F.3d 1145, 1147 (9th Cir. EDR Op. 2009); *Baehr v. Lewin*, 852 P.2d 44, 64 (Haw. 1993), *superseded by* Haw. Const. Amend. 2.[4]

---

[4] Defendants support their argument by passages from the VMI case that in no way limit the application of heightened scrutiny to only certain explicit gender classifications; the very holding

Defendants argue that the sex-based classifications in the marriage bans are exempt from heightened scrutiny because they are not designed to denigrate members of either sex or deny opportunity to men or women.  State Def. Br. 26.  But heightened scrutiny applies to *all* explicit sex-based classifications regardless of whether those classifications have a purpose to denigrate or deny opportunity.  *See Califano v. Webster*, 430 U.S. 313 (1977) (per curiam) (upholding sex-based classification as serving a benign purpose, but only after subjecting it to heightened scrutiny).  As the Fourth Circuit explained when it rejected a similar attempt to insulate from heightened scrutiny The Citadel's admission policy:   "Although *facially neutral* statutes which have a discriminatory impact do not violate the Equal Protection Clause unless discriminatory intent can be demonstrated, discriminatory intent need not be established independently when the classification is explicit, as in this case." *Faulkner v. Jones*, 51 F.3d 440, 444 (4th Cir. 1995) (citation omitted; emphasis in original).  Even if The Citadel's male-only admissions policy was not motivated by misogyny, the policy contained "an explicit gender-based classification" and was therefore subject to heightened scrutiny.  *Id.*

Moreover, as explained in Plaintiffs' opening brief, Pls. Br. 25-26, the sex-based classifications in this case are, in fact, based on sex stereotypes about the supposed "complementarity" of men and women and the parenting roles of men and women.  *See* State Def. Br. 32-34.  Like any other law that classifies based on sex, the marriage bans must be tested through the framework of heightened scrutiny in order to determine whether those sex-based classifications are constitutional.  *Cf. Shaw v. Reno*, 509 U.S. 630, 642 (1993) (explaining that "[e]xpress racial classifications are immediately suspect because, absent searching judicial

---

of the case is that the circuit court erred in deferentially reviewing Virginia's ostensibly benign remedial proposal.  *Virginia*, 518 U.S. at 555.

inquiry there is simply no way of determining what classifications are 'benign'" (internal quotation marks omitted; alterations incorporated)).

      c.      The Constitutional Marriage Bans Triggers Heightened Scrutiny Because They Excludes Lesbians and Gay Men From Equal Participation in the Political Process.

Defendants argue that any equal protection claims based on the marriage amendment's exclusion of lesbian and gay men from the normal political process are not viable because Plaintiffs have not suffered an injury in fact. State Def. Br. 28. But the Eighth Circuit rejected that same argument in *Citizens for Equal Protection v. Bruning*, 455 F.3d 859 (8th Cir. 2006). As the *Bruning* court explained, "when the government erects a barrier making it more difficult for members of a group to obtain a benefit, 'the "injury in fact" is the denial of equal treatment resulting from the imposition of the barrier, not the ultimate inability to obtain the benefit.'" *Id.* at 863 (quoting *Ne. Fla. Chapter of the Assoc. Gen. Contractors of Am. v. Jacksonville*, 508 U.S. 656, 666 (1993) (alterations incorporated)). The deprivation of "the right to full participation in the political life of the community" is what creates the requisite injury – not a specifically-stated intent to run headlong into the barrier, no matter how futile, burdensome, or costly the effort. *Washington v. Seattle Sch. Dist. No. 1*, 458 U.S. 457, 467-74 (1982).

Defendants claim that Plaintiffs lack standing because they have not "alleged an intention to seek a popular, political remedy," State Def. Br. 28, but there is no requirement for a plaintiff to be a lobbyist in order to challenge discriminatory burdens on the political process. For example, *Hunter v. Erickson*, 393 U.S. 385 (1969), involved a challenge to a rule prohibiting the city council from implementing its housing anti-discrimination ordinance without approval through a city-wide referendum. The Supreme Court found an equal protection violation without any discussion of whether the plaintiff intended to run the gauntlet of a campaign referendum first. *Id.* at 393; *see also Lee v. Nyquist*, 318 F. Supp. 710, 713-16 (W.D.N.Y. 1970) (three-judge

court) (expressly finding parent and student standing to challenge a statute barring racial equality efforts in schools absent local school board or parent approval, without any reference to any need to seek such approval first), *summarily aff'd*, 402 U.S. 935 (1971). Defendants cite no case suggesting any requirement to the contrary.

As Defendants admit in their own statement of facts, legislation has been repeatedly introduced to allow same-sex couples to marry, *see* State Def. SOUF ¶47, and recent polling indicates that Virginians support such legislation by a 55% to 37% margin, *see* NBC4/NBC News/Marist Poll (Sept. 2013) at 19, *available at* http://maristpoll.marist.edu/wp-content/misc/VAPolls/VA130917/Complete%20September%202013%20Virginia_NBC4_NBC%20%20News_Marist%20Poll%20Tables.pdf#page=21. Despite this popular support, advocates for allowing same-sex couples to marry in Virginia could change the law only by enduring the extra burdens and costs of passing a constitutional amendment through successive legislative sessions and then winning a ballot campaign. The Equal Protection Clause prohibits states from imposing these sorts of selective political burdens on disfavored minorities.[5]

    d.    **The Marriage Bans Are Not Rationally Related to Any Legitimate Governmental Purpose.**

        i.    **The Marriage Bans Cannot Be Justified By an Asserted Interest in Preserving Historical Discrimination, Preventing Judicial Activism, or Federalism.**

Defendants argue that, because the "traditional" definition of marriage excluded same-sex couples from marriage, Virginia's decisions to reaffirm that exclusion in the 1975 statute, the

---

[5] Defendants assert without explanation that "it is relatively easy to popularly amend the Virginia Constitution." State Def. Br. 27. In fact, because Virginia has no method for citizens to place a constitutional amendment on the ballot by petition, it is more difficult to amend the Commonwealth's constitution than that of many other states. In any event, whether or not it is "relatively" more difficult to amend the Virginia constitution than the constitutions of other states, it is certainly more difficult to amend the constitution than to pass a statute.

1997 statute, the 2004 statute, and the 2006 constitutional amendment are justified by the purportedly neutral purpose of preserving that historical definition.  State Def. Br. 40, 47-49. But preserving past discrimination is not a legitimate governmental interest.  As noted in Plaintiffs' opening brief, Defendants' circular argument does not defend the classification, it merely repeats it.  Pls Br. 32-33.  Even if the original marriage laws passed in colonial times were not the product of active animus against same-sex couples, *see* State Def. Br. 36, Virginia's maintenance of that limitation on who may marry cannot be defended on that ground, especially now that same-sex couples seek to be able to wed and are doing so without ill effects in fourteen other states[6] and the District of Columbia, as well as numerous other countries on four continents.  *See Lawrence*, 539 U.S. at 579  ("[T]imes can blind us to certain truths and later generations can see that laws once thought necessary and proper in fact serve only to oppress."); *Taylor v. Ouachita Parish Sch. Bd.*, 648 F.2d 959, 966 (5th Cir. 1981) ("[A]ctions neutral at their inception may, of course, be perpetuated or maintained for discriminatory purposes, and that perpetuation or maintenance itself may be found a constitutional violation.").[7]

---

[6]  At the time of this filing, the Illinois legislature has passed a measure allowing same-sex couples to marry; the Governor of Illinois has indicated he will sign the bill, which will make Illinois the fifteenth state to grant marriages to same-sex couples.

[7]  Defendants' argument that the original intent and public meaning of the Fourteenth Amendment could not have been to overturn a marriage restriction in effect since colonial times through the adoption of that amendment and long thereafter, *see* State Def. Br. at 27, 29, is no different than what the Commonwealth argued in *Loving* in its unsuccessful defense of Virginia's ban on interracial marriage.  *See Loving*, 388 U.S. at 6; *Loving* Appellee's Brief, 1967 WL 113931, at *52 ("The Virginia statutes here under attack reflects a policy which has obtained in this Commonwealth for over two centuries. . . .  They have stood—compatibly—with the Fourteenth Amendment, though expressly attacked thereunder—since that Amendment was adopted.").  *See also Tex. Monthly, Inc. v. Bullock*, 489 U.S. 1, 18 n.8 (1989) ("[N]o one acquires a vested or protected right in violation of the Constitution by long use, even when that span of time covers our entire national existence and indeed predates it.") (internal quotation marks omitted); *Williams v. Illinois*, 399 U.S. 235, 239 (1970) (holding that a law failed rational basis scrutiny even where the custom at issue "dates back to medieval England and has long been practiced in this country").

17

In any event, whether or not the original implicit exclusions of same-sex couples were passed for a discriminatory purpose, Virginia must present an independent reason for why it decided to reaffirm and expand that discrimination with new explicit exclusions in 1975, 1997, 2004, and 2006. *See Pers. Adm'r of Mass. v. Feeney*, 442 U.S. 256, 279 (1979) (equal protection violated when government has "selected *or reaffirmed* a particular course of action" because of its negative effects on an identifiable group (emphasis added)). Moreover, Virginia's 2004 statute and 2006 constitutional amendment did much more than simply preserve the traditional definition of marriage. They included sweeping new disabilities that prohibited same-sex couples from entering into any other legal relationship similar to marriage. Va. Code Ann. § 20-45.3; Va. Const. art. I, § 15-A. Even if preserving past discrimination were a valid explanation for the 1975 and 1997 statutes – and it is not – preserving tradition cannot explain the legislature's decision to impose these sweeping new disadvantages on same-sex couples.[8]

For similar reasons, Virginia's constitutional amendment cannot be justified by an asserted interest in preventing judicial activism. Defendants assert that the constitutional ban sought to preserve the purportedly neutral value of separation of powers by "prevent[ing] a Virginia court from using the Virginia Constitution to alter the definition of marriage as had occurred in other States." State Def. Br. 49. But insulating discriminatory statutes from judicial review is not a neutral governmental interest. And even if it were a legitimate governmental

---

[8] Significantly, the vast majority of cases cited by Defendants in which courts have rejected challenges to state laws excluding same-sex couples from marriage did not involve these sorts of sweeping bans on civil unions or other relationships approximating marriage. *See Sevcik v. Sandoval*, 911 F. Supp. 2d 996, 1002-03 (D. Nev. 2012) (rejecting challenge to marriage exclusion in the context of a state that already offers full domestic partnerships to same-sex couples), *appeal docketed*, No. 12-17668 (9th Cir. Dec. 14, 2012); *Jackson v. Abercrombie*, 884 F. Supp. 2d 1065, 1088 (D. Haw. 2012) (same), *appeal docketed*, Nos. 12-16995, 12-16998 (9th Cir. Sept. 10, 2012); *Hernandez v. Robles*, 855 N.E.2d 1 (N.Y. 2006) (no constitutional amendment, no ban on civil unions, and no ban on recognizing marriages from other jurisdictions); *Andersen v. King Cnty*, 138 P.3d 963 (Wash. 2006) (same).

interest, Virginia's marriage bans cannot be explained by a purported interest in preserving separation of powers.  If that were the only purpose of the amendment, then it would have been drafted along the lines of Hawaii's amendment, which simply states that "[t]he legislature shall have the power to reserve marriage to opposite-sex couples."  Haw. Const. amend. 2.  Hawaii's amendment did not prevent the legislature from passing a law extending civil unions to same-sex couples in 2011, Haw. Const. art. I, § 23, and it does not prevent the legislature from passing a law giving same-sex couples the freedom of marry, which it is currently considering in a special session, S.B.1, 27 Leg., Spec. Sess. (Haw. 2013).  In contrast, Virginia's constitutional amendment takes the decision about marriage out of the hands of the legislature as well as the courts.  And the amendment goes even further by barring the legislature – and any state political subdivision – from creating any legal status for same sex couples that approximates marriage. Even if preserving separation of powers were a neutral purpose, it is not a purpose that can explain Virginia's marriage amendment.

Finally, Virginia's marriage bans cannot be defended on federalism grounds.  As the Supreme Court in *Windsor* repeatedly noted, state laws defining and regulating marriage are subject to "constitutional limits" and "must respect the constitutional rights of persons." *Windsor*, 133 S. Ct. at 2691 (citing *Loving v. Virginia*, 388 U.S. 1 (1967)).  Just as Defendants argue that individual states should be able to decide whether same-sex couples should be permitted to marry, the Virginia Supreme Court in *Loving* argued that the Commonwealth's anti-miscegenation law was constitutional because "'[l]aws forbidding the intermarriage of the two races have been universally recognized as within the police power of the state.'"  *Loving v. Virginia*, 147 S.E.2d 78, 80 (Va. 1966), *rev'd sub nom.*, *Loving v. Virginia*, 388 U.S. 1 (1967) (quoting *Plessy v. Ferguson*, 163 U.S. 537, 545 (1896)) (alterations incorporated); *see also* Brief of Appellee Virginia, *Loving v. Virginia*, 388 U.S. 1 (1967) (No. 395), 1967 WL 113931, at *7-

8.  Respect for federalism does not come at the cost of sacrificing the constitutional rights of individuals.  *Cf. Loving*, 388 U.S. at 12 ("Under our Constitution, the freedom to marry or not marry, a person of another race resides with the individual and cannot be infringed by the State.").

> ii.  The Marriage Bans Cannot Be Justified By an Asserted Interest in Optimal Parenting, Responsible Procreation, or Promoting a "Conjugal Vision" of Marriage.

Defendants argue that the marriage bans satisfy rational-basis review because "marriage increases the opportunity for children to have a biological relationship to those with original legal responsibility for their wellbeing."  State Def. Br. 32.  But as explained in Plaintiffs' opening brief, that argument fails for the simple reason that there is no connection between their assertions about "optimal" child raising and what the marriage bans actually do.  The marriage bans do "not provide any incremental reason for opposite-sex couples to engage in 'responsible procreation.'  Incentives for opposite-sex couples to marry and procreate (or not) were the same after [the marriage bans] was enacted as they were before."  *Windsor*, 699 F.3d at 188.  All the bans do is deny important legal protections to children who are currently being raised by same-sex couples.  Denying those protections is all the more irrational in light of Defendants' assertion that the purpose of the marriage bans is not to "disparage [the suitability] of alternative arrangements where non-biological parents have legal responsibility for children" or "to deter other same-sex couples from having children."  Def. Br. 33, 38.  As the First Circuit explained when it rejected a similar defense for DOMA, "This is not merely a matter of poor fit of remedy to perceived problem, but a lack of any demonstrated connection between DOMA's treatment of same-sex couples and its asserted goal of strengthening the bonds and benefits to society of heterosexual marriage."  *Massachusetts v. U.S. Dep't of Health & Human Servs.*, 682 F.3d 1, 15

(1st Cir. 2012) (citations omitted); *accord Windsor*, 699 F.3d at 188; *Golinski*, 824 F. Supp. 2d at

998; *Varnum v. Brien*, 763 N.W.2d 862, 901-02 (Iowa 2009).

According to Defendants, because same-sex couples cannot produce that "ideal" of both

parents having a biological relationship to their children, it is rational to exclude them from the

definition of marriage.  It is not enough for Defendants to argue that the institution of marriage in

general serves legitimate governmental interests.  In order to defend the classification it has

drawn in an equal protection challenge, the government must show why the *exclusion* of same-

sex couples rationally advances the government's interest.  "When a state distributes benefits

unequally, the distinctions it makes are subject to scrutiny under the Equal Protection Clause of

the Fourteenth Amendment."  *Hooper v. Bernalillo County Assessor*, 472 U.S. 612, 618 (1985)

(while purpose of rewarding Vietnam Veterans was valid, equal protection was violated by

exclusion from tax benefit those who did not reside in the state before a certain date); *see also*

*Eisenstadt*, 405 U.S. at 448-53 (requiring a state interest in the *exclusion* of unmarried couples

from lawful access to contraception, not merely an interest in continuing to allow married

couples access); *U.S. Dep't of Agric. v. Moreno*, 413 U.S. 528, 535-38 (1973) (testing the federal

government's interest in *excluding* unrelated households from food stamp benefits, not in

maintaining food stamps for related households); *City of Cleburne v. Cleburne Living Ctr.*, 473

U.S. 432, 448-50 (1985) (examining the city's interest in *denying* housing for people with

developmental disabilities, not in continuing to allow residence for others).  Most on point, in

*Loving v. Virginia*, the question was not whether Virginia had reasons for providing the right to

marry to couples of the same race, but whether "*restricting* the freedom to marry solely because

of racial classifications" violated the Equal Protection Clause.  388 U.S. at 12 (emphasis added).[9]

---

[9]   Defendants misread *Johnson v. Robison*, 415 U.S. 361 (1974), to suggest a contrary rule—
inconsistent with all of the cases cited above—that the demands of the equal protection clause

In addition to misconstruing the legal question at stake here, Defendants' contention that same-sex couples do not serve the underlying purposes of marriage and erroneously assumes that the *only* purpose of marriage is exclusively to foster the well-being of children produced through accidental biological procreation.  Pls' Br. 35-36.  All children benefit from being raised by married parents, whether or not those children are produced through accidental biological procreation and whether or not those married parents are a same-sex couple.  *See* Pls' Br. 35; *Varnum*, 763 N.W.2d at 902; *In re Marriage Cases*, 183 P.3d 384, 433 (Cal. 2008); *Pedersen v. Office of Pers. Mgmt.*, 881 F. Supp. 2d 294, 339 (D. Conn. 2012).  And marriage serves many other important purposes besides raising children. *See* Pls' Br. 36; *see also Turner*, 482 U.S. at 95-96.  For all of these purposes of marriage, same-sex couples advance the government's interest just as well as heterosexual couples do.[10]

---

are met when the inclusion of one group promotes a government interest and the addition of others would not.  State Def. Br. 36.  Rather than merely asking whether certain educational benefits help military veterans and stopping there, *Johnson* carefully analyzed whether conscientious objectors were in fact similarly situated to military veterans *with regard to those benefits*, and found they were not.  415 U.S. at 382.  By contrast, as noted above, same-sex couples are similarly situated to different-sex couples *with regard to the benefits of marrying* since both same-sex and different-sex couples may have children inside or outside of marriage and both sets of couples—and their children—benefit in precisely the same ways when those couples are permitted to marry.  *Dragovich v. U.S. Dep't of Treasury*, 872 F. Supp. 2d 954, 958 n.10 (N.D. Cal. 2012) (rejecting similar attempt to rely on *Johnson* to defend DOMA).

[10] Because Defendants' arguments fail as a matter of law and logic, the Court does not need to engage with Defendants' completely unsupported assertions about "ideal" family arrangements, *see* Pls. Br. 40-41 (discussing scientific consensus rejecting such assertions).  Defendants attempt to cast doubt on this scientific consensus by citing to inapposite studies that did not actually look at children raised by same-sex parents.  Defendants cite research on single-parenthood to argue that children do best when raised by a mother and a father.  State Def. Br. 35.  But that body of research simply shows that children tend to fare better with two parents instead of one and can be negatively impacted by divorce; it says nothing about the relevance of parental gender.  *See United States v. Windsor*, No. 12-307, Brief of the American Psychological Association, *et al.*, as *Amici Curiae* on the Merits in Support of Affirmance, 2013 WL 871958, at *16-*17 (Mar. 1, 2013); *Hollingsworth v. Perry*, No. 12-144, and *United States v. Windsor*, 133 S. Ct. 2675 (2013), Brief of the American Sociological Ass'n, in Support of Respondent Kristin M. Perry and Respondent Edith Schlain Windsor, 2013 WL 840004, at *22-*26 (Feb. 28, 2013).

Most prominently, Defendants rely on M. Regnerus, *How Different are the Adult Children of Parents Who Have Same-Sex Relationships? Findings from the New Family Structures Study*, 41 Soc. Sci. Res. 752 (2012). State Def. Br. 39. But, as the leading mental health organizations explained in *amicus* briefs to the Supreme Court, the Regnerus study allows for no such conclusion because it did not actually assess the adjustment of children raised by same-sex parents at all, and this study does not tell us anything about children who grow up in families with same-sex parents. *See* Brief of the American Psychological Ass'n, *et al.*, 2013 WL 871958, at *29-*33; Brief of the American Sociological Ass'n, 2013 WL 840004, at *15-*20. The majority of the respondents in the study's so-called "lesbian mother" and "gay father" groups were the product of a failed heterosexual union whose parents had a same-sex relationship at some point. Most of the children spent very little – if any – time living in a household headed by a same-sex couple. Thus, the piece merely documented the well-established fact that children tend to do better in stable, intact families than they do after experiencing their parents' divorce. Regnerus himself recognizes that "[c]hild outcomes in stable, 'planned' [gay, lesbian or bisexual] families and those that are the product of previous heterosexual unions are quite likely distinctive, as previous studies' conclusions would suggest." Regnerus, *supra*, at 765. For these reasons, an independent auditor appointed by the journal that published the articles described it as "a non-scientific study" with "serious flaws and distortions" and concluded it should not have been published. D.E. Sherkat, *The Editorial Process and Politicized Scholarship: Monday Morning Editorial Quarterbacking and a Call for Scientific Vigilance,* 41 Soc. Sci. Res. 1346 (2012).

Similarly, Defendants erroneously cite to a recent study from a Canadian economist published in a home economics journal that claims to show lower high school graduation rates for Canadian children raised by same-sex parents compared to married opposite-sex parents. Douglas W. Allen, *High School Graduation Rates Among Children of Same-Sex Households*, REV. ECON. HOUSEHOLD (Sept. 2013). As with the Regnerus study, the home economics study does not compare children raised by same-sex parents with children raised by different-sex parents. Instead, most of the children in the same-sex parent groups had experienced the divorce or separation of their parents while the heterosexual comparison group was restricted to only those who were living with married parents.

Defendants also assert that gay couples should be excluded from marriage because, they say, children tend to do better if they are raised by their biological parents as opposed to parents who conceive through donor sperm or ova or form families through adoption. State Def. Br. 32-33. In support of that assertion, Defendants erroneously cite to a study examining the impact of step-family life, which uses the term "biological parents" as shorthand to distinguish between parents (whether biologically related to the child or not) and step-parents. *See* Kristen Anderson Moore, et al., *Marriage from a Child's Perspective:  How Does Family Structure Affect Children, and What Can We Do About It,* Child Trends Research Br. (June 2002). But the authors of that study have explicitly disavowed attempts to cite to their study in support of the claim that biological parenthood best promotes children's well-being. In response to attempts to distort the import of their research, the authors added a new introductory note to their study explicitly warning that no conclusions can be drawn from this research about the wellbeing of children raised by same-sex parents or adoptive parents." *Id.* at introductory note; *see also* Brief of the American Sociological Ass'n, 2013 WL 840004, at *26-*27 (debunking similar attempts to mischaracterize this body of research).

Defendants also assert that limiting marriage to different-sex couples is necessary to reinforce a "norm" that marriage should be linked to biological procreation.  State Def. Br. 32.  But as noted above, if Virginia wants to promote a social norm of "conjugal marriage" and the "ideal ordering of human relationships" in which marriage is linked to biological procreation, it must do so within constitutional limits.  It cannot do so by infringing on the fundamental rights of individuals and it cannot do so by selectively imposing a conjugal vision on same-sex couples while using a "consent based" vision for everyone else.  Pls. Br. 37-38.  Moreover, if the purpose of the marriage bans is to send a message about the special importance of the connection between the word "marriage" and procreation, then the marriage bans are grotesquely overbroad for that purpose because – unlike even the marriage ban held unconstitutional in *Perry* – Virginia's marriage bans also prohibit same-sex couples from entering into any other legal relationship approximating marriage.  Va. Code Ann. § 20-45.3; Va. Const. art. I, § 15-A.  There is no rational linkage between imposing any of these disabilities on same-sex couples and their children and the asserted state interest in encouraging heterosexuals to procreate responsibly.  As in *Romer*, "the breadth of" the marriage bans "is so far removed from these particular justifications" that it is "impossible to credit them."  *Romer*, 517 U.S. at 635.

        iii.    The Primary Purpose and Effect of the Marriage Bans Is to Discriminate.

The Supreme Court made clear in *Windsor* that a law whose purpose and practical effect is to impose inequality on same-sex couples and their families violates equal protection.  133 S. Ct.  at 2694, 2696.  Defendants argue that the "*Windsor* animus test," State  Def. Br. 45, cannot be applied to Virginia's marriage bans because – unlike the Defense of Marriage Act struck down *Windsor*, which departed from a federal tradition of deferring to state definitions of

24

marriage – Virginia's marriage bans are consistent with the tradition in Virginia and other states of limiting marriage to different-sex couples.  State Def. Br. 47-49.

But *Windsor* did not create a special "animus test" for unusual federal statutes, State Def. Br. 45; the decision simply applied the longstanding principle that laws cannot be passed for the purpose of disadvantaging a particular group.  *See Windsor*, 133 S. Ct. at 2693 (citing *Moreno*, 413 U.S. at 534-35).  One way of establishing that legislation is motivated by an impermissible intent to discriminate is by drawing an inference from the law's unusual character.  In *Windsor*, that unusual character was a departure from Congress's traditional deference to state definitions of marriage. *Windsor*, 133 S. Ct. at 2693.  In *Romer* the unusual character of the law was its imposition of a broad and undifferentiated disability on lesbians and gay men.  *Romer*, 517 U.S at 633.  But the unusual character of a law is not the only way to infer an impermissible purpose. As discussed in Plaintiffs' opening brief, an impermissible purpose can also be inferred from the text of a statute and its obvious practical effects, statements by legislators during floor debates or committee reports, the historical background of a challenged statute, and a history of discrimination by the relevant governmental entity.  Pls.' Br. 30, 43.  In addition, even without direct evidence of discriminatory intent, the absence of any logical connection to a legitimate purpose can yield an inference of an impermissible intent to discriminate.  *Id.*[11]

As explained in Plaintiffs' opening brief, it is indisputable that Virginia's marriage laws were driven by the same impermissible purpose to discriminate that existed in *Windsor*.  Indeed, even Defendants' purportedly neutral justifications for the marriage bans are discriminatory on their face.  According to Defendants, the purpose of the marriage bans was to "reflect[] . . . the

---

[11] In any event, Virginia's marriage bans *are* of an "unusual character."  Within constitutional limits, states have a "historic and essential authority to define the marital relation," *Windsor*, 133 S. Ct. at 2692, but no other aspect of marriage law in Virginia has been selected to be enshrined in the form of a constitutional amendment.

community's understanding of the human person and the ideal ordering of human relationships."
State Def. Br. 33.  Like the purported interest in preserving the traditional institution of marriage,
an interest in communicating that same-sex couples do not reflect the ideal ordering of human
relationships "is just a kinder way of describing the [s]tate's *moral disapproval* of same-sex
couples."  *Lawrence*, 539 U.S. at 601 (Scalia, J., dissenting) (emphasis in original).  Further,
several portions of the legislative history reflecting such disapproval were not so kind or gentle.
*See, e.g.,* Pl.'s Br. at 5 n.1 (collecting quotations from Del. Bob Marshall during floor debate).

The purpose and inescapable practical effect of Virginia's marriage bans is "to impose a
disadvantage, a separate status, and so a stigma upon" same-sex couples in the eyes of the
Commonwealth and the broader community.  *Windsor*, 133 S. Ct at 2693.  Imposing that
disadvantage on same-sex couples in order to indicate that they do not represent the ideal
ordering of human relationships is not a legitimate governmental interest.[12]

IV.    Plaintiffs' Injuries Are Redressable and Their Claims Do Not Implicate Section Two
       of the Defense of Marriage Act.

At the end of their brief, Defendants argue that Plaintiffs lack standing because even if
Virginia's marriage bans were invalidated, Virginia common law and public policy would still
prohibit same-sex couples from marrying.  But Plaintiffs do not merely seek to have the statutory
and constitutional marriage bans declared unconstitutional; they also seek a declaratory judgment
with respect to "and any other sources of state law that (1) exclude same-sex couples from
marrying, or (2) refuse recognition to the marriages of" same-sex couples. Compl. Prayer for

---

[12] Defendants cannot take refuge in assertions about *Windsor* made by dissenters in that case that
are not supported by or are flatly contradicted by the *Windsor* majority opinion.  *See* State Def.
Br. 43-44 (relying on Chief Justice Roberts' assertion that states may continue to utilize the
traditional definition of marriage, although the majority opinion says no such thing); *id* at 44
(relying on Justice Alito's assertion "that *Windsor* is a federalism-based decision,"
notwithstanding the majority's explicit rejection that its decision rested on federalism concerns
rather than "basic due process and equal protection principles," 133 S. Ct. at 2692-93).

Relief ¶ C.  Similarly, Plaintiffs have requested an injunction "Requiring Defendants in their official capacities to permit issuance of marriage licenses to same-sex couples, pursuant to the same restrictions and limitations applicable to different-sex couples' freedom to marry, and to recognize marriages validly entered into by Plaintiffs."  *Id.* ¶ D. That injunction would supersede any contrary state common law or public policy and would fully redress Plaintiffs' injuries.

Defendants also make the puzzling assertion that, in order to challenge Virginia's refusal to recognize the legally valid marriages of same-sex couples entered into in other jurisdictions, Plaintiffs would have to challenge Section 2 of the Defense of Marriage Act, which provides that States do not have to give full faith and credit to the marriages of same-sex couples from other jurisdictions.  State Def. Br. 29; *see* 28 U.S.C. § 1738C (implementing Congress's power under the Full Faith and Credit Clause); U.S. Const. Art. IV §1 (proving Congress with authority to prescribe laws for implementing Full Faith and Credit Clause).  Plaintiffs' claims, however, are based on equal protection and due process – not the Full Faith and Credit Clause.  Whether or not the Full Faith and Credit Clause independently requires such recognition is irrelevant.[13]  And Congress could not in any event authorize Virginia by statute to violate the Constitution.

V.    **Plaintiffs Harris and Duff are Also Entitled to Summary Judgment on Their Claims Against Defendant Roberts in His Official Capacity as Staunton Circuit Court Clerk.**

Defendant Roberts previously filed a motion to dismiss the claims against him pursuant to Rule 12(b)(1) based on purported standing and ripeness grounds.  *See* ECF No. 32.  As Plaintiffs detailed in their opposition to Defendant Roberts' motion to dismiss, *see* ECF No. 42, these claims are baseless.  Even if the court were to treat Plaintiffs Duff and Harris as not having

---

[13]  Defendants also make the extremely odd assertion that "no plaintiff has standing to complain about the nonrecognition of foreign civil unions because no Plaintiff has pled that they are situated in any way that such nonrecognition has injured them."  State Def. Br. 50.  Of course, that is untrue.  *See* Compl. ¶¶ 25-33; *see also* Kidd Decl. (ECF No. 48) ¶¶ 7-15; Berghoff Decl. (ECF No. 49) ¶¶ 8-16.

sought a marriage license from Defendant Roberts, they would still have standing to seek injunctive redress of their constitutional harm from Defendant Roberts, and their claims would still be ripe, because "[t]he law does not require [] a futile act," *Townes v. Jarvis*, 577 F.3d 543, 547 n.1 (4th Cir. 2009). Defendant Roberts acknowledges that he and his staff informed Plaintiffs Duff and Harris that they were ineligible to get a marriage license from his office based on their sex and sexual orientation. *See* ECF No. 32 (memorandum of law in support of Defendant Roberts' motion to dismiss); ECF No. 33-1, ¶¶ 2-3. (Affidavit of Deputy Clerk Laura Moran in support of Defendant Roberts' motion to dismiss). Thus, undisputed facts establish that Plaintiffs Duff and Harris have personally been subjected to Defendant Roberts' enforcement of Virginia's marriage bans. *See Arch Mineral Corp. v. Babbitt*, 104 F.3d 660, 666 (4th Cir. 1997) (affirming summary judgment for plaintiff and rejecting defendant's ripeness argument, where defendant agency disputed that it had completed all steps antecedent to a final decision but this was irrelevant because "for all practical purposes . . . the decision has been made.").

Defendant Roberts also contends that he cannot be held liable under 42 U.S.C. § 1983 for the constitutional injury suffered by Plaintiffs Harris and Duff because he lacks personal involvement in the perpetration of that injury. In support of that argument, Defendant Roberts relies on inapposite cases where plaintiffs sought to hold officials liable for damages *in their individual capacities*. *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985). But where a plaintiff seeks prospective relief under *Ex parte Young*, 209 U.S. 123 (1908), the defendant does not have to be personally involved in the challenged action; rather, the official merely has to have "some connection with enforcement of the act" to be a proper defendant. *S.C. Wildlife Fed'n. v. Limehouse*, 549 F.3d 324, 332 (4th Cir. 2008). Defendant Roberts is the constitutional officer responsible for issuing marriage licenses in the jurisdiction where Plaintiffs Duff and Harris live,

and thus is a proper defendant in a suit for injunctive and declaratory relief under *Ex parte Young*. [14]  In any event, even if personal involvement were necessary, there is no genuine issue of material fact as to Roberts' personal involvement in the circumstances giving rise to this case because it is uncontested that Defendant Roberts directly advised Plaintiffs Duff and Harris that they were ineligible to obtain a marriage license from his office.  ECF No. 33-1, ¶¶ 2-3.

Similarly, that Defendant Roberts was following state law and does not set statewide marriage policy for Virginia is irrelevant.  *See  CSX Transp., Inc. v. Bd. of Public Works of State of W.Va.*, 138 F.3d 537, 541 (4th Cir. 1998) (rejecting claim that defendant could not be sued in official capacity because enforcement duties were merely "ministerial" and noting that, "in *Ex parte Young* itself the Supreme Court explained that it had the power to enjoin ministerial actions of state officials"); *Finberg v. Sullivan*, 634 F.2d 50, 54 (3d Cir. 1980) ("[C]ourts often have allowed suits to enjoin the performance of ministerial duties in connection with allegedly unconstitutional laws.") (collecting cases).  Indeed, state officers sued under *Ex parte Young* are virtually always performing duties mandated by state law; the basic premise of *Ex parte Young* is that "because an unconstitutional legislative enactment is 'void,' a state official who enforces that law 'comes into conflict with the superior authority of [the] Constitution,' and thus is 'stripped of his official or representative character and is subjected in his person to [injunctive relief for] the consequences of his individual conduct.'"  *Va. Office for Protection & Advocacy v. Stewart*, 131 S. Ct. 1632, 1638 (2011) (quoting *Ex parte Young*, 209 U.S. at 159-60).

---

[14] The case law Defendant Roberts cites in attempting to argue to the contrary were not suits for injunctive relief under *Ex parte Young* and are therefore inapposite.  *See* ECF No. 74 at 5.  For example, Defendant Roberts' reliance on *Triche-Wilson v. Shewry*, 2006 U.S. Dist. LEXIS 92126 (E.D. Cal. 2006), *8-*9, is misplaced because that case did not involve an official-capacity claim under *Ex parte Young* and merely held that a couple whose marriage license was voided by a California Supreme Court decision failed to state a claim for personal liability against county officials.

**CONCLUSION**

For all these reasons, and the reasons set forth in Plaintiffs' initial memorandum of law,

Plaintiffs' motion for summary judgment should be granted.

Dated: November 7, 2013

Respectfully submitted,
AMERICAN CIVIL LIBERTIES UNION
OF VIRGINIA FOUNDATION, INC.

_____/s/_____
Rebecca K. Glenberg (VSB No. 44099)
701 E. Franklin Street, Suite 1412
Richmond, Virginia 23219
Phone: (804) 644-8080
Fax: (804) 649-2733
rglenberg@acluva.org

LAMBDA LEGAL DEFENSE AND EDUCATION
FUND, INC.

Gregory R. Nevins, *pro hac vice*
Tara L. Borelli, *pro hac vice*
730 Peachtree Street, NE, Suite 1070
Atlanta, Georgia 30308
Phone: (404) 897-1880
Fax: (404) 897-1884
gnevins@lambdalegal.org

*Counsel for Plaintiffs*

AMERICAN CIVIL LIBERTIES UNION
FOUNDATION

James D. Esseks, *pro hac vice*
Amanda C. Goad, *pro hac vice*
Joshua A. Block, *pro hac vice*
125 Broad Street, 18th Floor
New York, New York 10004
Phone: (212) 549-2500
Fax:  (212) 549-2650
jesseks@aclu.org
agoad@aclu.org
jblock@aclu.org

JENNER & BLOCK LLP

Paul M. Smith, *pro hac vice*
Luke C. Platzer, *pro hac vice*
Mark P. Gaber, *pro hac vice*
1099 New York Avenue, NW Suite 900
Washington, D.C. 20001-4412
Phone: (202) 639-6000
Fax: (202) 639-6066
psmith@jenner.com
lplatzer@jenner.com
mgaber@jenner.com

## CERTIFICATE OF SERVICE

I hereby certify that on the 7th day of November 2013, I effected service upon counsel for Defendants by electronically filing the foregoing with the Clerk of the Court using the CM/ECF system.

E. Duncan Getchell, Jr.
Solicitor General of Virginia
Office of the Attorney General
900 East Main Street
Richmond, Virginia 23219
(804) 786-7240
dgetchell@oag.state.va.us

Rita W. Beale
Deputy Attorney General
rbeale@oag.state.va.us

Allyson K. Tysinger
Senior Assistant Attorney General/Chief
atysinger@oag.state.va.us

Michael H. Brady
Assistant Solicitor General
mbrady@oag.state.va.us

*Counsel for Defendants Robert F. McDonnell and Janet M. Rainey*

Rosalie Pemberton Fessier
Timberlake, Smith, Thomas & Moses, P.C.
25 North Central Avenue
P.O. Box 108
Staunton, VA 24402-0108
(540) 885-1517
rfessier@tstm.com

*Counsel for Defendant Thomas E. Roberts*

November 7, 2013

        /s/
Rebecca K. Glenberg (VSB No. 44099)
701 E. Franklin Street, Suite 1412
Richmond, Virginia 23219
Phone: (804) 644-8080
Fax: (804) 649-2733
rglenberg@acluva.org